**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MOISES JAVIER AGUILAR PERALTA, F.M., S.T., AND JOSE ARMANDO DE LEON ZAPATA, on behalf of themselves and all others similarly situated,<br><br>                                   Plaintiffs,<br><br>        v.<br><br>DEPARTMENT OF HOMELAND SECURITY,<br>KRISTI NOEM, in her official capacity,<br>IMMIGRATION AND CUSTOMS ENFORCEMENT,<br>TODD M. LYONS, in his official capacity,<br>ROBERT LYNCH, in his official capacity,<br>CUSTOMS AND BORDER PROTECTION,<br>RODNEY S. SCOTT, in his official capacity,<br>BORDER PATROL, and<br>MICHAEL W. BANKS, in his official capacity,<br><br>                                   Defendants. | No.: 2:26-cv-337<br><br>District Judge<br>Magistrate Judge<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plain clothed, masked, and armed federal agents have been patrolling the streets of Ohio, wantonly stopping and detaining individuals without warrants and without probable cause. The federal government has vowed to arrest 3,000 immigrants each day, which has contributed to this pattern and practice of unlawful behavior by insufficiently trained, unqualified federal agents who are recruited and deployed under pressure to meet this goal.

2.      Federal law and longstanding precedent require that federal agents must have probable cause to arrest an individual without a warrant. Specifically, to make a warrantless arrest,

the agent must have probable cause to believe that the person is removable from the United States and probable cause that the individual would be likely to escape before a warrant can be obtained.

3.      But in blatant disregard of the law, ICE and CBP agents are conducting warrantless arrests without making any pre-arrest determination of probable cause, and arresting individuals irrespective of any evidence that indicates they are likely to escape and irrespective of evidence that shows they are *not*, including their cooperation and their ties to their community. And although the Department of Homeland Security (DHS) has touted its enforcement operations in Ohio as a success, arresting "the worst of the worst," the vast majority of immigration detainees in Ohio and 73% of immigration detainees nationwide lack any criminal record.[1]

4.      Many of the individuals who have been detained by ICE have long and consistent presence in the U.S., steady jobs, cohesive families, and strong ties to their community. But numerous Ohioans continue to be stopped and arrested without warrants and without an individualized assessment that they are likely to escape before a warrant can be obtained, irrespective of their immigration status or personal circumstances. In fact, ICE agents and CBP officers often arrest and detain individuals even before asking their name.

---

[1] Cato Institute, *New Data: 73% of ICE Detainees Have No Criminal Record* (Nov. 25, 2025), https://www.cato.org/news-releases/new-data-73-ice-detainees-have-no-criminal-record. *And see*, Robert Farley, *As ICE Arrests Increased, a Higher Portion Had No U.S. Criminal Record,* FACTCHECK.ORG (Jan. 28, 2026), https://www.factcheck.org/2026/01/as-ice-arrests-increased-a-higher-portion-had-no-u-s-criminal-record/; *see also* Ohio Immigrant Alliance, *Tramonte testifies before Columbus City Council* (Feb. 17, 2026), https://ohioimmigrant.org/blog/2026/2/17/tramonte-testifies-columbus; *and see* Transactional Records Access Clearinghouse, *Immigration Detention Quick Facts*, https://tracreports.org/immigration/quickfacts/ (last accessed Mar. 17, 2026).

5.      The most recent release of data from ICE shows that there are currently 670 immigration detainees in Ohio.[2] Countless of these individuals were arrested and detained without a warrant and without any pre-arrest, individualized determination of probable cause.

6.      Those who are ultimately released from detention experience significant physical and psychological harm from their arbitrary arrest and detention and live in fear that they will be re-detained and experience those harms again as federal agents continue to aggressively carry out immigration enforcement activities in their neighborhoods.

7.      What's more, Temporary Protected Status (TPS) for the approximately 30,000 Haitians living in Central Ohio remains in limbo, and Ohio officials anticipate an uptick in immigration enforcement throughout the state once litigation concludes. By the same token, TPS designation for those from Somalia is also uncertain.

8.      Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of likelihood of escape is not only harmful to the individuals and families of those detained, it also violates unequivocal statutory restrictions on warrantless arrests. Plaintiffs Moises Javier Aguilar Peralta, F.M., S.T., and Jose Armando de Leon Zapata bring this lawsuit on behalf of themselves and those similarly situated to put an end to this unlawful policy and practice in Ohio.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (right of review). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706

---

[2] U.S. Immigr. and Customs Enf't, *FY26 Detention Statistics*, Facilities FY26 (Feb. 12, 2026), https://www.ice.gov/doclib/detention/FY26_detentionStats_02122026.xlsx.

(Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act), and the inherent equitable powers of this Court.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because Defendants are officers or employees of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

11.     **Plaintiff Moises Javier Aguilar Peralta** is a 38-year-old man from Honduras who came to the United States in 2023 and applied for asylum, fearing that if he returned to Honduras, he would be killed. Mr. Peralta has lived in Ohio since arriving in the U.S., and he has a U.S. work permit and social security number. He was aggressively arrested and detained by four men in civilian clothing and face coverings on December 18, 2025, while leaving a Home Depot three minutes away from his home where he was picking up materials for work. Mr. Peralta was never shown a warrant and was arrested without an individualized determination of his likelihood of escape. He spent twenty-seven days in detention before being released on bond, when an immigration judge determined he was not an escape risk, but he is scared to go about his daily life as he lives near an area that is heavy with immigration enforcement.

12.     **Plaintiff F.M.** fled Kenya in December 2023, after facing violence and persecution and obtaining a J1 visa as a means to escape. He arrived in the U.S. and worked on a farm in Huron, Ohio for one year. While working on the farm, F.M. applied for asylum in April 2024. He received an asylum-based work permit in October 2024, and moved to Sandusky, Ohio around the beginning of 2025, where he currently resides. F.M. was working as a delivery driver on the morning of April 22, 2025, when he was approached and apprehended by four men in civilian clothing without a warrant and without any individualized pre-arrest determination of his

likelihood of escape. F.M. was detained for five terrifying weeks, in which he was in complete shock and feared being sent back to Kenya. Ultimately, he was released on bond, with an immigration judge finding that he did not pose a risk of escape, but F.M. fears every day that he will be arrested again.

13.     **Plaintiff S.T.** was born in Lima, Peru, and has lived in the United States since 2014. She currently lives in Northland Columbus, Ohio, with her partner and three children, one of whom is a U.S. citizen. S.T. worked at a restaurant inside Easton Town Center Mall and was arrested on the morning of December 18, 2025, when unmarked trucks cut her vehicle off while driving in the parking lot of the mall. Two officers wearing "ICE" vests with guns banged on her car door and grabbed her hands as she opened her car door, putting her in handcuffs before even knowing her name. S.T. was never shown a warrant and was arrested without an individualized determination of her likelihood of escape. She was released from custody one month after her initial detention when an immigration judge found her not to be a flight risk, but she remains fearful of being arrested again as ICE continues to be very active in her neighborhood.

