**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MOISES JAVIER AGUILAR
PERALTA, et al.,

               Plaintiffs,

    v.

DEPARTMENT OF HOMELAND
SECURITY, et al.,

               Defendants.

No.: 2:26-cv-337

District Judge Morrison
Magistrate Judge Vascura

**PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, Plaintiffs Moises Javier Aguilar Peralta, F.M., S.T., and Jose Armando de Leon Zapata hereby move this Court for a preliminary injunction requiring that Defendants suspend their practice of making warrantless arrests in Ohio without an individualized, pre-arrest determination of probable cause that the person is likely to escape before a warrant can be obtained. This Motion is based on the attached memorandum of law and supporting declarations of Plaintiffs and other Declarants.

Plaintiffs request that this Court waive bond. *See, e.g.*, *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district courts have discretion to waive bond); *Planned Parenthood Southwest Ohio Reg. v. Yost*, 2019 WL 1305762, at *4 (S.D. Ohio Mar. 21, 2019) (same); *Arevalo v. Trump*, 785 F. Supp. 3d 644, 668 (C.D. Cal. 2025) ("[C]ourts routinely impose either no bond or a minimal bond in cases involving public interests[.]") (internal citation omitted). In the alternative, Plaintiffs respectfully request a nominal $1 bond be ordered.

[*Signatures next page.*]

Dated: April 15, 2026

Respectfully submitted,

/s/ Freda J. Levenson
Freda J. Levenson (0045916)
Amy Gilbert (0100887)
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 541-1376 (Levenson)
(216) 770-6704 (Gilbert)
flevenson@acluohio.org
agilbert@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(380) 215-1972
dcarey@acluohio.org

Kathleen Kersh (91198)
Maria Otero (93841)
Gwen Short (102151)
ADVOCATES FOR BASIC LEGAL EQUALITY,
INC.
525 Jefferson Avenue, Suite 300
Toledo, OH 43604
Phone: (937) 535-4408
kkersh@ablelaw.org
motero@ablelaw.org
gshort@ablelaw.org

Vincent W. Wells (0101765)
Jesse H. Vogel (0102292)
COMMUNITY REFUGEE & IMMIGRATION
SERVICES
4645 Executive Drive
Columbus, Ohio 43220
Phone: 614-955-9505
vwells@cris-ohio.org
jvogel@cris-ohio.org

/s/ John S. Marshall
John S. Marshall (0015160)
*Trial Attorney for Plaintiffs*
Helen M. Robinson (0097070)
Edward R. Forman (0076651)
Samuel M. Schlein (0092194)
Madeline J. Rettig (0098816)
MARSHALL, FORMAN AND SCHLEIN, LLC
250 Civic Center Drive, Suite 480
Columbus, Ohio 43215-5296
Phone: (614) 463-9790
Fax (614) 463-9780
jmarshall@marshallforman.com
hrobinson@marshallforman.com
eforman@marshallforman.com
sschlein@marshallforman.com
mrettig@marshallforman.com

OF COUNSEL
Louis A. Jacobs (002101)
MARSHALL, FORMAN AND SCHLEIN, LLC
177 19th Street, Apt. 9C
Oakland, CA 94612
Phone: (614) 203-1255
Fax (510) 250-9007
LAJOhio@aol.com

Frederick M. Gittes (0031444)
Jeffrey P. Vardaro (0081819)
THE GITTES LAW GROUP
723 Oak Street
Columbus, Ohio 43205
Phone: (614) 222-4735
Fax: (614) 221-9655
fgittes@gitteslaw.com
jvardaro@gitteslaw.com

*Counsel for Plaintiffs*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MOISES JAVIER AGUILAR PERALTA, et al., | No.: 2:26-cv-337 |
| Plaintiffs, | District Judge Morrison |
| v. | Magistrate Judge Vascura |
| DEPARTMENT OF HOMELAND SECURITY, et al., | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| Defendants. | |

**INTRODUCTION**

Defendants have a policy and practice of arresting Ohioans wantonly and recklessly, without a warrant or probable cause, in violation of the mandates of the Immigration and Nationality Act (INA) and Department of Homeland Security (DHS) regulations. Federal law requires that, before an agent makes a civil immigration arrest without a warrant, the agent must make an individualized determination of probable cause that the person is likely to escape before a warrant can be obtained. Defendants are brazenly flouting this requirement.

Plaintiffs Moises Javier Aguilar Peralta, F.M., S.T., and Jose Armando de Leon Zapata seek a preliminary injunction against Defendants' unlawful policy and practice to ensure that Defendants and their agents make civil immigration arrests in Ohio in accordance with federal law. A separate motion seeking provisional class certification for purposes of a preliminary injunction will be filed later today. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (District Court "did not abuse its discretion by granting provisional class certification" in an order also addressing a request for a preliminary injunction.).

Based on the Complaint, the Declarations submitted herewith, and the remarks of Defendants themselves, the record in Ohio is irrefutable—as it has been found to be in states across the country. The DHS and its Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) offices are employing a masked and armed force composed of inexperienced and untrained federal agents, incentivized to aggressively reach for the President's national quota of 3,000 civil immigration arrests per day. To meet this quota, Defendants have implemented a nationwide policy, practice, and pattern of arresting individuals without either a warrant or probable cause that the person arrested was likely to escape before a warrant could be obtained.

Although ICE has touted that it is catching the "worst of the worst" in Ohio, posting pictures and criminal records of a few of those arrested, the overwhelming majority of the individuals who have been arrested in Ohio lack criminal records and instead have deep community ties, steady jobs, close family in the United States (including U.S. citizen spouses and children), and posed no danger of escape before a warrant could be obtained. These individuals are on their way to work or at work, going grocery shopping, returning home, and often with their families, when unidentified officers in civilian clothing with their faces covered aggressively stop and snatch these Ohioans out of their lives. They are shoved into unmarked vehicles and transported to detention centers far from home where they are forced to remain in inhumane conditions, often for long periods of time.

When immigration judges ultimately considered Plaintiffs' lack of escape risk, ICE was ordered to release them. But their release did not eliminate the physical and psychological harms from being arrested and detained and the palpable threat of being unlawfully arrested again and again. Defendants' policy of flouting the requirements of federal law has left immigrant

2

communities in fear—afraid to go to work, take their children to school, attend their places of worship, and in some cases even leave their home.

## STATEMENT OF FACTS

### I.        Unlawful Arrests and Detention in Ohio

As part of President Trump's nationwide deportation plan, federal agents have engaged in aggressive immigration enforcement operations in Ohio since at least April 22, 2025, eager to detain and arrest anyone they perceive to be removable from the United States. These officers are often dressed in civilian clothing, masked, and carry guns as they aggressively stop, arrest, and detain law abiding Ohioans as they go about their daily lives without even attempting to make any probable cause assessment of their risk of escape in violation of 8 U.S.C. § 1357(a)(2).

In the fall of 2025, ICE expanded its presence in central Ohio, leasing a second office space to "support law enforcement operations" in Columbus.[1] ICE escalated these enforcement operations in December 2025, for the stated purpose of "targeting the worst of the worst criminal illegal aliens" throughout Ohio,[2] but the overwhelming majority of immigration detainees in Ohio and over 70% of immigrants detained nationwide lack any criminal record.[3] Predictably, given

---

[1] Katie Millard, *Report: ICE to open legal office in Westerville*, NBC4 (Feb. 13, 2026), https://www.nbc4i.com/news/local-news/westerville/report-ice-to-open-legal-office-in-westerville/.

[2] Press Release, U.S. Dep't of Homeland Sec., *OPERATION BUCKEYE: ICE arrests the worst of the worst from Ohio, with convictions including felony drug possession, assault, DUIs and more* (Dec. 20, 2025), https://www.ice.gov/news/releases/operation-buckeye-ice-arrests-worst-worst-ohio-convictions-including-felony-drug.

[3] Cato Institute, *New Data: 73% of ICE Detainees Have No Criminal Record* (Nov. 25, 2025), https://www.cato.org/news-releases/new-data-73-ice-detainees-have-no-criminal-record;    Anna Lynn Winfrey, *ICE says it arrested 'worst of the worst' in Columbus. Data shows not so*, COLUMBUS DISPATCH (Apr. 6, 2026), https://www.dispatch.com/story/news/local/2026/04/06/ice-agents-mostly-arrested-people-without-criminal-records-in-columbus/89437996007/ (Less than 7% of those arrested during Operation Buckeye had a criminal record.); Robert Farley, *As ICE Arrests Increased, a Higher Portion Had No U.S. Criminal Record,*

Defendants' failure to establish probable cause, even U.S. citizens have been swept up in ICE's unlawful immigration enforcement operations.[4] These arrests have "sharply increased" over the last year, with arrest rates for the Detroit field office nearly doubled between January 2025 and March 2026.[5]

The President also terminated Temporary Protected Status (TPS)[6] for those from Haiti and Somalia, and their designations were set to expire in February and March of 2026, respectively,[7] with federal agents ready to enforce civil immigration laws against the nearly 30,000 Haitians with TPS living in Central Ohio, and Ohio's large population of Somali residents.[8] Although this

---

FACTCHECK.ORG (Jan. 28, 2026), https://www.factcheck.org/2026/01/as-ice-arrests-increased-ahigher-portion-had-no-u-s-criminal-record/; Transactional Records Access Clearinghouse, *Immigration Detention Quick Facts*, https://tracreports.org/immigration/quickfacts/ (last accessed Mar. 17, 2026).

