## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| MOISES JAVIER AGUILAR PERALTA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security[1], *et al.*, <br><br> Defendants. | Case No. 2:26-cv-00337 <br><br> Chief Judge Sarah D. Morrison <br><br> Magistrate Judge Chelsey M. Vascura |

## DECLARATION OF LUKE AFFHOLTER

I, Luke Affholter, hereby declare as follows:

1. I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as an Acting Assistant Field Office Director [(A)AFOD] with the Detroit Field Office, Columbus, Ohio Sub-Office, which is located in Westerville, OH. I have held this position since December 15, 2025.

2. I have been employed by ICE since November 6, 2006. Since that time, I have held several positions with ICE: Immigration Enforcement Agent from 2006 to 2009, Deportation Officer from 2009 to 2019, and Supervisory Detention and Deportation Officer from 2019 to present. I am currently serving in the capacity of Assistant Field Office Director as a temporary promotion. In my career with ICE, I have overseen various units as both a first-line supervisor and second-line supervisor, to include fugitive

---

[1] Pursuant to Fed. R. Civ. P. 25, Markwayne Mullin, Secretary, United States Department of Homeland Security, is properly substituted for Kristi Noem.

operations, custody management, non-detained case management, prosecutions, and the alternatives to detention program.

3. This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction and Defendants' Opposition to Plaintiffs' Motion for Provisional Class Certification.

4. The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other ICE employees, and/or information portals maintained and relied upon by ICE.

5. ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from cross-border criminal activity and illegal immigration that threatens national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by Field Office Directors (FOD's); (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor (OPLA), which includes 9 regional locations led by Regional Counsel.

6.     ERO deportation officers are immigration officers under Title 8 of the U.S. Code and have been delegated limited customs officer warrantless arrest authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally.  This includes those who cross the border illegally, which is a federal misdemeanor in the first instance and a felony on repeat offenses (8 U.S.C. § 1325), and those who illegally reenter after having been removed, which is a felony (8 U.S.C. § 1326)—or otherwise undermine the integrity of our immigration laws and our border control efforts.

7.     The majority of ERO's immigration enforcement operations take place in the interior of the United States. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them or otherwise overseeing their departure from the United States.

**Operation Buckeye: December 17, 2025 to December 21, 2025, Columbus, OH**

8.     Operation Buckeye was an exclusive federal operation organized and executed by the ICE ERO Office of Firearms and Tactical Programs (OFTP). ICE executes federal law through immigration enforcement by its federal officers and agents. No State, County, or Municipal officials from Ohio participated in Operation Buckeye. ICE did not coerce,

conscript or command any State, County, or Municipal officials from Ohio to participate in Operation Buckeye.

9.      During Operation Buckeye, approximately 120 additional ERO officers and HSI agents were detailed to Columbus, OH. These additional officers and agents arrived in Columbus on December 16, 2025, and departed on December 21, 2025 or December 22, 2025. Typically, the ERO Columbus Sub-Office is staffed with approximately 40 officers covering the Columbus metropolitan area as well as 26 counties in the Central Ohio region.

10.     The mission of Operation Buckeye was to significantly increase "at-large" arrests of illegal aliens in the State of Ohio.  This effort was a joint effort between ICE ERO and ICE HSI, with assistance from other federal components. During Operation Buckeye, ICE arrested 283 illegal aliens in Columbus, OH and surrounding areas.

**Warrantless Arrests**

11.     ICE officers and agents may conduct warrantless arrests if there is reason to believe that the alien to be arrested is present in the United States in violation of any U.S. immigration law and is likely to escape before a warrant can be obtained. ERO officers receive initial training from the Federal Law Enforcement Training Center that includes Fourth Amendment and arrest authorities. ERO officers also receive OPLA-administered refresher Fourth Amendment training twice a year, which includes training on warrantless arrest authority under 8 U.S.C. § 1357, and standards for enforcement activity under 8 C.F.R. § 287.8.

12.     The "reason to believe" standard requires probable cause to make an arrest.  In considering the "likelihood of escape," an ICE officer or agent must consider the totality

of the circumstances known to the officer before the arrest. There is no exhaustive list of factors that should be considered in determining whether an individual is "likely to escape before a warrant can be obtained."