14.     **Plaintiff Jose Armando de Leon Zapata** came to the U.S. on a visa in May of 2022, and has lived in Toledo, Ohio since October of 2022. In August 2025, he married his wife, who is a U.S. citizen. Other than a misdemeanor for driving without a license in March of 2024, Mr. Zapata has no criminal history and has not driven since that date. Mr. Zapata was arrested while in a Lyft on his way to work on September 30, 2025. He was first arrested by Toledo Police but Border Patrol agents soon arrived and re-arrested Mr. Zapata without even asking his name and never made an individualized pre-arrest determination of his likelihood of escape. It was not until he arrived at a CBP station that he was asked for his name as well as other questions about

himself. Mr. Zapata was detained for three weeks before an immigration judge found him not to be a flight risk and he was released on bond but he remains scared of being arrested again.

15. **Defendant U.S. Department of Homeland Security ("DHS")** is the federal agency responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a).

16. **Defendant Kristi Noem** is the Secretary of DHS and is sued in her official capacity. As Secretary of DHS, she oversees component agencies including ICE, U.S. Customs and Border Protection ("CBP"), and U.S. Border Patrol.

17. **Defendant U.S. Immigration and Customs Enforcement ("ICE")** is a component agency of DHS. Among other functions, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, maintains custody over individuals in immigration detention, and is responsible for management and oversight of the civil immigration detention system.

18. **Defendant Todd M. Lyons** is the Senior Official Performing the Duties of the Director of ICE and is sued in his official capacity. In this role, he oversees ICE's functions, including managing enforcement of laws related to immigration, setting policies governing stops and arrests of individuals by ICE personnel, and managing the civil immigration detention system.

19. **Defendant Robert Lynch** is the acting ICE Field Office Director for Enforcement and Removal Operations in Detroit, Michigan, and is sued in his official capacity. As Field Office Director, he oversees decisions concerning arrest, detention, and removal decisions in Ohio.

20. **Defendant U.S. Customs and Border Protection ("CBP")** is a component agency of DHS that is responsible for, among other things, interdiction and processing of individuals attempting to enter or exit the United States at the U.S. border without authorization. CBP agents

have been involved in making stops and arrests of individuals for civil immigration violations in Ohio.

21.     **Defendant Rodney S. Scott** is the Commissioner of CBP and is sued in his official capacity. As Commissioner of CBP, he has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention.

22.     **Defendant U.S. Border Patrol ("USBP" or "Border Patrol")** is a component agency of CBP and is responsible for interdiction and processing of individuals attempting to enter or exit the United States without authorization at the U.S. border. Border Patrol agents have been involved in making stops and arrests for civil immigration violations in Ohio.

23.     **Defendant Michael W. Banks** is Chief of the Border Patrol. He is sued in his official capacity. As chief of Border Patrol, he has authority over all Border Patrol policies, procedures, and practices regarding immigration stops, arrests, and detention.

## FACTUAL ALLEGATIONS

### A.     Defendants' Nationwide Immigration Crackdown

24.     During the 2024 presidential campaign, President Trump promised that "on Day One . . . [w]e will begin the largest deportation operation in the history of our country."[3]

---

[3] Press Release, The White House, *Promises Made, Promises Kept: Border Security Achieved in Fewer Than 100 Days* (Apr. 28, 2025), https://www.whitehouse.gov/articles/2025/04/promises-made-promises-kept-border-security-achieved-in-fewer-than-100-days (quoting *Transcripts, Donald Trump Holds a Campaign Rally in Concord, North Carolina – October 21, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-concord-north-carolina-october-21-2024/#108).

25.     The President has continued to make false and misleading claims about immigrants, including that they are "criminals", "killers", "gang members", "poisoning our country" and "taking your jobs."[4]

26.     In January 2025, after President Trump took office, the administration imposed an arrest quota of 75 arrests per day on each ICE field office across the country, including the Detroit ICE field office.[5] The Detroit ICE field office manages immigration enforcement in the states of Michigan and Ohio.[6]

27.     In May, the arrest quota increased to a new goal of 3,000 daily arrests nationwide, a number that Homeland Security Advisor and White House Deputy Chief of Staff Stephen Miller publicly confirmed.[7] And Miller said that "number is going to keep getting bumped higher over time."[8]

28.     To help meet the quota and carry out these massive arrests, ICE officers were encouraged to "turn up the creativity knob up to 11 and push the envelope."[9]

---

[4] The Marshall Project, *Fact-checking Over 12,000 of Donald Trump's Quotes About Immigrants* (Oct. 21, 2024), https://www.themarshallproject.org/2024/10/21/fact-check-12000-trump-statements-immigrants#migrant_crime.

[5] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, WASH. POST (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota.

[6] U.S. Immigr. and Customs Enf't, Detroit Field Off., https://www.ice.gov/field-office/detroit-field-office.

[7] Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily*, FOX NEWS (May 29, 2025), https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day.

[8] *Id.*

[9] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, THE GUARDIAN (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests [https://perma.cc/54HH-SNSN].

29.     Instead of just focusing on the "worst of the worst," Defendant Lyons said ICE will take into custody anyone living in the U.S. without authorization whom ICE encounters, even those who are not their direct target.[10]

30.     As part of President Trump's nationwide deportation plan, federal agents have engaged in aggressive immigration enforcement operations in Ohio since April 22, 2025, eager to detain and arrest anyone they perceive to be removable. These officers are often dressed in civilian clothing, cover their faces, and carry guns as they aggressively stop, arrest, and detain law abiding Ohioans as they go about their daily lives.

31.     In the fall of 2025, ICE expanded its presence in central Ohio, leasing a second office space to "support law enforcement operations" in Columbus.[11]

32.     ICE escalated these enforcement operations in December 2025, for the stated purpose of "targeting the worst of the worst criminal illegal aliens" throughout Ohio,[12] but the overwhelming majority of immigration detainees in Ohio and over 70% of immigrants detained nationwide lack any criminal record.[13] What's more, the arrests are so wanton and sloppily

---

[10] Camilo Montoya-Galvez, *ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers*, CBS NEWS (July 21, 2025), https://www.cbsnews.com/news/ice-head-todd-lyons-agents-will-arrest-anyone-found-illegally-crack-down-on-employers/.

[11] Katie Millard, *Report: ICE to open legal office in Westerville*, NBC4 (Feb. 13, 2026), https://www.nbc4i.com/news/local-news/westerville/report-ice-to-open-legal-office-in-westerville/.

[12] Press Release, U.S. Dep't of Homeland Sec., *OPERATION BUCKEYE: ICE arrests the worst of the worst from Ohio, with convictions including felony drug possession, assault, DUIs and more* (Dec. 20, 2025), https://www.ice.gov/news/releases/operation-buckeye-ice-arrests-worst-worst-ohio-convictions-including-felony-drug.