[4]*More than 200 detained in ICE 'Operation Buckeye,' including 2 US citizens, says Ohio group,* WOSU 89.7 NPR NEWS (Dec. 30, 2025), https://www.wosu.org/politics-government/2025-12-30/more-than-200-detained-in-ice-operation-buckeye-including-2-us-citizens-says-ohio-group.

[5] Albert Sun, Allison McCann & Hamed Aleaziz, *New Data Shows Where ICE Has Been Most Active This Year*, NYTIMES (Mar. 20, 2026), https://www.nytimes.com/2026/03/20/us/ice-arrests-immigration-enforcement.html.

[6] Temporary Protected Status (TPS) is a status given to people from certain countries facing civil unrest, violence, or natural disasters, allowing them to live and work in the U.S. for a period of time. Jill Wilson, CONG. RSCH. SERV., RS20844, Temporary Protected Status and Deferred Enforced Departure (2025).

[7] Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28760 (July 1, 2025); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733 (Nov. 28, 2025).

[8] Megan Henry, *'The folks are fearful.' Haitians living in Ohio may soon lose temporary protected status*, OHIO CAP. J. (Jan. 28, 2026), https://ohiocapitaljournal.com/2026/01/28/the-folks-are-fearful-haitians-living-in-ohio-may-soon-lose-temporary-protected-status/ (noting Ohio is home to an estimated 30,000 Haitians living in the greater Columbus area with TPS); Max Filby, *Trump wants to end TPS for Haitians. What does that mean?*, COLUMBUS DISPATCH (Feb. 2, 2026), https://www.dispatch.com/story/news/local/2026/02/02/how-will-columbus-springfield-tps-ends-haitians-immigration/88413133007/ (The Haitian population in Springfield, Ohio, 45 miles west of Columbus, makes up about 25% of the City's 60,000 population); Hearcel F. Craig, *Standing in Solidarity with our Somali Neighbors*, THE DEMOCRATIC STANDARD (Dec. 8, 2025), https://www.ohiosenate.gov/news/the-democratic-standard/standing-in-solidarity-with-our-somali-neighbors (Ohio has the second largest population of Somalians in the U.S. after Minnesota);

designation remains in limbo due to pending litigation,[9] fear prevails as immigration officers continue to aggressively enforce civil immigration activities throughout the state.[10]

As described in the Complaint and the attached Declarations, Plaintiffs and Declarants were each arrested by Defendants without a warrant and without any pre-arrest, individualized determination that they were likely to escape before a warrant could be obtained. For example, on April 22, 2025, CBP agents arrested Plaintiff F.M. as he exited his vehicle in a Walmart parking lot to pick up a delivery for work without asking him anything about himself, his job, where he lived, or his ties to the community. Declaration of F.M., ¶¶ 12-14, 28. They also never showed him a warrant for his arrest or indicated they had one. *Id.* ¶ 21. F.M. has worked in the U.S. for the past two years after entering on a J-1 visa and applying for asylum, paid all taxes, and obeyed all laws. *Id.* ¶¶ 2-11. After five terrible weeks in detention, an immigration judge found F.M. not to be a flight risk when he was ultimately released on bond. *See id.* ¶¶ 32-35. Now out of detention, F.M. must go out of the house and work, but he lives in fear due to the pervasive immigration enforcement in his community. *Id.* ¶¶ 37-40. He is too afraid to go to church, and instead streams church services online, which do not have the same engaging effect or benefit of community. *Id.* ¶ 37.

---

[9] Nate Raymond, *US judge temporarily blocks Trump from ending protections for 1,100 Somalis*, REUTERS (Mar. 13, 2026), https://www.reuters.com/world/us-judge-temporality-blocks-trump-ending-protections-1100-somalis-2026-03-13/; *African Cmtys. Together v. Noem*, __ F. Supp. 3d __, 2026 WL 395732 (D.Mass 2026); Order Granting Certiorari, *Trump v. Miot*, 607 U.S.__, 2026 WL 731087 (March 16, 2026) (No. 25-1084); *Miot v. Trump*, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026); *Miot v. Trump*, __ F. Supp. 3d __, 2026 WL 266413 (D.D.C. 2026) .

[10] For example, at least 10 individuals were arrested in the Columbus area between March 9-15, 2026. *See* @614icewatch, INSTAGRAM (Mar. 17, 2026), https://www.instagram.com/p/DV-L3OjDksX/?img_index=1. ICE data reveals that one in five arrests in Ohio between August and February are "collateral", meaning no warrant was issued. *See* Danae King, *'Wrong place, wrong time?' Over 500 Ohio ICE arrests were 'collateral'*, COLUMBUS DISPATCH (Apr. 10, 2026), https://www.dispatch.com/story/news/politics/2026/04/10/ice-arrests-skyrocket-including-those-detained-as-collateral/89523780007/.

Plaintiff Jose Armando de Leon Zapata was similarly arrested on September 30, 2025, without a warrant or any individualized determination of probable cause that he was likely to escape before a warrant could be obtained, when his Lyft driver turned him over to police as he was on his way to work. Declaration of Jose Armando de Leon Zapata, ¶¶ 15-23. CBP soon showed up and arrested Mr. Zapata without asking him his name, how long he had been in the U.S., anything about his family, job, or ties to the community. *Id.* ¶ 20. Mr. Zapata was never shown a warrant for his arrest. *Id.* ¶ 21. Mr. Zapata's wife is a U.S. citizen and he has been steadily employed and pays taxes since he arrived in the U.S. in May 2022. *Id.* ¶¶ 2-7, 30. Nevertheless, Mr. Zapata spent twenty-one days in jail before an immigration judge eventually found him not to be a flight risk and he was released on bond. *See id.* ¶¶ 30, 32. Mr. Zapata still has to take a ride share service to get to work but he fears being arrested again as he lives and works in areas with many other immigrants and is aware that ICE has been in his neighborhood since his arrest. *Id.* ¶¶ 36, 41.

Plaintiff Moises Javier Aguilar Peralta was arrested on December 18, 2025, after leaving a Home Depot three minutes away from his home where he purchased materials for work. Declaration of Moises Javier Aguilar Peralta, ¶¶ 17-23. The officers did not show him a warrant or assess whether he was likely to escape before they could obtain one. *Id.* ¶ 41. They did not ask Mr. Peralta any questions about his family or community ties or learn that he had a pending asylum application after fleeing Honduras in 2023 where he had been kidnapped and almost killed. *Id.* ¶¶ 4-8, 50. Mr. Peralta spent twenty-seven days in jail before being released on bond, when an immigration judge found he posed no flight risk. *Id.* ¶¶ 103, 108-09. Since his release, Mr. Peralta still feels panic. *Id.* ¶ 126. He lives near Cleveland Avenue, which is an area where a lot of immigrants are being targeted and where ICE has targeted a lot of nearby apartments. *Id.* ¶¶ 123-

6

24. Mr. Peralta has changed his routine in an effort to avoid rearrest, but he still has to go to Home Depot to get materials for work. *Id.* ¶¶ 125, 127-28. Before getting out of his car or getting gas he checks his surroundings for ICE. *Id.* ¶¶ 129-30. He fears being sent back to Honduras, a country he fled, because if he is sent back, he would be murdered. *Id.* ¶¶ 135-36.

ICE agents also arrested Plaintiff S.T. on December 18, 2025, when she was driving in the parking lot of Easton Town Center Mall, where she worked at a restaurant. Declaration of S.T., ¶¶ 11-12, 17. The officers never showed S.T. a warrant for her arrest and never asked about her family, job, ties to the community, or how long she has been in the United States. *Id.* ¶¶ 29, 36. Rather, they just accused her of being "illegal." *Id.* ¶¶ 27, 33. S.T. was eventually released on bond one month after her arrest when an immigration judge found that S.T. did not pose a flight risk. *Id.* ¶¶ 94-96. Since her release from detention, S.T. has remained fearful every day that she will be arrested again by ICE. *Id.* ¶ 97. S.T. had been employed and paid taxes in the U.S. since arriving in 2014, but lost her job while she was detained and now tries to stay home as much as possible, although she still must take her daughter to the bus stop and get groceries for her family, including three young children, one of whom is a U.S. citizen. *Id.* ¶¶ 5-10, 13 100-01, 105. ICE continues to be very active in S.T.'s neighborhood, as they have an office ten minutes away. *Id.* ¶ 103. S.T. receives text messages from her friends and neighbors reporting weekly about ICE arresting more people in her neighborhood, including arrests at the Home Depot down the street from her home. *Id.* ¶ 104. S.T. has also seen posts online and in WhatsApp groups that ICE is arresting people and leaving the cars of those they arrest on the side of the road in her neighborhood. *Id.* ¶ 106.