13. ERO officers are also trained to identify when there is reasonable suspicion to briefly detain an individual for further investigation into alienage and immigration status. ERO officers may develop reasonable suspicion in any number of ways. Examples include: subjects making incriminating statements or exhibiting suspicious behavior during consensual encounters; subjects failing to produce any documentation during consensual encounters or producing documentation suspected to be fraudulent; information from open-source investigations, other law enforcement agencies, informants, and surveillance; and information gleaned from records and database checks.

14. ERO officers are trained to develop specific and articulable facts, taken together with rational inferences from those facts for reasonable suspicion, as set forth above, which are not solely based on an individual's race, ethnicity, or national origin.

15. ERO officers also receive training on the statutory and regulatory provisions of the INA and relevant DHS and ICE policies. They are instructed to follow procedures emphasizing targeted investigations and arrests of aliens with final removal orders and/or serious criminal histories. That being said, ERO officers have the statutory authority to arrest any alien for whom there is probable cause to believe he/she is illegally present in, or otherwise removable from, the United States regardless of their criminal history.

16. **Moises Javier Aguilar Peralta** is a 38-year-old citizen of Honduras. On December 18, 2025, at approximately 0915 hours, Moises Javier Aguilar Peralta was encountered by plain clothes ICE Deportation Officers, during Operation Buckeye. The ICE officers

approached the subject to identify him and establish alienage as he was walking to his vehicle located at Home Depot on 6333 Cleveland Ave, Columbus, OH, 43231. These ICE officers were identifiable by agency-issued badges, law enforcement/Police patches, and were in unmarked agency vehicles. During the consensual encounter, the subject admitted to being a Honduran citizen illegally present in the United States

17. Moises Javier Aguilar Peralta allegedly resides in Columbus, OH and was arrested in Columbus, OH.

18. Moises Javier Aguilar Peralta was detained for 28 days.  He was arrested on December 18, 2025 and released on Bond on January 18, 2026, after posting bond.

19. On February 9, 2026, DHS appealed the order granting him a bond; this appeal is pending.

20. Moises Javier Aguilar Peralta is in removal proceedings.

21. No future hearings have been set.

22. **The party Plaintiff identified as S.T.**, has been identified as a 44-year-old citizen of Peru.  S.T. does not indicate her whereabouts between February 19, 2014, and December 18, 2025, the date of her detention. On December 18, 2025, ICE officers were conducting surveillance on an address that was linked to a confirmed illegal alien for whom an arrest warrant had been issued.  During this activity, they observed a vehicle operating in the area whose license plate revealed it was registered by an individual who was present in the United States illegally and had been encountered by immigration officials previously. ICE officers conducted a vehicle stop on this vehicle as they had probable cause the driver was present in the United States in violation of immigration law.  During this vehicle stop, ICE officers encountered S.T., who, through communication with a

Spanish-speaking ICE officer, admitted that she was the wife of the registered owner of the vehicle. During this encounter, S.T. was reluctant to provide information to ICE officers, but they were able to determine that S.T. was a citizen of Peru who had entered the United States on a non-immigrant visa and had overstayed that visa. ICE officers arrested S.T. for being present in the country illegally, and she was transported to a Westerville, Ohio location for intake and processing. S.T. was there "for another 2 to 3 hours" before being transferred to Michigan. She was released on bond one month after her initial detention. Her non-immigrant visitor visa issued on February 19, 2014, did not afford her legal status incident to the date of arrest, nor does it confer any legal status currently.

23. S.T. resides in, and was arrested in, the Columbus, OH metropolitan area but was detained in ICE custody in Michigan.

24. S.T. was detained for a total of 30 days (4 weeks). S.T. was arrested on December 18, 2025, and released on bond on January 18, 2026.

25. DHS filed a Notice to Appear (NTA) on December 30, 2025, initiating her in removal proceedings.

26. No future hearings have been set.


I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief, and in accordance with the preliminary information I have received. Executed this 7th day of May, 2026, at Westerville, Ohio.

LUKE H AFFHOLTER  Digitally signed by LUKE H AFFHOLTER
Date: 2026.05.07 10:46:51 -04'00'

Luke Affholter