[13] See *supra* note 1.

executed that even U.S. citizens have been swept up in ICE's unlawful immigration enforcement operations in Ohio.[14]

33.     Ohio also has a large Somali population, the second largest in the U.S. after Minnesota,[15] and the same population that has been openly targeted by the federal administration.[16]

34.     The President has openly expressed his distaste for people from Somalia, calling them "garbage" at a December 2, 2025, cabinet meeting, also saying "we don't want them in our country," and telling them to "go back to where they came from."[17] Shortly thereafter, on January 13, 2026, Trump announced that he would end Somalia's designation for Temporary Protected Status (TPS), a status given to people from certain countries facing civil unrest, violence, or natural disasters, allowing them to live and work in the U.S. for a period of time.[18] TPS for Somalia was set to terminate on March 17, 2026, but is currently stayed pending continuing litigation.[19]

---

[14] *More than 200 detained in ICE 'Operation Buckeye,' including 2 US citizens, says Ohio group,* WOSU 89.7 NPR NEWS (Dec. 30, 2025) https://www.wosu.org/politics-government/2025-12-30/more-than-200-detained-in-ice-operation-buckeye-including-2-us-citizens-says-ohio-group.

[15] Hearcel F. Craig, *Standing in Solidarity with our Somali Neighbors*, THE DEMOCRATIC STANDARD (Dec. 8, 2025), https://www.ohiosenate.gov/news/the-democratic-standard/standing-in-solidarity-with-our-somali-neighbors.

[16] Alyssa Chen, *A timeline of Operation Metro Surge*, MINN. REFORMER (Feb. 20, 2026), https://minnesotareformer.com/2026/02/20/a-chronology-of-operation-metro-surge/.

[17] Isabella Murray, Lalee Ibssa & Ivan Pereira, *Trump Describes Somali Immigrants as "Garbage" Amid Feud with Minnesota Congresswoman, Governor*, ABC NEWS (Dec. 3, 2025), https://abcnews.go.com/Politics/trump-describes-somali-immigrants-garbage-amid-feud-minnesota/story?id=128069199.

[18] Jill Wilson, CONG. RSCH. SERV., RS20844, Temporary Protected Status and Deferred Enforced Departure (2025).

[19] Nate Raymond, *US judge temporarily blocks Trump from ending protections for 1,100 Somalis*, REUTERS (Mar. 13, 2026), https://www.reuters.com/world/us-judge-temporality-blocks-trump-ending-protections-1100-somalis-2026-03-13/; Memorandum and Order, *African Cmtys. Together v. Noem*, No. 26-cv-11201 (D.Mass Mar. 13, 2026), ECF No. 33.

35. Ohio is also home to a large population of Haitian residents, with an estimated 30,000 living in the greater Columbus area with TPS.[20] The Haitian population in Springfield, Ohio, 45 miles west of Columbus, makes up about 25% of the City's 60,000 population.[21]

36. The President has made abundantly clear his feelings for Haitians living in Springfield, Ohio, infamously targeting this community in his 2024 presidential debate with false and incendiary claims that they are "eating the dogs . . . they're eating the cats. . . .they are eating the pets of the people that live there."[22]

37. Soon after, the President also terminated Haiti's designation for TPS.[23] The termination, originally set for February 3, 2026, has been delayed due to pending litigation, and the United States Supreme Court recently set oral argument for the end of April. *See* Order Granting Certiorari, *Trump v. Miot,* 607 U.S.__ (2026) (No. 25-1084); *Miot v. Trump*, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026); Order, *Miot v. Trump*, No. 1:25-cv-02471 (D.D.C. Feb. 2, 2026) ECF No. 123.

---

[20] Megan Henry, *'The folks are fearful.' Haitians living in Ohio may soon lose temporary protected status*, OHIO CAP. J. (Jan. 28, 2026), https://ohiocapitaljournal.com/2026/01/28/the-folks-are-fearful-haitians-living-in-ohio-may-soon-lose-temporary-protected-status/.

[21] Max Filby, *Trump wants to end TPS for Haitians. What does that mean?*, COLUMBUS DISPATCH (Feb. 2, 2026), https://www.dispatch.com/story/news/local/2026/02/02/how-will-columbus-springfield-tps-ends-haitians-immigration/88413133007/.

[22] Merlyn Thomas & Mike Wendling, *Trump repeats baseless claim about Haitian immigrants eating pets*, BBC (Sept. 15, 2024), https://www.bbc.com/news/articles/c77l28myezko. (noting that President Trump stated this falsehood at the 2024 presidential debate, and continued to repeat it even after city officials refuted it); *see also US election: Springfield woman who started pet-eating claims says she is 'not racist'*, SKY NEWS (Sept. 14, 2024), https://news.sky.com/story/us-election-springfield-woman-who-started-pet-eating-claims-says-she-is-not-racist-13214409, (noting that the story began with an unfounded rumor that was shared online before being elevated by President Trump).

[23] Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28760 (July 1, 2025); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733 (Nov. 28, 2025).

38.     But for *Miot*, which until now has stayed the termination of Haiti's designation for TPS, "DHS would have acted to enforce immigration laws in light of the termination" in Ohio. *See* Decl. of Liana J. Castano, *Miot. v. Trump.*, No. 1:25-cv-02471 (D.D.C. Feb. 2, 2026) ECF No. 129; *see also* Megan Henry, *'The folks are fearful.' Haitians living in Ohio may soon lose temporary protected status*, OHIO CAP. J. (Jan. 28, 2026), https://ohiocapitaljournal.com/2026/01/28/the-folks-are-fearful-haitians-living-in-ohio-may-soon-lose-temporary-protected-status/ ("Ohio Gov. Mike DeWine said Ohio officials are expecting a 30-day ICE surge in Springfield starting Feb. 4.")

39.     Fear prevails as immigration officers continue to aggressively enforce civil immigration activities throughout the state,[24] and protected status for those who hold TPS from Somalia and Haiti remains in limbo. [25]

**B.     Defendants Have a Policy and Practice of Making Warrantless Arrests in Ohio Without Making Individualized Determinations of Likelihood of Escape**

40.     To carry out the President's promise to conduct widespread immigration arrests and deportations, Defendants have a policy and practice in Ohio of making warrantless immigration arrests without probable cause that the person is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2).

41.     Congress requires immigration arrests to be based on warrants, with certain narrow exceptions. Under 8 U.S.C. § 1357(a)(2), two conditions must be met before an agent may conduct a warrantless arrest: the agent must have "reason to believe" *both* that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely

---

[24] For example, at least 10 individuals were arrested in the Columbus area between March 9-15, 2026. *See* @614icewatch, INSTAGRAM (Mar. 17, 2026), https://www.instagram.com/p/DV-L3OjDksX/?img_index=1.
[25] *See supra* note 19; *Trump v. Miot*, 607 U.S.__ (2026) (No. 25-1084).