The experiences of the Plaintiffs described in the preceding paragraphs are not unique. To the contrary, they reflect Defendants' unlawful policy and practice of effecting warrantless arrests without regard to probable cause that the person is likely to escape. For example, Jose Cesareo

7

Valladares, who has lived in Columbus for the past eighteen years and is the primary breadwinner for his wife and eleven-year-old child, both of whom are U.S. citizens, was arrested by individuals in plain clothing while returning home from the grocery store on December 17, 2025. Declaration of Jose Cesareo Valladares, ¶¶ 5-11, 13-15. The men did not identify themselves as law enforcement officers or immigration agents, did not present a warrant, and never asked about his ties to the community, family, employment, or his criminal history. *Id.* ¶¶ 17, 23-24, 25-28. Leosdanis Mulet, a Cuban national with a pending green card application under the Cuban Adjustment Act, was also arrested on December 20, 2025, when ICE officers cut off the vehicle his wife was driving and physically pulled him out of the passenger seat. Declaration of Leosdanis Mulet, ¶¶ 1, 16-24. Mr. Mulet was never shown a warrant for his arrest and other than being asked "what makes you legal in this country," no further questions were asked. *See id.* ¶¶ 34, 36-39. No one asked how long he had been in the U.S., anything about his family, his employment, ties to the community or whether he had a criminal record. *Id.*

Guadalupe Montoya Sadillo, who has resided in Columbus for the past twenty-one years with his three children, two of whom are U.S. citizens, was arrested while working at a construction site on December 21, 2025, by masked individuals in unmarked black vehicles. Declaration of Guadalupe Montoya Sadillo, ¶¶ 6-15. Officers never conducted a pre-arrest determination of Mr. Sadillo's likelihood of escape. They never asked him how long he had been in the United States, about his ties to the community, family, or employment, whether he had a criminal history, or showed him a warrant for his arrest. *Id.* ¶¶ 18-20, 25-28. Rather, after looking at his Mexican ID, officers told Mr. Sadillo that he had "no papers" and would be deported. *Id.* ¶¶ 21-22. Julio Cesar Chavez Velasquez was also arrested in December 2025, while placing groceries in his car after shopping to celebrate his daughter's birthday. Declaration of Julio Cesar Chavez Velasquez, ¶¶ 11-

18. He was arrested by masked men who did not identify themselves as immigration officers or any other law enforcement agency, had their faces covered, did not show him a warrant, and did not ask about his employment or ties to the community. *Id.* ¶¶ 4-10, 26-29, 33-40.

Brad Bonacci, the General Manager of a hotel in Columbus, Ohio, also witnessed a horrifying incident on December 17, 2025, when masked federal agents entered the hotel lobby looking for an unknown individual. Declaration of Brad Bonacci, ¶¶ 1-8. At that same moment, three housekeepers who were walking to their cars in the parking lot for a lunch break were snatched by federal agents who jumped out of their vehicles then sped off the property. *Id.* ¶ 9. All three housekeepers appear Hispanic or Latino, and two are Puerto Rico-born United States citizens. *Id.* ¶¶ 12-13. No questions were asked before these federal agents grabbed them and placed them in their vehicles. *Id.* ¶¶ 11-12. Two of the women were ultimately released once ICE realized they were U.S. citizens—but only after spending four days in jail. *Id.* ¶ 19.

On the morning of February 7, 2026, M.A.R. and his coworker were pulled over by an unmarked vehicle on I-270 as they were driving to work. Declaration of I.A., ¶¶ 18-19. Officers did not show M.A.R. a warrant for his arrest, did not explain to M.A.R. why he was being stopped or detained, and did not ask him any questions about his community ties or family. *Id.* ¶¶ 20-23. M.A.R. has lived in the United States continuously since 2006 and has lived in Columbus for the past twelve years. *Id.* ¶¶ 8-10. Similarly, J.R. was arrested and detained by ICE officers on March 13, 2026, without a warrant and without any questions asked about his flight risk, family, or community ties. Declaration of Y.R., ¶¶ 21-27. J.R. has been in the United States since August 2016, and has a pending asylum application. *Id.* ¶¶ 8-9. J.R. has no criminal history, two children, one of whom is a United States citizen, valid work authorization and a valid driver's license, both of which he showed to the arresting officers. *Id.* ¶¶ 13-15, 26. J.R. has worked in construction for

9

nearly ten years, pays taxes, has owned a home since 2020, and is responsible for paying his family's bills and mortgage. *Id.* ¶¶ 16-20.

Over the past year, most of the clients of Emily Montgomery Brown, the Director of the Immigration Clinic and Assistant Clinical Professor of Law at The Ohio State University Moritz College of Law, appear to have been picked up in collateral, non-targeted arrests. Declaration of Emily Montgomery Brown, ¶¶ 1, 4. None of those clients appear to have been arrested pursuant to a warrant, but rather were picked up at gas stations, in parking lots next to construction vehicles, or at their cars parked outside of work or shopping areas. *Id.* ¶ 4. The agents did not ask them any questions to assess their community ties or flight risk before arresting them, although several of those arrested in fact had U.S. citizen children or other family members and had lived in the U.S. for many years. *Id.* ¶ 5.

Brian Hoffman, the Executive Director of the Ohio Center for Strategic Immigration Litigation and Outreach ("OCSILiO"), has weekly conversations with prospective clients who have been detained by ICE or U.S. Border Patrol, most of whom were not arrested pursuant to a warrant and none of whom were asked anything about their community ties or other questions to assess their likelihood of escape before being arrested. Declaration of Brian J. Hoffman, ¶¶ 1, 3-4, 9-10. Most recently, Brian met with a brother and sister who were arrested on the morning of February 25, 2026, in Canton, Ohio, on their way to work. *Id.* ¶ 8. They both have U.S. citizen children but were arrested without warrants and without any analysis of whether they were likely to escape before a warrant could be obtained. *Id.*

## II. Since President Trump's Second Term in Office, Defendants Have Embarked on a Nationwide Crackdown on Immigration

What is happening in Ohio is part of a nationwide crackdown. During the 2024 presidential campaign, President Trump promised that "on Day One . . . [w]e will begin the largest deportation

operation in the history of our country."[11] The President has continued to make false and misleading claims about immigrants, including that they are "criminals", "killers", "gang members", "poisoning our country" and "taking your jobs."[12]

In January 2025, after President Trump took office, the administration imposed an arrest quota of 75 arrests per day on each ICE field office across the country, including the Detroit ICE field office.[13] The Detroit ICE field office manages immigration enforcement in the states of Michigan and Ohio.[14] In May, the arrest quota increased to a new goal of 3,000 daily arrests nationwide, a number that Homeland Security Advisor and White House Deputy Chief of Staff Stephen Miller publicly confirmed.[15] Miller also said that "number is going to keep getting bumped higher over time."[16] To help meet the quota and carry out these massive arrests, ICE officers were encouraged to "turn up the creativity knob up to 11 and push the envelope."[17]

---

[11] Press Release, The White House, *Promises Made, Promises Kept: Border Security Achieved in Fewer Than 100 Days* (Apr. 28, 2025), https://www.whitehouse.gov/articles/2025/04/promises-made-promises-kept-border-security-achieved-in-fewer-than-100-days (quoting *Transcripts, Donald Trump Holds a Campaign Rally in Concord, North Carolina – October 21, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-concord-north-carolina-october-21-2024/#108).

[12] The Marshall Project, *Fact-checking Over 12,000 of Donald Trump's Quotes About Immigrants* (Oct. 21, 2024), https://www.themarshallproject.org/2024/10/21/fact-check-12000-trump-statements-immigrants#migrant_crime.

[13] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, WASH. POST (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota.

[14] U.S. Immigr. and Customs Enf't, Detroit Field Off., https://www.ice.gov/field-office/detroit-field-office.

[15] Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily*, FOX NEWS (May 29, 2025), https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day.

[16] *Id.*

[17] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, THE GUARDIAN (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests [https://perma.cc/54HH-SNSN].

Instead of just focusing on the "worst of the worst," Defendant Lyons said ICE will take into custody anyone living in the U.S. without authorization whom ICE encounters, even those who are not their direct target.[18] Tellingly, ICE has recently rejected its own previous requirement that immigration officers must gain prior supervisor approval of, or at least fill out a paper form with information about, the person they plan to arrest, instead preferring more "spontaneous" arrests.[19] In a January 28, 2026 Memo from Defendant Lyons to all ICE personnel, Lyons set forth factors that purport to satisfy the likelihood of escape requirement in 8 U.S.C. § 1357 but are in fact so broad that they would sweep in essentially any person encountered on the street in a vehicle or on foot.[20] Such an analysis essentially renders the likelihood of escape requirement in 8 U.S.C. § 1357(a)(2) meaningless,[21] reflecting the administration's intention to "move[]from targeted enforcement to broad street sweeps."[22]

Courts across the country have consistently found Defendants' practices unlawful: They may not make immigration arrests without warrants and without complying with the probable cause requirements in § 1357(a)(2).[23] In fact, as a result of a 2018 lawsuit filed by Chicago

---

[18] Camilo Montoya-Galvez, *ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers*, CBS NEWS (July 21, 2025), https://www.cbsnews.com/news/ice-head-todd-lyons-agents-will-arrest-anyone-found-illegally-crack-down-on-employers/.

[19] Julia Ainsley et al., *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC NEWS (Sept. 9, 2025), https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407.

[20] Memorandum from Todd Lyons, Senior Off. Performing Duties of the Dir. to All ICE Personnel (Jan. 28, 2026) (available at https://immpolicytracking.org/policies/ice-issues-guidance-on-arrest-warrants-and-warrantless-arrests/#/tab-policy-documents).

[21] *See* Hamed Aleaziz & Charlie Savage, *ICE Expands Power of Agents to Arrest People Without Warrants*, NYTIMES (Jan. 30, 2026), https://www.nytimes.com/2026/01/30/us/politics/ice-expands-power-agents-warrants.html.

[22] *Supra* note 19.

[23] *See Escobar Molina* v. *Dep't of Homeland Sec*, 811 F. Supp. 3d 1, 15 (D.D.C. 2025); *); Ramirez Ovando v. Noem*, 810 F. Supp. 3d. 1209, 1241 (D. Colo. 2025); *United Farm Workers v. Noem*,

12

residents and non-profit organizations against ICE for this same policy and practice of conducting warrantless arrests in the Chicago-area without complying with the probable cause requirements in § 1357(a)(2),[24] ICE adopted a policy prohibiting warrantless arrests that failed to meet the requirements of § 1357(a)(2).[25] This policy makes clear that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be obtained."[26] It also lists specific factors relevant to determining likelihood of escape, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond."[27]

Despite this prior recognition that probable cause encompasses such considerations, ICE is now disregarding its obligations under federal law and carrying out warrantless arrests on a wide scale, without probable cause.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). To obtain relief,

---

No. 25-cv-246 (E.D. Cal. Apr. 29, 2025); *Hussen v. Noem,* __ F. Supp. 3d. __, 2026 WL 657936 (D. Minn. 2026).