12

to escape before a warrant can be obtained for his arrest." "Reason to believe" means "constitutionally required probable cause[,]" *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 887 (S.D. Ohio 2016), which "must be particularized with respect to the person to be searched or seized," *United States v. Pruitt*, 458 F.3d 477, 490 (6th Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

42. The statute's two-pronged probable cause requirement is mirrored in DHS's regulations for enforcement activities. Specifically, 8 C.F.R. § 287.8(c)(2) provides that "[a]n arrest shall be made *only* when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States" and that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." (Emphasis added).

43. In 2018, Chicago residents and non-profit organizations sued ICE for its policy and practice of conducting warrantless arrests in the Chicago area without complying with the probable cause requirements in § 1357(a)(2). Second Amended Complaint, *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Dec. 18, 2018), ECF No. 58.

44. After the district court denied the government's motion to dismiss, the case was resolved by a settlement agreement that required ICE to adopt a nationwide policy to prohibit warrantless arrests that failed to meet the requirements of § 1357(a)(2). As a result, on November 23, 2021, ICE issued a Broadcast Statement of Policy, which restates "the underlying laws and

13

policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) and is to be interpreted consistent with all implementing regulations."[26]

45.    This policy makes clear that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be obtained."[27] It also lists specific factors that may be relevant to determine likelihood of escape, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond."[28]

46.    During this current administration, however, ICE has disregarded its obligations under this nationwide policy – as well as under clear federal law – to carry out wide scale warrantless arrests without probable cause. Tellingly, ICE has recently rejected its own previous requirement that immigration officers must gain prior supervisor approval of, or even fill out a paper form with information about, the person they plan to arrest, instead preferring more "spontaneous" arrests.[29]

47.    And in a January 28, 2026 Memo from Defendant Lyons to all ICE personnel, Lyons set forth factors that purport to satisfy the likelihood of escape requirement in § 1357 but are in fact so broad that they would sweep in essentially any person encountered on the street in a

---

[26] ICE Broadcast Statement of Policy at 17-18, *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Nov. 23, 2021), Appendix A to Settlement Agreement, available at https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf.

[27] *Id.*

[28] *Id.*

[29] Julia Ainsley et al., *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC NEWS (Sept. 9, 2025), https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407.

vehicle or on foot.[30] Such an analysis essentially renders the likelihood of escape requirement in §

1357(a)(2) meaningless,[31] reflecting the administration's intention to "move[] from targeted

enforcement to broad street sweeps."[32]

48.     Since the President's second term in office, courts across the country have

consistently found Defendants' practices unlawful: They may not make immigration arrests

without warrants and without complying with the probable cause requirements in § 1357(a)(2).[33]

49.     ICE's behavior in Ohio is no different. Defendants continue to target law abiding

Ohioans going about their daily lives. They are going to work, carrying groceries, getting gas, or

arriving home, when they are abruptly approached by unidentified men, often masked and in

civilian clothing, insisting they are "illegal." And despite the lack of any arrest warrant or probable

cause to believe that they pose a likelihood of escape, federal agents snatch these Ohioans out of

their lives and into jail, flouting the requirements of the law.

*Defendants' Unlawful Arrest of Plaintiff F.M.*

50.     For example, on April 22, 2025, plain clothed CBP agents arrested Plaintiff F.M. as

he exited his vehicle in a Walmart parking lot to pick up a delivery for work without asking him

anything about himself, his job, where he lived, or his ties to the community. They also never

showed him a warrant for his arrest or indicated they had one. Despite F.M. calmly telling the

---

[30] Memorandum from Todd Lyons, Senior Off. Performing Duties of the Dir. to All ICE Personnel (Jan. 28, 2026) (available at https://immpolicytracking.org/policies/ice-issues-guidance-on-arrest-warrants-and-warrantless-arrests/#/tab-policy-documents).

[31] *See* Hamed Aleaziz & Charlie Savage, *ICE Expands Power of Agents to Arrest People Without Warrants*, NYTIMES (Jan. 30, 2026), https://www.nytimes.com/2026/01/30/us/politics/ice-expands-power-agents-warrants.html.

[32] *Supra* note 28; *see also* Memorandum from Todd Lyons, *supra* note 30.

[33] *See Molina* v. *DHS*, No. 25-3417, 2025 WL 3465518 (D.D.C., Dec. 2, 2025); *Ramirez Ovando v. Noem*, No. 25-0318, 2025 WL 3293467, at *15 (D. Colo. Nov. 25, 2025); *United Farm Workers v. Noem*, No. 25-cv-246 (E.D. Cal. Apr. 29, 2025); Findings of Fact and Conclusion of Law at ¶60, *Hussen v. Noem*, No. 26-cv-324 (D. Minn., Mar. 9, 2026), ECF No. 191.

agents that he had an ongoing immigration case, a driver's license, and work permit, and that he couldn't have gotten those documents without his immigration case, the officers said they were just doing their job. F.M. was in complete shock and panic, but he remained calm. He did not resist the officers. He did not fight. In fact, the officers remarked how nice and easy he was to deal with because he did not resist or try to run away in any manner. The agents never made any individualized determination that F.M. was likely to escape before a warrant could be issued before arresting him. Nevertheless, they arrested F.M. and he remained in detention for five terrifying weeks.

51.     When he was processed at jail, the officers looking through his documents questioned why they even arrested him, as "it seems like he did things right." That's correct. F.M. came to the U.S. on a J1 visa, he applied for asylum and was given a work permit. He has worked in the U.S. for the past two years, paid taxes, and obeyed all laws. An immigration judge found F.M. not to be a flight risk when he was ultimately released on bond.

52.     F.M. lives in Sandusky. While he was held in detention, he encountered many other detainees from Sandusky who had also been arrested by CBP. Sandusky is home to many immigrants: many come for the summer to work at large water parks such as Kalahari and amusement parks such as Cedar Point, as well as to work in agriculture. Now out of detention, F.M. must go out of the house and work, but he lives in fear due to the pervasive immigrant enforcement in his community.

*Defendants' Unlawful Arrest of Plaintiff Jose Armando de Leon Zapata*

53.     Plaintiff Jose Armando de Leon Zapata was similarly arrested on September 30, 2025, without a warrant and without any individualized determination of probable cause that he was likely to escape before a warrant could be obtained when his Lyft driver turned him over to

16

police as he was on his way to work. Mr. Zapata was asked for his ID, which he did not have on him. The police arrested him before even asking his name. They never asked him how long he had been in the U.S., about his family, his job, his ties to the community, or whether he had ever been arrested. Mr. Zapata did not try to flee the area, did not resist his arrest, and cooperated with the officers.

54. CBP soon showed up. They similarly never asked Mr. Zapata anything. They didn't ask him his name, how long he had been in the U.S., anything about his family, his job, or ties to the community. If they had, they would have learned that Mr. Zapata's wife is a U.S. citizen who does not work and depends on Mr. Zapata for financial and emotional support after leaving an abusive family situation. Mr. Zapata has been employed since arriving in the U.S. in May of 2022 and pays taxes. He does not drive, as he does not have a license, and was on his way to work.