[24] *See* Second Amended Complaint, *Castañon Nava v. Dep't of Homeland Sec*., 806 F. Supp. 3d 823 (N.D. Ill. 2018) ( No. 18-cv-03757), ECF No. 58.

[25] ICE Broadcast Statement of Policy, *Castañon Nava v. Dep't of Homeland Sec*., 806 F. Supp. 3d 823 (N.D. Ill. 2018) ( No. 18-cv-03757), Appendix A to Settlement Agreement, available at https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf.

[26] *Id.* at 18.

[27] *Id.* at 17.

plaintiffs must show that they: (1) have a strong likelihood of success on the merits; (2) will suffer irreparable harm if the injunction is not issued; (3) the issuance of the injunction will not cause substantial harm to others; and (4) that the public interest would be served by issuing the injunction. *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017). The factors governing whether a court issues a preliminary injunction "are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573.

Here, Plaintiffs seek a prohibitory injunction, which "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983); *see also, UFW v. Noem*, 785 F. Supp. 3d 672, 732 (E.D. Ca. 2025) (finding plaintiffs' request for an injunction directing DHS to comply with § 1357(a)(2) and § 287.8(c)(2)(ii) to be "prohibitory" rather than "mandatory").

## I. Plaintiffs Have a Strong Likelihood of Success on the Merits of Their Claims

Plaintiffs are likely to succeed on the merits of their claim that Defendants' policy and practice of making warrantless arrests in Ohio without making any individualized determinations of flight risk violates 8 USC § 1357(a)(2), 8 CFR § 287.8(c)(2)(ii), the APA, 5 USC § 706(2)(A), (C), and the *Accardi* doctrine.

A. <u>Before an arrest may be made without a warrant, the INA and DHS regulations require agents to make an individualized determination that the person is likely to escape before a warrant can be obtained.</u>

The Immigration and Nationality Act (INA) sets out the "terms and conditions of admission to the country[.]"*Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011), quoting *De Canas v. Bica,* 424 U.S. 351, 359 (1976).[28] Generally, officers making civil immigration arrests are

---

[28] The INA does not strip this Court of jurisdiction, as this case does not challenge the Attorney General's "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders[,]'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (citing 8

required to have a warrant. *See Arizona v. United States*, 567 U.S. 387, 408 (2012). "If no federal warrant has been issued, those officers have more limited authority." *Id.* That limited authority is codified in 8 U.S.C. § 1357(a)(2), which permits warrantless arrests *only if* the agent "has ***reason to believe that the alien so arrested*** is in the United States in violation of any such [immigration] law or regulation *and **is likely to escape before a warrant can be obtained for his arrest***[.]" 8 U.S.C. § 1357(a)(1), (2) (emphasis added). The statute's two-pronged requirement is mirrored in DHS's regulations for enforcement activities. *See* 8 C.F.R. § 287.8(c)(2) ("An arrest shall be made *only* when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States" and that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." (emphasis added)).

"Though 8 U.S.C. § 1357(a)(2) uses the phrase 'reason to believe' as the standard for executing warrantless civil immigration arrests, 'aliens in this country are sheltered by the Fourth Amendment in common with citizens,' and therefore, to avoid running afoul of the Fourth Amendment, this statutory phrase is 'considered the equivalent of probable cause.'" *Escobar Molina* v. *Dep't of Homeland Sec*, 811 F. Supp. 3d 1, 13 (D.D.C. 2025) (quoting *Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222-23 (D.C. Cir. 1971)); *accord Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause."); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) (same); *United States v. Pacheco-Alvarez*,

---

U.S.C. § 1252(g)) (emphasis in original), removal of an alien from the United States, *see* 8 U.S.C. § 1252(b)(9), or a final order of removal, *see* 8 U.S.C. § 1252(a)(5).

227 F. Supp. 3d 863, 887 (S.D. Ohio 2016) (same). "Reason to believe" must therefore "be particularized with respect to the person to be searched or seized," *United States v. Pruitt*, 458 F.3d 477, 490 (6th Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

"[H]aving reason to believe [that the suspect] is an alien subject to removal from the United States does not, without more, provide the probable cause needed to make a lawful [warrantless] arrest." *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017); *Ramirez Ovando v. Noem,* 810 F. Supp. 3d. 1209, 1241 (D. Colo. 2025); *see also Pacheco-Alvarez*, 227 F. Supp. 3d at 872, 889-90 ("ICE officers lacked 'reason to believe' [the suspect] posed a risk of escape," even though he had admitted that he "was born in Mexico and did not have any documentation that would allow him to reside in the United States"). To find otherwise would render the INA requirement of an individualized finding on escape risk to be surplusage. *See Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016) ("Such a reading would render the limitations on warrantless arrest created by . . . [§] 1357(a)(2) meaningless.").

Defendants previously recognized as much in 2021 when ICE issued a nationwide "Broadcast Statement of Policy" in *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823 (N.D. Ill. 2018), making clear that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be obtained" and listing specific factors that may be relevant to a flight risk determination, including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof."[29]

---

[29] ICE Broadcast Statement of Policy, *supra* n. 25 at 17.

Under both the INA and DHS regulations, "ICE officers must make a 'particularized inquiry' that the subject is likely to abscond." *Ramirez Ovando*, 810 F. Supp. 3d at 1217 (quoting *Moreno*, 213 F. Supp. 3d at 1007–08); *see also* ICE Broadcast Statement of Policy at 17-18, *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823 (N.D. Ill. 2018) ( No. 18-cv-03757), Appendix A to Settlement Agreement, available at https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf. (requiring ICE officers to document "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained"). When assessing whether the individual is an escape risk, courts look to factors such as the individual's criminal history, job stability, financial or familial obligations, interaction with law enforcement once stopped, and other factors to determine whether ICE had (or even could have had) knowledge that the individual "posed a risk of escape before [ICE] could obtain an administrative arrest warrant for [their] removal proceedings[.]" *Pacheco-Alvarez*, 227 F. Supp. 3d at 890. The "specific circumstances that weigh in favor of or against a reasonable belief that the person is likely to abscond . . . are not to be viewed singly; they must be considered as a whole." *Ramirez Ovando*, 810 F. Supp. 3d at 1241.

"Courts have also made the self-evident finding that the likelihood of escape is lower when the individual has resided in the country for a lengthy period of time and has strong community ties." *Escobar Molina*, 811 F. Supp. 3d at 13. Those Courts included ones in this District. *See United States v. Abdi*, No. 04-cr-88, 2005 WL 6119695, at *6 (S.D. Ohio Sept. 12, 2005), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006) (no probable cause for escape risk where defendant owned a business, leased property, lived with his then-pregnant wife and two children, and had family in the area); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (same, where defendant had a stable job, lived with his fiancé, and helped pay her rent and raise her two children); *see also La Franca*

17

*v. Immigr. & Naturalization Serv.*, 413 F.2d 686, 689 (2d Cir. 1969) (being "the owner and operator of a bakery in Jersey City" lowered petitioner's likelihood of escape before a warrant could be obtained); *United States v. Bautista-Ramos*, No. 18-CR-4066, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (no flight risk where ICE encountered noncitizen at his place of employment, "a place he routinely visited," as opposed to anywhere near the border or heading in that direction); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (same, where defendant worked two jobs, owned a vehicle, paid rent, and never experienced legal trouble before his immigration arrest); *Pichardo Medina v. Hermosilla*, No. 25-CV-02233, 2025 WL 3712271, at *4 (D. Or. Dec. 22, 2025) (same, where "Petitioner has lived in the United States for approximately 21 years, has no criminal record, has paid taxes for over a decade, is connected to his community through his church, has a family, and is a unique source of trust and affection for his son, who is a U.S. citizen").

B. <u>Defendants have a policy and practice of making warrantless immigration arrests without an individualized determination of escape risk in Ohio.</u>

The Complaint, Declarations submitted herewith, and statements and actions of Defendants themselves make it abundantly clear that Defendants have a policy and practice of making warrantless arrests in Ohio without making individualized determinations of likelihood of escape. This policy of Defendants is consistently manifested in several ways:

(1) *Defendants' own statements*

Statements of Defendants themselves demonstrate that federal agents are not making an individualized determination of probable cause for escape risk before making a warrantless arrest. For example, in July 2025, the acting U.S. Attorney for the Eastern District of California was fired after she told a Border Patrol official that he could not arrest immigrants without probable cause. Heather Knight and Hamed Aleaziz, *Trump Fired a U.S. Attorney Who Insisted on Following a*

*Court Order*, NYTIMES (Sept. 26, 2025), https://nytimes.com/2025/09/26/us/trump-fires-us-attorney-california-immigration.html. In response to a similar warrantless arrest lawsuit filed in D.C., Defendant DHS issued a public statement in September 2025, that "DHS law enforcement uses '*reasonable suspicion*' to make arrests." Teo Armus and Jenny Gathright, *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.*, WASH. POST (Sept. 25, 2025), https://www.washingtonpost.com/immigration/2025/09/25/dc-ice-arrests-lawsuit-trump/; *see also* Homeland Security (@DHSgov), X (Sept. 25, 2025), https://x.com/DHSgov/status/1971315047201694042 (reiterating that DHS uses this "reasonable suspicion" standard in making civil immigration arrests). The following month, former Chief Border Patrol Agent Gregory Bovino reiterated in a public statement, "We need reasonable suspicion to make an immigration arrest . . . You notice I did not say probable cause, nor did I say I need a warrant." Priscilla Alvarez and Michael Williams, *Border Patrol official denies racial profiling factors in immigration arrests, says officers do consider whether people appear "panicked" or "scared"*, CNN (Oct. 7, 2025), https://www.cnn.com/us/live-news/national-guard-chicago-portland-trump-10-07-25?post-id=cmgh33k7200053b6nkxi1fl97.