55. Mr. Zapata was never shown a warrant for his arrest. These officers just told him everything was going to be alright, and that they would deport him quickly. Then, they took off the handcuffs he had on, put on new handcuffs, and placed him in one of their vehicles. Mr. Zapata was told he was being arrested because he's an "illegal alien" and he would probably be deported. Mr. Zapata was taken to a CBP station where he was asked, for the first time, his name. At the station, officers had Mr. Zapata write down the passcode to his phone so they could look through his phone, which they did for one and a half to two hours while laughing and talking to each other. Mr. Zapata spent twenty-one days in jail before an immigration judge found him not to be a flight risk and he was released on bond.

56. Mr. Zapata still has to take Lyft or Uber to get to work but he fears being arrested again as he lives and works in areas with many other immigrants and is aware that ICE has been in his neighborhood since his arrest.

*Defendants' Unlawful Arrest of Plaintiff Moises Javier Aguilar Peralta*

57.    Plaintiff Moises Javier Aguilar Peralta was arrested on December 18, 2025, after leaving a Home Depot three minutes away from his home where he purchased materials for work. As he left the store, two agents exited an unmarked Ford Explorer. They were in civilian clothing with face coverings and said in Spanish, "Police! This is a routine check!" Another unmarked truck came around and two more officers got out. The officers asked Mr. Peralta where he was from and if he had residency or citizenship. Mr. Peralta explained to them that he has an asylum case, but the officers told him: "that is not valid."

58.    The officers did not show him a warrant. Nor did they assess whether he was likely to escape before they could obtain a warrant. They did not ask Mr. Peralta any questions about his family or community ties. If they had, they would have learned that he lives with his sister and her two sons, who he helps to care for. He also has a partner and son back home in Honduras who he helps to financially support. He has a U.S. work permit and a social security number.

59.    Mr. Peralta did everything to cooperate with the officers. He showed them his driver's license, he did not run away, fight back, or resist his arrest. When the officers arrested him, he heard one of them shout something like, "I have one more! I have one more!" After processing Mr. Peralta, they chained his legs and arms together and chained his handcuffs and leg chains to a chain around his waist and drove him and ten other Latino men to Detroit. From there, Mr. Peralta was taken to North Lake Correctional Facility in Baldwin, Michigan. He spent twenty-seven days in jail before being released on bond, with an immigration judge finding he posed no flight risk.

60.    Since his release, Mr. Peralta still feels panic. He lives near Cleveland Avenue, which is an area where a lot of immigrants are being targeted and ICE has targeted a lot of nearby apartments. Mr. Peralta changed his routine in an effort to avoid rearrest, but he still has to go to

18

Home Depot to get materials for work. Before getting out of his car or getting gas he checks his surroundings for ICE. He fears being sent back to Honduras, a country he fled, and that if he is sent back, he would be murdered.

*Defendants' Unlawful Arrest of Plaintiff S.T.*

61.     ICE agents also arrested Plaintiff S.T. on December 18, 2025, when she was driving in the parking lot of Easton Town Center Mall, where she worked at a restaurant. Unmarked trucks cut her off, and two officers wearing vests that said "ICE" and carrying guns got out of the trucks and walked toward her vehicle. One officer took out his phone and started recording her. One of the officers was yelling at her in English, and the other in Spanish. The officers were banging on her car door so hard it felt like they were going to break it. S.T. opened her car door with her phone and bank cards in hand to show the officers her information. They immediately grabbed her by the hands, took her phone, pulled her out of the car, and put her in handcuffs.

62.     The officers accused S.T. of being illegal. They found her name on her bank cards and didn't ask her any more questions. They never showed S.T. a warrant for her arrest. They never asked S.T. about her family or job, ties to the community, or how long she has been in the United States. They never learned that S.T. has been in the United States since 2014, has paid taxes since then, has three young children, one of whom is a U.S. citizen, and she attends a Catholic Church every Sunday.

63.     S.T. did not try to run away or resist in any way. The officers put S.T. in a truck and drove her and another young man who had also been arrested and was in the back of the truck to behind a Target store, where they took them out of the truck and sat them on wood benches. The officers started laughing at them and saying things like, "we got two more!" More trucks brought

19

people to this location and every time someone that had been arrested got out of one of the trucks the officers would laugh at them. The officers asked them questions like, "are you illegal?"

64. S.T. was then taken to an office building in Westerville where she and other arrestees were taken out of trucks. There were so many people waiting to get into the building that they all had to be put in a line to enter. S.T. was processed and placed in a room with a camera. She asked if there was a private restroom she could use because there was a camera in the room that could see the toilet, but the guards assured her that the camera was turned off. After she used the toilet, the same guards later said, "actually the camera was on" and started laughing with one another.

65. S.T. and other women remained in that room for many hours before being told they were being transferred to Michigan. S.T. was loaded into a truck with two other women from Honduras and about 20 Hispanic men. They were all handcuffed and their feet were chained. They arrived in Michigan late that night, famished and thirsty after a long ride. The next day they called her in for more information, asking S.T. how long she had been in the U.S. and how many children she had.

66. At 7 p.m. that night, S.T. was told she would be moved to Detroit, a four-hour drive. The manager of the place kept telling the officers to work hard because they would get bonuses and gift cards for the more people they detain. The officers continued to laugh at the people they arrested and talked about their bonuses and overtime pay.

67. S.T. was again handcuffed, chained, and transferred to a detention facility in Michigan where she remained until her eventual release on bond one month after her arrest. In determining that she was eligible for bond, an immigration judge found that S.T. did not pose a flight risk.

68.     Since her release from detention, S.T. has remained fearful every day that she will be arrested again by ICE. She lost her job while she was detained and now tries to stay home as much as possible, although she still must take her daughter to the bus stop and get groceries for her family.

69.     ICE continues to be very active in S.T.'s neighborhood. S.T. heard that ICE has an office ten minutes away from her neighborhood. S.T. receives text messages from her friends and neighbors reporting weekly about ICE arresting more people in her neighborhood, including arrests at the Home Depot down the street from her home. S.T. has also seen posts online and in WhatsApp groups that ICE is arresting people and leaving the cars of those they arrest on the side of the road in her neighborhood.

*Defendants' Unlawful Arrests of Similarly Situated Individuals*

70.     The experiences of the Plaintiffs described in the preceding paragraphs are not unique. To the contrary, they reflect Defendants' unlawful policy and practice of effecting warrantless arrests without regard to probable cause that the person is likely to escape.