But Defendants' reliance on the "reasonable suspicion" standard falls far short of the requisite probable cause it needs to effectuate a warrantless arrest. *See, e.g., United States v. Pruitt*, 458 F.3d 477, 490 (6th Cir. 2006) ("Reason to believe" must "be particularized with respect to the person to be searched or seized[.]"(cleaned up). In fact, such statements confirm that such a policy and practice of making warrantless civil immigration arrests *without* the requisite probable cause findings exists.

(2) *The experiences of the Plaintiffs and Declarants, including Ohio attorneys who practice immigration law.*

In none of the more than 11 arrests documented in the attached Declarations did federal officers even attempt to obtain knowledge of facts relevant to any flight or escape risk factor. Indeed, in none of the arrests did the agents ask any questions about where the person they arrested lives, whom the person lives with or the person's family members, the person's work history, criminal history, or anything else about the person's family or ties to their community—factors that courts have held militate *against* finding probable cause that the person poses a flight risk. This appears to be standard practice for ICE and Border Patrol in Ohio. This is corroborated by the Executive Director of the Ohio Center for Strategic Immigration Litigation and Outreach (OCSILiO), who has weekly conversations with prospective clients who were detained by ICE or U.S. Border Patrol, most of whom were arrested without a warrant and *none* of whom were asked questions to assess their likelihood of escape. Brian J. Hoffman Decl., ¶¶ 1, 3-4, 9-10.

For example, officers arrested Plaintiff F.M. without asking him anything about his asylum case, criminal background, or ties to the community, despite F.M. calmly telling the officers that he had an ongoing immigration case, work permit, and driver's license. F.M. Decl., ¶¶ 14, 28. Rather, the arresting officers told F.M. to just "stay silent and stay calm", shackled his legs and placed him in the back of a car. *Id.* ¶¶ 17, 29. Border Patrol agents likewise arrested Plaintiff Jose Armando de Leon Zapata on September 30, 2025, without learning how long he had been in the U.S., anything about his family, job, or ties to the community. Jose Armando de Leon Zapata Decl., ¶¶ 20, 23. Mr. Zapata was handcuffed and put in a vehicle where a Border Patrol agent told him he was being arrested because he was an "illegal alien" and would probably be deported before they even asked his name. *Id.* ¶ 20, 25.

20

Plaintiff Moises Javier Aguilar Peralta was arrested as he was exiting a Home Depot where he picked up materials for work after officers approached him and demanded to know if he had "residency or citizenship." Moises Javier Aguilar Peralta Decl., ¶¶ 21-32, 37-38. The officers never asked him how long he had been in the U.S., about his work, or his family. *Id.* ¶ 50. Instead, the officers aggressively handcuffed and arrested Mr. Peralta, celebrating the fact that they had "one more." *Id.* ¶¶ 54-61. Plaintiff S.T. was also arrested by ICE without being asked anything about her family, job, ties to her community, or how long she had been in the U.S. S.T. Decl. ¶ 29. The officers merely accused her of being "illegal." *Id.* ¶¶ 27, 33.

Officers likewise arrested Guadalupe Montoya Sadillo, who has lived in Columbus, Ohio, for the past twenty-one years, while he was working at a construction site and without asking him how long he had been in the U.S., about his ties to the community, family or employment, or criminal history. Guadalupe Montoya Sadillo Decl., ¶¶ 6-7, 13-14, 23, 25-28. Julio Cesar Chavez Velasquez was similarly arrested by officers after shopping with his wife and their six-year-old daughter for her birthday. Julio Cesar Chavez Velasquez Decl.¶¶ 11, 13-20. The officers asked Mr. Velasquez where he was born and arrested him without asking how long he had lived in the U.S., his employment or business, or criminal history. *Id.* ¶¶ 36, 38, 40-41. Rather, the officers told Mr. Velasquez that if he did not get out of his vehicle, they would break his window and take him out, then handcuffed him, placed him in their vehicle, sped off and ran two red lights. *Id.* ¶¶ 31, 42- 44, 45-50. Officers also arrested Jose Cesareo Valladares in the parking lot of his apartment building as he returned home from the grocery store without asking him how long he had lived in the U.S., his ties to the community, anything about his family or employment, or his criminal history. Jose Cesareo Valladares Decl., ¶¶ 13-14, 25-28. Mr. Valladares has lived and worked in Columbus,

Ohio, for the past eighteen years, and is the primary breadwinner for his U.S. citizen girlfriend and eleven-year-old U.S. citizen child. *Id.* ¶¶ 5-11.

Leosdanis Mulet was also arrested by ICE officers while his wife drove him and their two children home from the bank. Leosdanis Mulet Decl., ¶¶ 18-21. The officers did not ask Mr. Mulet how long he had been in the U.S., his ties to the community, his family, employment, or criminal history. *Id.* ¶¶ 36-39. Rather, after pulling Mr. Mulet out of the passenger seat of his car and handcuffing him, the officers asked "what makes you legal in this country?", and when he responded that he entered on humanitarian parole and had a pending application for his green card, they told him to "take it up with the judge." *Id.* ¶¶ 24, 27. M.A.R. was arrested on the morning of February 7, 2026, while driving to work with a coworker. I.A. Decl., ¶ 18. He did not provide any identification to the officers who pulled him over and was arrested without any questions asked about his family or community. *Id.* ¶¶ 23-24. J.R. was likewise arrested on March 13, 2026, without a warrant and without being asked any questions about his family, community ties, or other questions assessing his flight risk. Y.R. Decl., ¶¶ 21-27.

Notably, when each Plaintiff was finally afforded the opportunity to appear before an Immigration Judge, the Judge determined that they were eligible for a bond, which necessarily included a determination that they did not present a flight risk. If ICE had made a proper assessment, the individual would have never been detained.

(3) *Defendant Lyons' memo*

A memo by Defendant Lyons on January 28, 2026 (The "Lyons memo") circulated to all ICE personnel, purports to reiterate the statutory requirements contained in § 1357(a)(2) before ICE may make a warrantless arrest. But it in fact eliminates the requirement to inquire about *any* of the palpably relevant circumstances, and instead redefines "likelihood of escape" so broadly that it would apply to virtually any person ICE officers encounter, including anyone with access

to transportation.[30] The factors that purport to satisfy the likelihood of escape requirement thus sweep in essentially any person encountered on the street in a vehicle or on foot.[31] Such a definition essentially renders the warrant requirement in § 1357 meaningless.[32]

Despite the lip service to the probable cause standard reflected in the statute and case law, the memorandum demonstrates that ICE officers do not even *try* to establish probable cause as to the likelihood of Plaintiffs' and Declarants' absconding prior to arrest. Instead, physical ability to depart the physical scene of the encounter, "suspicious behavior," age, health, suspicion of fraudulent documents, and likelihood to physically "remain at the scene of the encounter," are weighted-factors which are so broad that they swallow the whole. Even so, however, none of the Plaintiffs or Declarants displayed any furtive conduct suggesting that they were likely to escape arrest. Nor did any make any effort to resist, drive or walk away. *Cf. U.S. v. Cantu*, 519 F.2d 494, 497 (1975) (finding probable cause where arrestee was speeding cross country).

Indeed, most of the Plaintiffs and declarants were arrested while going about their daily and routine life activities and fully cooperated with the arresting officers. For example, Mr. Zapata was arrested while in a Lyft on his way to work. Zapata Decl., ¶¶ 15-20. He did not try to flee the area, resist arrest, or protest. *Id.* ¶¶ 20-22. F.M. was also arrested while going to Walmart to pick up a delivery for work. F.M. Decl. ¶ 12. He followed all orders once stopped by the officers and did not protest. *Id.* ¶¶ 14-16. The officers even remarked how nice and easy to deal with F.M. was because he did not resist or try to run away. *Id.* ¶ 18. ICE officers followed and cut off the car Plaintiff S.T. was driving, and despite her obeying their orders to turn off her car, officers still

---

[30] *Supra* note 20.

[31] *Id.*

[32] *See* Hamed Aleaziz and Charlie Savage, *ICE Expands Power of Agents to Arrest People Without Warrants*, NYTIMES (Jan. 30, 2026), https://www.nytimes.com/2026/01/30/us/politics/ice-expands-power-agents-warrants.html.

banged on her car door and pulled her out of her vehicle. S.T. Decl. ¶¶ 17, 24-26. At no point did S.T. resist or try to run away. *Id.* ¶ 31.

Similarly, Plaintiff Moises Javier Aguilar Peralta did everything to cooperate with the officers when he was arrested after leaving a Home Depot where he purchased supplies for work. Moises Javier Aguilar Peralta Decl., ¶¶ 21-24, 51. He showed them his driver's license and did not resist his arrest, did not try to flee, or fight back. *Id.* ¶¶ 51-52. He did not even consider resisting or fleeing because he knew he was not present unlawfully since he had a pending asylum case. *Id.* ¶ 53. Julio Cesar Chavez Velasquez likewise cooperated with the officers who arrested him, providing his driver's license upon request. Velasquez Decl., ¶¶ 20-22. He did not resist and did not try to run away. *Id.* ¶ 32; *see also* I.A. Decl., ¶ 21 (noting her father, M.A.R., did not try to resist his arrest in any way); Y.R. Decl., ¶ 25 (noting her husband, J.R., did not resist or attempt to flee).