71.     For example, Jose Cesareo was arrested by individuals in plain clothing while returning home from the grocery store on December 17, 2025. The men did not identify themselves as law enforcement officers or immigration agents. They asked Mr. Cesareo for identification, and he provided his Mexican Consulate Identification Card. The individuals accused Mr. Cesareo of being "illegal" and asked if he had gone back to Mexico at any time. Mr. Cesareo responded truthfully that he had not, and that he had been living in the United States for the past eighteen years. Mr. Cesareo was arrested. He was never shown a warrant for his arrest. He was never asked about his ties to the community, his family, his employment, or his criminal history.

21

72.     Mr. Cesareo has lived in Columbus for the past eighteen years and has worked in kitchens across the city as the primary breadwinner for his girlfriend and eleven-year-old child, both of whom are United States citizens. He has never been charged with or convicted of a crime. Mr. Cesareo was initially taken to Butler County Jail, then transferred to North Lake Correctional Facility in Baldwin, Michigan, where he remains detained.

73.     Leodanis Mulet, a Cuban national with a pending green card application under the Cuban Adjustment Act, was also arrested on December 20, 2025. ICE agents in unmarked vehicles cut off the car Mr. Mulet's wife was driving with their children in the backseat as they were leaving the bank and three blocks from their home. ICE officers ordered Mr. Mulet to put his hands up in the passenger seat, which he did. The officers opened his car door, unbuckled his seatbelt, and physically pulled him out of his car. They pinned Mr. Mulet against the hood of the car and placed him in handcuffs. The officers removed his phone from his pocket, which contained his REAL ID, and asked him "what makes you legal in this country?" Mr. Mulet responded that he entered on humanitarian parole and had a pending application for a green card. The officers told him to "take it up with the judge." They then placed him in one of their vehicles and drove away quickly. The officers examined his REAL ID and accused Mr. Mulet of being "illegal."

74.      Mr. Mulet was never shown a warrant for his arrest. Other than "what makes you legal in this country," no further questions were asked. No one asked how long he had been in the U.S., his family, his employment, ties to the community or whether he had a criminal record. If they had, they would have learned that Mr. Mulet has been steadily employed in Columbus, Ohio, where he has resided with his family for approximately three years. He and his family attend church services every Sunday, and he has never been charged or convicted of a crime.

75. Mr. Mulet was taken to a facility in Columbus where approximately thirty-five other people were being held. The officers at this facility asked him how many children he had, and if he wanted to leave the country and whether he would be willing to sign papers to leave voluntarily. Mr. Mulet was transferred to Butler County Jail, where he remains detained.

76. Guadalupe Montoya Sadillo was arrested while working at a construction site on December 21, 2025, by masked individuals in unmarked black vehicles. He has resided in Coumbus, Ohio, for the past twenty-one years, has three children, two of whom are United States citizens, has been the primary financial provider for his family, has never been arrested, and pays his taxes. But officers never conducted a pre-arrest determination of Mr. Sadillo's escape risk. They never asked him how long he had been in the United States. They never asked him about his ties to the community, his family, or his employment. They never asked him about his criminal history, and they never showed him a warrant. Rather, after looking at his Mexican ID, officers told Mr. Sadillo that he had "no papers" and would be deported.

77. Julio Cesar Chavez Velasquez was also arrested in December 2025, while shopping to celebrate his daughter's birthday. As he placed the groceries in his car, a black vehicle came and parked directly in front of his car, while another parked behind him so they could not leave. His wife, who is currently pregnant, and their six-year-old daughter were in the car. Three or four men wearing vests and with their faces covered approached their vehicle, but these men did not identify themselves as immigration officers or any other law enforcement agency. They asked Mr. Velasquez if he had identification, and Mr. Velasquez provided them with his driver's license. After running his license, the officers told Mr. Velasquez he had to come with them.

78. Mr. Velasquez's wife asked if they had any documents or a warrant to arrest him, but he was never shown any warrant or documents prior to his arrest. One officer became upset

when Mr. Velasquez's wife asked about the warrant and said if Mr. Velasquez did not get out of this vehicle, they would break his window and take him out. Mr. Velasquez did not resist and did not try to run away. He got out of his vehicle and was immediately placed in handcuffs. The officers never asked him about his ties to the community or how long he had been in the United States. They asked where he was born and if his daughter was born in the United States but otherwise did not ask any questions about his family. They did not ask him about his employment, the roofing and siding business he was starting, or about the work permit he recently obtained. They did not learn that he has never been convicted or charged with a crime. They also did not learn that he has been filing his taxes.

79. Rather, the officers aggressively handcuffed him and put him in a car where there was another person who had already been arrested. The driver took off and ran a red light. Mr. Velasquez told the driver to be careful because there was another person in the car. The driver ran another red light. Mr. Velasquez was taken to a location in Columbus, transported to somewhere in Michigan, and then transported again with approximately thirty to forty other individuals from Latin American countries to another location four hours away where he remains detained.

80. Brad Bonacci, the General Manager of a hotel in Columbus, Ohio, also witnessed a horrifying incident on December 17, 2025, when masked federal agents entered the hotel lobby looking for an unknown individual. At that same moment, three housekeepers who were walking to their cars in the parking lot for a lunch break were snatched by federal agents who jumped out of their vehicles then sped off the property. All three housekeepers appear Hispanic or Latino, and two are Puerto Rico-born United States citizens. No questions were asked before these federal agents grabbed them and placed them in their vehicles. Two of the women were ultimately released once ICE realized they were U.S. citizens – but only after spending four days in jail.

24

81.     On February 7, 2026, at 9:50 a.m., M.A.R. was driving to work with a coworker on I-270 when he was pulled over by an unmarked vehicle that activated flashing lights behind him. Officers approached his car but did not show M.A.R. any warrant for his arrest. The officers did not explain to M.A.R. why he was being stopped or detained. They also did not ask him any questions about his community ties or his family. Both M.A.R. and his coworker were arrested, and M.A.R. remains detained at Butler County Jail.

82.     M.A.R. has lived in the United States continuously since 2006 and has lived in Columbus for the past 12 years. He had never been arrested before this incident and is the sole breadwinner for himself and his partner, and he provided financial support to his mother who still lives in Honduras. Since his arrest and detention, M.A.R.'s daughter I.A. has been working to support his partner, who now requires significant financial support that she did not previously need.

83.     Similarly, J.R. was arrested and detained by ICE officers on March 13, 2026, without a warrant and without any pre-arrest, individualized determination of whether J.R. was likely to escape before a warrant could be obtained. J.R. has been in the United States since August, 2016, and has a pending asylum application. J.R. has no criminal history, two children, one of whom is a United States citizen, valid work authorization, and a valid driver's license. J.R. has worked in construction for nearly ten years, pays taxes, has owned a home since 2020, and is responsible for paying his family's bills and mortgage.

84.     Nevertheless, J.R. was stopped and aggressively detained by ICE officers who cut off his car and pulled him out of his vehicle after he was leaving his daughter's apartment in Reynoldsburg, Ohio, a heavily Latino neighborhood, while wearing a bright yellow shirt indicative of a construction worker. J.R. did not resist the officers or attempt to flee the area. He was not

shown a warrant for his arrest and was not asked any questions about flight risk, his family, or community ties.