The Lyons Memo begs the question by presuming anyone without legal status is likely to escape, and it expressly departs from and impermissibly seeks to overrule the applicable case law by instructing officers not to consider the actual risk that an individual will flee instead of appearing for subsequent immigration hearings or complying with future immigration obligations

(4) *Defendants' policy and practice in other locations throughout the country.*

Courts around the country have found that Defendants have a policy and practice of making warrantless arrests without a pre-arrest, individualized determination that the individual is likely to escape before a warrant can be obtained. *See Hussen v. Noem*, __ F. Supp. 3d __, 2026 WL 657936, at *40 (D. Minn. 2026) ("I conclude that Plaintiffs have made a clear showing that Defendants adopted a policy authorizing federal immigration officers to conduct warrantless arrests without probable cause that the arrestees were violating immigration laws, and without probable cause that the arrestees were likely to escape before a warrant for their arrest could be

24

obtained, in Minnesota from mid-December 2025 to mid-January 2026."); *Escobar Molina v. Dep't of Homeland Sec*, 811 F. Supp. 3d 1, 33 (D.D.C. 2025) ("defendants 'are engaging in a systemic policy and practice of making warrantless arrests without individualized determinations of flight risk.'"); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1237 (D. Colo. 2025) ("[D]efendants likely have a policy, pattern, and/or practice of violating these sections by effecting warrantless arrests without individualized probable cause of flight risk"); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 735 (E.D. Cal. 2025) ("[T]he evidence shows a pattern and practice of warrantless arrests without Border Patrol agents performing individualized flight risk assessments to have probable cause for the arrest as required.").

Defendants' unlawful actions in Ohio are no different.

C. Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of escape risk violates the INA, DHS regulations, and the *Accardi* doctrine.

Having established the existence of Defendants' policy and practice of effectuating warrantless arrests without making an individualized determination that the person is likely to escape before a warrant can be obtained, it necessarily follows that Defendants are violating federal law, DHS's own regulations, and the *Accardi* Doctrine.

"Courts have consistently held that an agency policy of effecting warrantless immigration arrests under § 1357(a)(2) without regard for individualized flight risk" is amenable to judicial review and being struck down as invalid. *Ramirez Ovando,* 810 F. Supp. 3d 1209, at 1235 (citing *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008-09 (N.D. Ill. 2016). Here, Defendants' "systemic failure to apply the probable cause standard, including the failure to consider escape risk, directly violates the clear statutory requirements under the INA." *See Escobar Molina*, 811 F. Supp. 3d at 27; *Roy v. Cnty. of Los Angeles*, Case No. 12-cv-09012, 2018 WL 914773, at *21 (C.D. Cal., Feb. 7, 2018) (finding ICE's policy and practice of issuing detainers without making any assessment of

25

flight risk violates § 1357(a)(2)); *Creedle v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1276, 1295 (S.D. Fla. 2018) (same, as to plaintiff)).

DHS's regulation, 8 C.F.R. § 287.8(c)(2)(ii), likewise expressly requires that a "warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." Defendants' policy and practice of making warrantless immigration arrests without probable cause that the person Defendants' agents are arresting without a warrant "is likely to escape before a warrant can be obtained" directly violates 8 C.F.R. § 287.8(c)(2)(ii).

The *Accardi* doctrine provides the elementary principle of administrative law that agencies are required to follow their own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see also Masis Lucero v. Field Off. Dir. of Enf't & Removal Operations, Detroit Field Off., Immigr. & Customs Enf't*, 25-cv-823, 2025 WL 3718730, at *5 (S.D. Ohio Dec. 23, 2025) ("[W]here an agency has bound itself, through the adoption of rules, to provide certain substantive rights, the *Accardi* doctrine sharply limits the agency's ability to simply ignore their own published rules."). In particular, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Gafurova v. Whitaker*, 911 F.3d 321, 330 (6th Cir. 2018) (quoting *Morton* at 235). Because DHS is not following its own regulations, this policy and practice also violates the *Accardi* doctrine.

Plaintiffs accordingly are likely to succeed on the merits of their claim that Defendants' policy and practice of making warrantless immigration arrests without an individualized

26

determination of probable cause for escape risk violates 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); and the *Accardi* doctrine.[33]

    D. <u>Defendants' policy and practice of making warrantless arrests without probable cause of escape risk is a final agency action that violates the APA, 5 U.S.C. § 706(2)(A), (C)</u>

The APA empowers affected parties to challenge agency actions that are (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" or (2) "in excess of statutory jurisdiction, authority, or limitations, short of statutory right[.]" 5 U.S.C. §§ 706(2)(A), (C). Review under the APA requires that the allegedly unlawful policy, pattern, and/or practice reflects "final agency action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990); *see* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). For agency action to be "final," it must be an action that "mark[s] the consummation of the agency's decisionmaking process and . . . one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted). "Courts approach the APA's finality requirement flexibly and pragmatically." *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 901 (N.D. Ill. 2020).

---

[33] Defendants also lack sovereign immunity in this action because it states a claim that an agency or its officers acted in an official capacity and seeks only injunctive relief. *See Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 425 (6th Cir. 2016) (rejecting sovereign immunity due to the express waiver of immunity in the APA, where 5 U.S.C. § 702 provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.").

Defendants' policy of making warrantless immigration arrests without the requisite probable cause findings in § 1357(a)(2) is a final agency action.[34] This policy reflects a final decision by Defendants as to how to conduct warrantless immigration arrests in Ohio in pursuit of the President's goal of mass immigration arrests and deportations; it is not an action of "merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Rather, it is an action "by which rights or obligations have been determined, or from which legal consequences will flow," *Corner Post, Inc.*, 603 U.S. at 808, given that it is determinative of whether an individual will be arrested and detained without a warrant.

## II.     Plaintiffs Have Standing to Pursue Their Claims.

Plaintiffs and the class they represent fully expect to be confronted again by ICE officers. When arrested, they had been engaged in innocent, lawful conduct, yet they were confronted and arrested without probable cause. None had any criminal record at all—save one who had a previous case of driving without a license. ICE remains active in Ohio and continues to execute the government's illegal warrantless arrest policy on a daily basis.[35] Moreover, more surges in enforcement have been threatened. Plaintiffs and their fellow class members have been forced to limit their movements, imposing real and unavoidable costs on them, their families, their employers, and their communities. But because of the breadth of Defendants' activity in these communities, even these efforts to avoid experiencing unlawful arrest again are unlikely to protect Plaintiffs in the absence of the requested relief from this Court.

---

[34] The APA's requirement of final agency action imposes its own exhaustion duty, and exhaustion here would be futile to make an agency correct its own intentional violations of statutory rights. *Cf. Shearson v. Holder*, 725 F.3d 588, 594-95 (6th Cir. 2013) (where exhaustion would "allow the agencies involved an opportunity to resolve problems with their procedures").

[35] *See supra* n. 10, discussing recent arrests in Ohio.

28

Those seeking to enjoin illegal conduct must have Article III standing. The Plaintiffs have satisfied that requirement. The core jurisdictional standing requirement is that a plaintiff have a "personal stake in the outcome." *Baker v. Carr*, 369 U.S. 186, 204 (1962). In similar litigation, the government has generally relied heavily on the oft-cited *Los Angeles v. Lyons*, 461 U.S. 95 (1983), but such reliance would be inapposite here.

*Lyons* held that the personal stake requirement of *Baker* meant more than past harm and fear of recurrence; instead, plaintiffs had to show beyond "subjective apprehensions" the "reality of the threat of repeated injury." *Id.* at 107 n.81. In *Lyons*, the plaintiff, who had been subjected to an unlawful chokehold, lacked standing. He could not demonstrate the required personal stake because an injury from an unlawful chokehold was unlikely to recur. Missing from the evidence was proof that the "City ordered or authorized police officers to act in such [a] manner." 461 U.S. at 106. Here, in contrast, the evidence demonstrates beyond question that Defendants have ordered and authorized federal officers to act exactly as they have toward Plaintiffs and their fellow class members. Worse, Defendants have incentivized this unlawful conduct on a massive scale by the imposition of arbitrary numerical goals.

The evidence here demonstrates that DHS is operating throughout the United States on a quota system to detain undocumented aliens. "Courts generally agree that, 'when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again,' and it is consequently more likely that plaintiffs have standing to pursue equitable relief." *Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 49 (D.D.C. 2021) (quoting *Does I Through III v. District of Columbia*, 216 F.R.D. 5, 11 (D.D.C. 2003)). "[E]xposure to [the allegedly unlawful] policy is both itself an ongoing harm and evidence that there is 'sufficient

29

likelihood' that Plaintiffs' rights will be violated again." *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

The absence of such a pattern doomed standing in *Lyons*: the plaintiff was unlikely to violate a traffic law and be stopped by police and subjected to a chokehold without provocation when the police department policy prohibited such a chokehold. 461 U.S. at 105-08. The presence of arrests without probable cause pursuant to DHS policy establish standing here. *See*, *e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) ("credible threat" of future enforcement based on State's "'history of past enforcement against nearly identical conduct'"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))).