85.    Over the past year, most of the clients of Emily Montgomery Brown, the Director of the Immigration Clinic and Assistant Clinical Professor of Law at The Ohio State University Moritz College of Law, appear to have been picked up in collateral, non-targeted arrests. None of those individuals appear to have been arrested pursuant to a warrant, but rather were picked up at gas stations, in parking lots next to construction vehicles, or at their cars parked outside of work or shopping areas. The agents did not ask them any questions to assess their community ties or flight risk before arresting them, although several of those arrested in fact had U.S. citizen children or other family members and had lived in the U.S. for many years.

86.    Brian Hoffman, the Executive Director of the Ohio Center for Strategic Immigration Litigation and Outreach ("OCSILiO"), has weekly conversations with prospective clients who have been detained by ICE or U.S. Border Patrol, most of whom were not arrested pursuant to a warrant and none of whom were asked anything about their community ties or other questions to assess their likelihood of escape before being arrested. Most recently, Brian met with a brother and sister who were arrested on the morning on February 25, 2026, on their way to work. They both have U.S. citizen children but were arrested without warrants and without any analysis of whether they were likely to escape before a warrant could be obtained.

**C.    Plaintiffs and Ohio Residents of Immigrant Backgrounds Anticipate and Fear Future Unlawful Arrests Due to Defendants' Continuing Policy and Practice of Making Warrantless Arrests Without Probable Cause**

87.    Because of the widespread nature of the arrests pursuant to Defendants' unlawful policy and practice of making warrantless arrests without probable cause of escape risk, and because of the systemic nature of Defendants' disregard for the requirements of federal law,

26

Plaintiffs and numerous others who live and work in Ohio face a substantial risk that they will be subjected to unlawful warrantless arrests without an individualized probable cause determination in the near future.

88.     The recent ICE Memo by Defendant Lyons stirs up even more fear in immigrant communities, with ICE essentially admitting that its agents no longer make a pre-arrest individualized determination of risk of escape but rather use factors that sweep in virtually any individual encountered on the street as a basis to be unlawfully detained.[34]

89.     For example, since Plaintiff Mr. Peralta's release from his 27 days in detention, he is scared to go about his daily life. Mr. Peralta changed his routine because of his experience and fear of being rearrested, and no longer goes to the Home Depot near his house. But he lives near an area where ICE continues targeting immigrants, including at nearby apartments, and he often feels panic. He looks around before exiting his car or getting gas and has trouble sleeping. He worries about being arrested again and being murdered if he is sent back to Honduras.

90.     Plaintiff S.T. also lives in a neighborhood where ICE continues to be very active. She has heard from friends and neighbors that ICE continues to arrest people in her neighborhood, including at a Home Depot down the street from her home. S.T. lost her job while she was detained, and she tries to stay home as much as possible, but she still has to take her daughter to the bus stop and get groceries for her family. Because of ICE's presence in her neighborhood, she remains fearful of being arrested again by ICE.

91.     Plaintiff F.M. was similarly left shattered by his five weeks in detention. He is too scared to be in public and too scared to go to church, so he prefers to stay in isolated areas or inside his car, and streams church services online. While he was detained, he met many others from

---

[34] Memorandum from Todd Lyons, *supra* note 29.

Sandusky who had also been arrested, and knows federal agents are still out there. Many immigrants come to the Sandusky area to work over the summer—in water and amusement parks and in agriculture. F.M. is scared every day that he will be arrested again.

92. Plaintiff Jose Armando de Leon Zapata also now fears the police after his three weeks in jail. All he does now is go to work and come home. He is too scared to go out to eat with his wife anymore. He and his wife had to cancel their plans to move into their own apartment closer to Mr. Zapata's work because they were supposed to move while he was detained, so he still has to take Lyft or Uber to get to work. There are many other immigrants in Mr. Zapata's neighborhood and where he works, so he is always looking around to make sure he is safe. He has also heard that ICE has been in his neighborhood since his arrest.

93. Mr. Zapata has difficulty sleeping and is worried about leaving his wife alone again. She left an abusive family situation and relies on him for emotional and financial support. Mr. Zapata worries that he could still be arrested, even though he has a pending I-130 Petition to have legal status in the United States. He is scared that if he is re-detained, he will not have enough money to pay another bond.

94. Even Julio Cesar Chavez Velazquez, who remains in detention since his December 2025 arrest, fears that if he gets out of jail, he could be arrested again.

95. Over the past year, the staff at Central Ohio Worker Center ("COWC"), a nonprofit organization based in Columbus, Ohio, have also noted a measurable decline in community members' willingness to access services due to fear of immigration enforcement. COWC has moved its programs online, changed the physical locations of certain programs, reduced in-person events, and modified outreach methods to protect the safety of community members. Community

members have also become harder to contact, and are less willing to participate in programs, share personal information, or accept referrals to attorneys or other resources.

96. Staff at COWC have also noticed that community members are limiting or avoiding everyday activities because of fear of immigration enforcement, including driving to work, sending children to school, seeking medical care, purchasing groceries, and attending religious services. Families are keeping their children home from school out of fear that a parent could be picked up by ICE at pick-up or drop-off.

97. Emily Montgomery Brown, the Director of the Immigration Clinic at The Ohio State University Moritz College of Law, is hearing from her clients that they fear spending time in public places or driving to work or their children's schools. Even clients who are green card holders and asylees fear for their safety and the risk of being arrested by ICE. Some clients have discussed difficulty sleeping, while others have quit jobs, stopped driving, and no longer answer the door to their home. One individual who worked with the U.S.-backed government in Afghanistan and legally entered the U.S. and applied for asylum asked if he should stop attending his English class out of fear that ICE might look for people there. Many of these individuals know someone who has been arrested in public by ICE and fear that they too will be detained in public, without a warrant and with no questions asked.

98. Brian Hoffman. Executive Director at OCSILiO also notes that immigration detentions do not appear to be slowing down in northern Ohio, as his organization receives a high number of calls from detained people and their loved ones as ICE continues to engage in warrantless arrests without any assessment of likelihood of escape. Their client community is also fearful of being in public—churches are experiencing a drop in participation, and community events are not as well attended as they used to be as people hunker down and stay at home.

## CLASS ACTION ALLEGATIONS

99.    Plaintiffs Moises Javier Aguilar Peralta, F.M., S.T., and Jose Armando de Leon Zapata bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

100.    Plaintiffs Moises Javier Aguilar Peralta, F.M., S.T., and Jose Armando de Leon Zapata seek to represent the following class:

> **Warrantless Arrests Class**: All persons who, since April 22, 2025, have been, or will be, arrested in this State for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is likely to escape before a warrant can be obtained.