As in *Escobar Molina*, "plaintiffs have shown a substantial likelihood that they are among the group of individuals that defendants target[.]" 811 F. Supp 3d. at 15. That increases significantly the threat of imminent harm. *See, e.g.*, *Church v. City of Huntsville*, 30 F.3d 1332, 1337-39 (11th Cir. 1994) (plaintiffs who were homeless were "far more likely to have future encounters with the police" under city's alleged policy of harassing or removing homeless individuals); *Williams v. City of Chicago*, No. 22-cv-3773, 2023 WL 6388891, at *4 (N.D. Ill. Sept. 29, 2023) (plaintiffs alleged "sufficient risk of future harm" from police encounters where the city had an alleged policy of targeting plaintiffs' neighborhoods for stop-and-frisks due to the "high rates of ShotSpotter activations").

Here, "for reasons beyond" the control of Plaintiffs and the class they represent, they are "unable to avoid repeating the conduct that led to the original injury at the hands of the defendant." *Church*, 30 F.3d at 1338; *see also Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (finding

30

"exposure to [a traffic stop] policy while going about one's daily life . . . constitutes 'ongoing harm and evidence that there is 'sufficient likelihood' that the Plaintiffs' rights will be violated again'") *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) (finding standing to challenge suspicionless stops and/or frisks because the plaintiffs were stopped or frisked while engaging in "innocent, lawful conduct" such as "walking home from the grocery store, standing in front of their own homes or the homes of friends, or taking digital photographs"). Plaintiffs and the class they represent suffer the same fate and, unless ICE is enjoined, they are likely to face the denial of statutory rights again.

As the Court is no doubt aware, in the much-reported-on *Noem v. Vasquez Perdomo*, __ U.S. __, 146 S.Ct. 1, 2-3 (2025), Justice Kavanaugh concurred in staying an injunction because "plaintiffs likely lack Article III standing to seek a broad injunction restricting immigration officers from making these investigative stops." But that single justice's fact-specific commentary, which occurred in a different substantive legal context and has since been overtaken by more recent events, does not alter the analysis above.

Justice Kavanaugh reasoned in that case, relying on *Lyons*, that "plaintiffs have no good basis to believe that law enforcement will unlawfully stop *them* in the future based on the prohibited factors—and certainly no good basis for believing that any stop of the plaintiffs is imminent." *Vasquez Perdomo* at 2 (Kavanaugh, J., concurring) (emphasis in original). But he was assessing a very different injunction. Justice Kavanaugh was not addressing a regular pattern and policy by Defendants that violated established law. Instead, during an earlier period of immigration enforcement, he was analyzing a set of informal factors agents were allegedly using to support reasonable suspicion for immigration stops. His concurrence was not premised entirely on the unlikelihood of an individual person in Los Angeles being stopped by federal agents. Instead, it

31

was based on what Justice Kavanaugh deemed the particular unlikelihood of that person being stopped by those agents based on the particular set of factors the plaintiffs were alleging to be impermissible. *Id.* at 3. That is a very different scenario than the one presented here, where the government is applying an unlawful policy and practice on a blanket basis.

Importantly, Justice Kavanaugh's opinion was also informed and premised on his view at the time that the specific factors at issue related to reasonable suspicion, including the apparent race and primary language of those targeted for stops, were likely *not* impermissible on the merits. He noted statistical estimates of "an extremely high number and percentage of illegal immigrants in the Los Angeles area," the percentage arriving from Mexico and Central America, and their concentration in particular jobs, and expressed his view that incorporating race and primary language appeared to be "common sense." *Id.* at 3. But months later, and thus deeper into the expansion in geographic scope and intrusiveness of the Defendants' mass deportation push, Justice Kavanaugh himself seemed to acknowledge that his concurrence in *Vasquez Perdomo* had gone too far, and began to strike a different tone, warning that "officers must not make interior immigration stops or arrests" like those at bar "based on race or ethnicity." *Trump v. Illinois*, 607 U.S. __, 146 S. Ct. 432, 436 n.4 (2025).

In light of succeeding events painting a clearer picture of the Defendants' blanket policies of violating federal statutory constraints, their expansion of these efforts to the interior, including Ohio, and the clearer showing of the impact of those efforts on the daily lives of those targeted, it is not surprising that cases like *Escobar Molina* have recognized the standing of individuals and classes similar to Plaintiffs and the Putative Class here. Where exceptions have arisen, such as in the recent case of *Hussen v. Noem,* __ F. Supp. 3d. __, 2026 WL 657936, at *1 (D. Minn. 2026), they have arisen not based on blanket assertions that no one can have a personal stake sufficient to

satisfy Article III in cases like this, but based on the specific facts demonstrating whether or not party or class can meet the *Baker v. Carr* standard. In *Hussen*, the court principally relied on its assessment that ICE enforcement had receded from the Minneapolis-St. Paul area in light of the overwhelming public condemnation of the violent surge there. *Id.* at *40. But relevantly, the months of continued, disruptive enforcement sweeps after the declared end of Operation Buckeye present a very different scenario.

*Hussen* also imposed an unprecedentedly restrictive view of standing, seeming to require that to have standing, plaintiffs must show they have had their rights violated more than once *each*. *Id.* at *41. Such a requirement, which treats individuals' efforts to avoid a repeat arrest as a "voluntary[]y" effort to "manufacture" standing, *id.* at *31, *quoting Bost v. Ill. State Bd. of Elections,* __ U.S. __, 146 S. Ct. 513, 522 (2026) , imposes a Catch-22: those who go into hiding out of a reasonable fear of a successive violation of their rights will be less likely to be harmed again, but will also lack standing, making it impossible for them to ever leave that hiding.

Such a Catch-22 is inconsistent with the Supreme Court's precedent. For instance, in *Clapper v. Amnesty Int'l USA*, the Court held that the harm predicted by the plaintiffs—who, unlike Plaintiffs here, had never experienced harm in the first place, and were following what the Court viewed as an unlikely chain of inferences that they might be harmed by the government's policies in the future—was too speculative to establish standing. 568 U.S. 398, 401-403 (2013). But even the *Clapper* Court acknowledged, "Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Id.* at 414, n.5. The same standard was recently quoted favorably in *Bost v. Ill. State Board of Elections*, 146 S. Ct. at 522 (2026), in which

33

a majority of the Supreme Court, including Justice Kavanaugh, recognized the standing of an electoral candidate to challenge a vote-counting procedure without requiring a showing that the policy would necessarily result in the candidate's defeat or an increase in campaign expenditures.

Plaintiffs and the putative class easily meet the *Clapper* test. The costs they have described and will demonstrate to the Court, including interference with their work, childcare, family relationships, worship, and participation in their communities, are extreme, but they are reasonable efforts to "mitigate or avoid" the harm imposed by Defendants' unlawful policies. There are only two ways for this widespread imposition of *de facto* house arrest to end. One is untenable, as it would require Plaintiffs and the class to ignore the established, substantial risk of harm, inviting another illegal arrest by returning to their pre-arrest routines. The other, only this Court can provide: a remedy, in the form of preliminary injunctive relief, that affords Plaintiffs and the class of similarly-situated individuals the legal rights afforded by Congress through the INA and allows them to step out of the shadows without fear of unjustified imprisonment.

## III. Absent Immediate Injunctive Relief, Plaintiffs and the Putative Class Will Continue Facing Irreparable Harm Due to Defendants' Unlawful Policy and Practice.

To be entitled to a preliminary injunction, Plaintiffs "must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002). The injury "'must be both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). Irreparable harm means harm that cannot readily or fully be remedied by relief ordered long after it was inflicted, whether in an award of money or an apology. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.").

34

Being denied statutory rights in a way that inflicts concrete harm can be an irreparable injury. *See Williams v. Transworld Sys. Inc.*, No. 25-CV-09527, 2026 WL 74202, at *2 (N.D. Cal. Jan. 9, 2026) ("Deprivation of some statutory rights may constitute irreparable harm[.]"); *see also Washington Post v. Dep't of Homeland Sec.,* 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Without a preliminary injunction directing the Secret Service to process the plaintiff's FOIA request in an expedited fashion, the plaintiff would lose out on its statutory right to expedited processing and on the time-sensitive public interests which underlay the request.").

Here, DHS is operating throughout Ohio on a quota system to detain removable immigrants. "The mere fear of immigration detention and deportation may alone constitute a sufficient irreparable injury." *D.B. v. Trump*, No. 25-CV-419, 2025 WL 1203232, at *3 (S.D. Ohio Apr. 23, 2025); *see also Ratsantiboon v. Noem*, No. 25-CV-01315, 2025 WL 1118645, at *2 (D. Minn. Apr. 15, 2025) (noting that "forc[ing the plaintiff] to live in uncertain legal status . . . can constitute a separate irreparable harm"). Here, Plaintiffs and the Putative Class continue to exist in a state of uncertainty as to whether they will be picked up and detained by ICE or CBP without any pre-arrest individualized determination of probable cause. This alone amounts to irreparable harm that has been sufficient to warrant a TRO, which places an even higher emphasis on irreparable harm. *See id* at *2; *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (finding irreparable harm, albeit in the context of a constitutional violation, where "[p]laintiffs faced a real possibility that they would again be stopped or detained and subjected to unlawful detention on the basis of their unlawful presence alone.").

An arrest itself also involves deprivation of liberty. *Escobar Molina* recognized that even a few hours of being handcuffed and detained imposed irreparable harm. *See Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d at 51 (D.D.C. 2025); *see also Estrada v. Noem*, No.