101.    Plaintiffs reserve the right to amend or modify the class definition as appropriate.

102.    The proposed class satisfies the prerequisites of Rule 23(a) and 23(b)(2). It satisfies the numerosity requirement of Rule 23(a)(1) because it includes anyone who will be subjected to Defendants' policy and practice of making warrantless arrests without the requisite probable cause finding. Since April 22, 2025, federal immigration agents have arrested countless people within the State for alleged immigration violations. It is not currently known to Plaintiffs how many such arrests have occurred. But what is known is the number of people held in immigration detention in Ohio in February 2026: 670. Certainly, the number of individuals who were arrested is larger than the number detained, and just as certainly, the number arrested since April 22, 2025 (a period of almost 12 months) is much larger than the number detained in the month of February 2026 alone. Many of this very large number of people were arrested by federal agents who lacked a warrant and who failed to conduct a pre-arrest, individualized assessment that the person was likely to escape before a warrant could be obtained.

30

103.     The proposed class satisfies the commonality requirement of Rule 23(a)(2) as it shares common issues of fact or law, including but not limited to whether Defendants' policy and practice of warrantless arrests without individualized determinations of probable cause for escape risk violates 8 U.S.C. § 1357(a)(2).

104.     The proposed class also satisfies the typicality requirement of Rule 23(a)(3). The claims of the proposed class representatives for the Warrantless Arrests Class are typical of the claims for that class because Plaintiffs Moises Javier Aguilar Peralta, F.M., S.T., and Jose Armando de Leon Zapata were all arrested without a warrant and without an individualized determination of their likelihood of escape before a warrant could be obtained, and they all live or work in areas of ICE activity and fear being arrested again.

105.     Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no conflict of interest with the putative class members, will fairly and adequately protect the interests of the class, and understand and accept their responsibilities as class representatives.

106.     The proposed class satisfies the requirements of Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, as they have a policy and practice, to which everyone in the Warrantless Arrests Class is subject, of making warrantless arrests without the requisite probable cause findings. Final injunctive or declaratory relief therefore is appropriate to the class as a whole.

107.     Counsel for Plaintiffs collectively have extensive experience litigating class actions and cases involving civil and constitutional rights generally, and the rights of noncitizens specifically, and are therefore qualified to be certified as class counsel pursuant to Rule 23(g).

## CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the *Accardi* doctrine, and the Administrative Procedure Act, 5 U.S.C. § 706:

### Warrantless Arrests Without Individualized Assessment of Escape Risk

108.    Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same). "Reason to believe" means "constitutionally required probable cause[,]" *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 887 (S.D. Ohio 2016), which "must be particularized with respect to the person to be searched or seized," *United States v. Pruitt*, 458 F.3d 477, 490 (6th Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

109.    Defendants have a policy and practice of making warrantless arrests in Ohio without making individualized determinations that the person arrested is likely to escape before a warrant can be obtained as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

110.    Defendants' policy and practice of making warrantless arrests in Ohio without making individualized determinations of risk of escape as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," U.S.C. § 706(2)(A), (C), and violates the elementary principle of administrative law that agencies are required to follow their own regulations, see *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

111.    This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

32

112. This Court also has inherent equitable authority to enjoin violations of federal law by federal officers. See *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

113. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Warrantless Arrests Class are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued and future irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Certify a class of all persons who, since April 22, 2025, have been or will be arrested by Defendants in this State for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is likely to escape before a warrant can be issued ("Warrantless Arrests Class"), and appoint Plaintiffs Moises Javier Aguilar Peralta, F.M., S.T., and Jose Armando de Leon Zapata as class representatives;

B. Appoint the undersigned counsel as class counsel pursuant to Federal Rules of Civil Procedure 23(g);

C. Declare that Defendants' policy and practice of making warrantless immigration arrests without making a pre-arrest, individualized assessment of probable cause that the person is likely to escape before a warrant can be obtained violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

D. Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without an individual determination of escape risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

33

E.      Enjoin Defendants policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of escape risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

F.      With respect to the Warrantless Arrests Class, issue an injunction requiring every arresting agent effectuating a warrantless arrest to comply with the requirements set forth in DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2), including but not limited to, that as soon as practicable after an arrest, each agent shall document in writing "the facts and circumstances surrounding the warrantless arrest" and the "specific, particularized facts supporting the conclusion that the [individual] was likely to escape before a warrant could be obtained."[35]

G.      Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge all records collected and maintained about Plaintiffs and class members from their unlawful arrests, including any derivative information;

H.      Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable source of law; and

I.      Award such further relief as the Court deems appropriate.

Dated: March 18, 2026

Respectfully submitted,

/s/ John S. Marshall

| | |
|---|---|
| John S. Marshall (0015160) | Freda J. Levenson (0045916) |
| Helen M. Robinson (0097070) | Amy Gilbert (0100887) |
| Edward R. Forman (0076651) | ACLU OF OHIO FOUNDATION, INC. |
| Samuel M. Schlein (0092194) | 4506 Chester Avenue |
| Madeline J. Rettig (0098816) | Cleveland, Ohio 44103 |
| MARSHALL, FORMAN AND SCHLEIN, LLC | (216) 541-1376 (Levenson) |
| 250 Civic Center Drive, Suite 480 | (216) 770-6704 (Gilbert) |

---

[35] *Supra* note 26.

34

Columbus, Ohio 43215-5296
Phone: (614) 463-9790
Fax (614) 463-9780
jmarshall@marshallforman.com
hrobinson@marshallforman.com
eforman@marshallforman.com
sschlein@marshallforman.com
mrettig@marshallforman.com

OF COUNSEL
Louis A. Jacobs (002101)
MARSHALL, FORMAN AND SCHLEIN, LLC
177 19th Street, Apt. 9C
Oakland, CA 94612
Phone: (614) 203-1255
Fax (510) 250-9007
LAJOhio@aol.com

Frederick M. Gittes (0031444)
Jeffrey P. Vardaro (0081819)
THE GITTES LAW GROUP
723 Oak Street
Columbus, Ohio 43205
Phone: (614) 222-4735
Fax: (614) 221-9655
fgittes@gitteslaw.com
jvardaro@gitteslaw.com

flevenson@acluohio.org
agilbert@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(380) 215-1972
dcarey@acluohio.org

Kathleen Kersh (91198)
Maria Otero (93841)
Gwen Short (102151)
ADVOCATES FOR BASIC LEGAL EQUALITY, INC.
525 Jefferson Avenue, Suite 300
Toledo, OH 43604
Phone: (937) 535-4408
kkersh@ablelaw.org
motero@ablelaw.org
gshort@ablelaw.org

Vincent W. Wells (0101765)
Jesse H. Vogel (0102292)
COMMUNITY REFUGEE & IMMIGRATION SERVICES
4645 Executive Drive
Columbus, Ohio 43220
Phone: 614-955-9505
vwells@cris-ohio.org
jvogel@cris-ohio.org

*Counsel for Plaintiffs*