35

25-CV-03271, 2025 WL 3691473, at *5 (C.D. Cal. Dec. 10, 2025) ("The Court finds that Petitioners' continued detention without an initial bond hearing constitutes immediate and irreparable injury, as this violates statutory rights afforded under 8 U.S.C. § 1226(a)."). The deprivation of opportunities as a result of one's unlawful detention also amounts to real, irreparable harm. *See Ramirez Ovando v. Noem*, 810 F. Supp. 3d at 1238 (D. Colo. 2025) ("If instead of being arrested immediately by ICE, plaintiffs were allowed to go home until summoned into immigration court or arrested on an administrative warrant, they would have had the opportunity to speak to their families, pay their rent, put their items in storage, and try to obtain representation by an immigration lawyer.") (record citations omitted).

In addition to an unlawful detention, Plaintiffs have convincingly alleged "an irreparable effect in the sense of making it difficult or impossible to resume their activities or restore the status quo ante in the event they prevail." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003); *see also Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) ("Even individuals who face significant constraints on their liberty or over whose liberty the government wields significant discretion retain a protected interest in their liberty."). This leaves Plaintiffs in the vulnerable position of being subject to re-detention, with potentially devastating consequences on their economic livelihoods, their families, and their health, and that harm will not be remedied by a money award at the end of this litigation. *See* S.T. Decl., ¶¶ 97-105 (fearing every day that she will be re-arrested by ICE due to frequent ICE activity and immigrant presence in her neighborhood); Peralta Decl., ¶¶ 123-35 (very scared to go about his daily life and often feels panic because of his experience in detention and living near an area where a lot of immigrants are being targeted); *id.* ¶¶ 135-38 (fearing if he returned to his country, he would be murdered); F. M. Decl., ¶¶ 36-41 (scared to go about his daily life, too scared to go to church and left to stream church

services online, fears being arrested again, not even able to be himself because of this fear); Zapata Decl., ¶¶ 35-38 (scared of being arrested again, having difficulty sleeping). Even those still in jail have no security that if released, they would not be subject to re-arrest. *See* Velasquez Decl., ¶ 80 ("I'm afraid that even if I get out of jail, I could be arrested again. If that happens, I don't know what I would do. I don't know how my family will survive this again.").

Plaintiffs have already been subject to arrests while going about their daily lives, and "these plaintiffs are subject to a much heightened risk of such re-arrest given that they fall within the targeted group for such arrests." *Escobar Molina*, 811 F. Supp. 3d at 51. This is especially true here and now since, as revealed in the recent Lyons Memo, the administration has continued to "move[] from targeted enforcement to broad street sweeps."[36]

Plaintiffs have merely been released from custody through a court order and the payment of bond, but there are no assurances that they, or any of the members of the Putative Class are not subject to detention without a pre-arrest individualized determination that they are likely to escape before a warrant can be obtained in violation of the INA and DHS regulations. What's more, the pace of civil immigration arrests in Ohio are on the increase[37] and authorities are explicitly threatening coming surges.[38]

---

[36] Julia Ainsley, et al., *supra* note 19 ; *see also* Memorandum from Todd Lyons, *supra* note 20.

[37] *See* Hoffman Decl., ¶ 16 ("Immigration detentions do not appear to be slowing down in northern Ohio . . . This high rate of detention is continuing to this day"); *see also supra* n. 10 (discussing immigration arrest rates as recent as February and March 2026).

[38] *See* Gov. Mike DeWine says Ohio prepping for possible ICE surge in Springfield, COLUMBUS DISPATCH (Jan. 27, 2026) ("Gov. Mike DeWine said Ohio officials are preparing for a potential surge in immigration enforcement when thousands of Haitians in Springfield lose their legal status overnight."). *Also see* Order Granting Certiorari, *Trump v. Miot*, 607 U.S.__, 2026 WL 731087 (March 16, 2026) (No. 25-1084); *Miot v. Trump*, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026); *Miot v. Trump*, __ F. Supp. 3d __, 2026 WL 266413 (D.D.C. 2026) (Termination of TPS for Haitians, originally set for February 3, 2026, has been delayed due to pending litigation, and the United States Supreme Court will hear oral argument on the matter later this month.).

Defendants' policy, practice, and pattern of statutory violations since at least April 22, 2025, are causing wholesale harm to Ohioans and continue to inflict an unnatural result: fear of ICE and CBP officers flouting the INA. "This is a deliberate choice to conduct routine civil immigration enforcement through masked anonymous agents operating without warrants across the interior of the United States." *Urquilla-Ramos v. Trump*, __ U.S. __, 2026 WL 475069, at *14 (S.D.W.Va. 2026).

## IV. Issuance of a Preliminary Injunction Does Not Harm Others and Promotes the Public Interest in Federal Officers Complying with the INA.

The final factors of a preliminary injunction analysis, the balance of harms and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Ohio v. Becerra*, 577 F. Supp. 3d 678, 688 (S.D. Ohio 2021), *aff'd in part, rev'd in part and remanded*, 87 F.4th 759 (6th Cir. 2023) (same). The cognizable "public interest [is] in having the immigration laws applied correctly and evenhandedly." *Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005); *see also Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 576 (1992) (discussing "the public interest in Government observance of the Constitution and laws"). Especially for undocumented immigrants seeking asylum, "the public's interest [is] in ensuring that we do not deliver [noncitizens] into the hands of their persecutors." *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011). Federal officers have ample ways to enforce immigration laws while complying with the INA.

What's more, the public clearly has a strong interest in ensuring that Defendants comply with the existing federal statutory framework to carry out civil immigration arrests and Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Ramirez Ovando, v. Noem*, 810 F. Supp. 3d at 1238 ("[T]he specific harms that attend warrantless arrest without probable cause of flight are

38

not inevitable. They are the direct result of defendants' ongoing violation of the law."). And Defendants have no colorable interest in continuing unlawful arrests.

Americans do not support Defendants' sweeping approach to immigration enforcement that is wreaking havoc on immigrant communities, hurting businesses, and forcing families to remain in hiding. And the public certainly does not have any interest in expending taxpayer funds to hold people in detention for multiple weeks only to have immigration judges finally assess their flight risk and release them. Nor should a bond be required for enjoining ICE to comply with statutory mandates. *Ramirez Ovando*, 810 F. Supp. 3d at 1242. *Accord UFW*, 785 F. Supp. 3d at 742; *Arevalo v. Trump*, 785 F. Supp. 3d 644, 668 (C.D. Cal. 2025) ("[C]ourts routinely impose either no bond or a minimal bond in cases involving public interests[.]") (internal citation omitted). Although if a bond is so ordered, Plaintiffs respectfully request a nominal $1 bond.

## CONCLUSION

Plaintiffs have presented persuasive evidence and argument based on controlling authority that Defendants must be preliminarily enjoined. The Court should grant Plaintiffs' motion, provisionally certify the Warrantless Arrests Class, and issue a class wide preliminary injunction enjoining Defendants from making warrantless arrests in Ohio without an individualized, pre-arrest determination of probable cause that the person is likely to escape before a warrant can be obtained.

Dated: April 15, 2026

Respectfully submitted,

/s/ Freda J. Levenson
Freda J. Levenson (0045916)
Amy Gilbert (0100887)
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, Ohio 44103

/s/ John S. Marshall
John S. Marshall (0015160)
*Trial Attorney for Plaintiffs*
Helen M. Robinson (0097070)
Edward R. Forman (0076651)
Samuel M. Schlein (0092194)

(216) 541-1376 (Levenson)
(216) 770-6704 (Gilbert)
flevenson@acluohio.org
agilbert@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(380) 215-1972
dcarey@acluohio.org

Kathleen Kersh (91198)
Maria Otero (93841)
Gwen Short (102151)
ADVOCATES FOR BASIC LEGAL EQUALITY,
INC.
525 Jefferson Avenue, Suite 300
Toledo, OH 43604
Phone: (937) 535-4408
kkersh@ablelaw.org
motero@ablelaw.org
gshort@ablelaw.org

Vincent W. Wells (0101765)
Jesse H. Vogel (0102292)
COMMUNITY REFUGEE & IMMIGRATION
SERVICES
4645 Executive Drive
Columbus, Ohio 43220
Phone: 614-955-9505
vwells@cris-ohio.org
jvogel@cris-ohio.org

Madeline J. Rettig (0098816)
MARSHALL, FORMAN AND SCHLEIN, LLC
250 Civic Center Drive, Suite 480
Columbus, Ohio 43215-5296
Phone: (614) 463-9790
Fax (614) 463-9780
jmarshall@marshallforman.com
hrobinson@marshallforman.com
eforman@marshallforman.com
sschlein@marshallforman.com
mrettig@marshallforman.com

OF COUNSEL
Louis A. Jacobs (002101)
MARSHALL, FORMAN AND SCHLEIN, LLC
177 19th Street, Apt. 9C
Oakland, CA 94612
Phone: (614) 203-1255
Fax (510) 250-9007
LAJOhio@aol.com

Frederick M. Gittes (0031444)
Jeffrey P. Vardaro (0081819)
THE GITTES LAW GROUP
723 Oak Street
Columbus, Ohio 43205
Phone: (614) 222-4735
Fax: (614) 221-9655
fgittes@gitteslaw.com
jvardaro@gitteslaw.com

*Counsel for Plaintiffs*

40

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2026, a copy of the foregoing Plaintiffs' Motion for a Preliminary Injunction, Memorandum in Support, and attached declarations were filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. In addition, the foregoing will be sent to counsel for Defendants via email at Christopher.Yates@usdoj.gov. All previous filings in this action have also been served upon Defendants by certified mail, email, or by the function of this Court's CM/ECF system.

/s/ Freda J. Levenson
Freda J. Levenson (0045916)

/s/ John S. Marshall
*Trial Attorney for Plaintiffs*
John S. Marshall (0015160)

41