UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MOISES JAVIER AGUILAR
PERALTA, *et al.*,

               Plaintiffs,

      v.

DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

            Defendants.

:

:

:

Case No. 2:26-cv-337
Chief Judge Sarah D. Morrison
Magistrate Judge Chelsey M.
Vascura

## OPINION AND ORDER

This case arises from the federal government's immigration enforcement operations in Ohio. Plaintiffs are four non-citizens who were arrested and detained by federal agents between April and December 2025. They now bring claims against the Department of Homeland Security ("DHS"), the U.S. Border Patrol ("USBP"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and certain agency officials,[1] challenging Defendants' unlawful policy or practice of making warrantless civil immigration arrests in Ohio without individualized probable cause determinations as to arrestees' likelihood of escape.

---

[1] Plaintiffs name former DHS Secretary Kristi Noem, former acting ICE Director Todd Lyons, acting ICE Field Office Director Robert Lynch, CBP Commissioner Rodney Scott, and former USBP Chief Michael Banks in their official capacities. (Compl. ¶¶ 15–23, ECF No. 1.) Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes current DHS Secretary Markwayne Mullin for former Secretary Noem, current acting ICE Director David J. Venturella for former acting Director Lyons, and current USBP Chief Rosario Vasquez for former Chief Banks.

Plaintiffs ask the Court to preliminarily enjoin Defendants from engaging in this illegal policy or practice and to provisionally certify a class of individuals who have been or will be arrested in Ohio for immigration violations without a warrant and without a probable cause determination as to escape. Defendants oppose Plaintiffs' requests and move to dismiss Plaintiffs' claims. All Motions are fully briefed and ripe for the Court's consideration.

Upon a fulsome review of the record in this case, it is clear that Defendants have, in some instances, unlawfully arrested and detained non-citizens in Ohio without a warrant and without a probable cause determination of their likelihood of escape. Some of the accounts offered by Plaintiffs and those they wish to represent about how individual agents effectuated arrests deeply trouble the Court. But Plaintiffs are not asking for damages or compensation for Defendants' prior conduct; they want the Court to impose forward-looking, declaratory and injunctive relief against Defendants. This means that past exposure to illegal conduct, no matter how egregious, is not enough to carry the day. Plaintiffs must demonstrate that their harm is ongoing or will almost certainly and imminently befall them again. Because they have not met their burden to make this showing, the Court finds that they lack standing to obtain the relief they seek.

Thus, for the reasons below, Defendants' Motion to Dismiss (ECF No. 30) is **GRANTED**, and Plaintiffs' Motion for Preliminary Injunction (ECF No. 12) and Motion to Certify Class (ECF No. 14) are **DENIED as moot**.

## I.     BACKGROUND

The following summary draws from the allegations in Plaintiffs' Complaint (ECF No. 1), as well as any documents integral to and incorporated therein. Any facts beyond the Complaint that are relevant to the pending Motions are included as necessary throughout this Opinion and Order.

### A.     Legal Authority for Civil Immigration Arrests

DHS is the principal agency that administers and enforces federal immigration laws in the United States. (Compl. ¶ 15.) To do so, DHS relies on component agencies, including ICE and CBP. (*Id.* ¶¶ 17, 20.) ICE is responsible for stopping, arresting, and detaining individuals believed to be in violation of civil immigration laws. (*Id.* ¶ 17.) CBP also conducts stops and arrests for such violations (mainly through its law enforcement arm, USBP), but it is primarily tasked with processing individuals trying to enter the United States at the border without authorization. (*Id.* ¶¶ 20, 22.) Agents from ICE, CBP, and USBP have engaged in immigration enforcement in Ohio during the relevant time. (*Id.* ¶¶ 3, 20, 22.)

The Immigration and Nationality Act ("INA") allows these federal agents to make civil arrests of non-citizens pursuant to administrative warrants and to detain non-citizens during the pendency of any removal proceedings. *See* 8 U.S.C. § 1226(a). The INA also permits an agent to arrest a non-citizen without a warrant, but only when the agent has "reason to believe" that the non-citizen is (1) present in the United States in violation of "any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens"; and (2) "likely

3

to escape before a warrant can be obtained for his arrest[.]" 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. §§ 287.8(c)(2)(i)–(ii) (providing that "[a]n arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States" and that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained"). Courts have construed the phrase "reason to believe" to mean "constitutionally required probable cause." (Compl. ¶ 41 (quoting *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 887 (S.D. Ohio 2016) (Watson, J.)).) Consequently, an agent may not arrest a non-citizen without a warrant unless the agent has probable cause to believe that the non-citizen is in the United States unlawfully *and* is likely to escape before a warrant may be obtained.

Plaintiffs are not challenging the existence or validity of these legal authorities and requirements. Instead, Plaintiffs take issue with *how* Defendants perform warrantless civil immigration arrests in Ohio thereunder, alleging that Defendants have a policy or practice of conducting warrantless arrests without complying with § 1357(a)(2)'s probable cause requirements. (*See* Compl. ¶¶ 3, 8.)

Plaintiffs are not the first to lodge such a challenge. In 2018, residents and non-profit organizations in Illinois sued ICE for conducting warrantless arrests in the Chicago area without the necessary probable cause. (Compl. ¶ 43 (citing *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (N.D. Ill. Dec. 18, 2018)).) That case resulted in a settlement agreement, pursuant to which ICE

4

issued a "Broadcast Statement of Policy" prohibiting warrantless arrests that failed to satisfy § 1357(a)(2) and explaining proper procedures. (*Id.* ¶ 44 (citing Settlement Agmt., App'x A, *Castañon Nava*, No. 1:18-cv-03757 (N.D. Ill. Nov. 23, 2021), available at *https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_ attA.pdf*).) More recently, several courts have addressed claims about Defendants' procedures for effectuating warrantless civil immigration arrests under the current presidential administration. *See, e.g., Hussen v. Noem*, 822 F. Supp. 3d 944 (D. Minn. 2026); *M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147 (D. Or. 2026); *Escobar Molina v. Dep't of Homeland Sec*, 811 F. Supp. 3d 1 (D.D.C. 2025); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209 (D. Colo. 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025).

In January 2026, then-acting ICE Director Lyons issued a memorandum to all ICE personnel (the "Lyons Memo"), which "serves as a reminder of" the agency's civil immigration arrest authority. (Lyons Memo, ECF No. 30-1; *see* Compl. ¶ 47.) The Lyons Memo contains "guidance for the lawful and consistent exercise of warrantless arrest authority for civil violations of immigration laws." (Lyons Memo, PAGEID # 496.) Among other things, the Lyons Memo outlines the probable cause requirement in § 1357(a)(2) and sets forth a non-exhaustive list of factors for agents to consider as part of their likelihood of escape determinations, which "must be made before a warrantless arrest is effectuated." (*Id.*, PAGEID ## 496–98.) The Lyons Memo concludes by reiterating that

> [i]f warrantless arrests become necessary under the circumstances, immigration officers must effectuate such arrests in a manner

5

consistent with the ICE policy and the law. Immigration officers must therefore conduct an analysis of an alien's likelihood of escape prior to effectuating a civil warrantless arrest and, as soon as practicable after the arrest, immigration officers must properly document all the likelihood of escape factors on Form I-213.[2]

(*Id.*, PAGEID # 499.)

### B.    Immigration Enforcement in Ohio

During his 2024 campaign, President Donald Trump promised that he would usher in "the largest deportation operation in the history of our country." (Compl. ¶ 24 (citation omitted).) Consistent with that promise, in January 2025, the Trump administration imposed an arrest quota requiring each ICE field office around the country to make at least 75 civil immigration arrests per day.[3] (*Id.* ¶ 26 (citation omitted).) That quota increased in May 2025 to 3,000 daily arrests nationwide, and at least one White House official indicated that the number would "keep getting bumped higher over time." (*Id.* ¶ 27 (citations omitted).) ICE officers were encouraged to meet or exceed the quota by "turn[ing] up the creativity knob up to 11 and push[ing] the envelope." (*Id.* ¶ 28 (citation omitted).)

Considering these national directives, federal agents (particularly those from ICE and CBP) have engaged in "aggressive immigration enforcement operations" in Ohio since April 22, 2025. (Compl. ¶¶ 3, 29–30.) Many agents dressed in civilian

---

[2] The Form I-213, or the "Record of Deportable or Inadmissible Alien," is a form used by ICE to capture a non-citizen's biographical and basic case information. (Hr'g Tr. Vol. II, 278:25–279:6, ECF No. 69-1.) The form includes a "Narrative" section, in which the arresting or processing agent records, *inter alia*, what happened during his encounter with the non-citizen. (*Id.*)

[3] The ICE offices that manage operations in Ohio are located in Detroit, Michigan. (Compl. ¶ 26.)

clothing, covered their faces, and carried guns while on patrol. (*Id.* ¶¶ 1, 30, 49.)

They approached, arrested, and detained individuals who were going about their

daily lives, "going to work, carrying groceries, getting gas, or arriving home." (*Id.*

¶¶ 30, 49.) To support these enforcement operations, ICE leased office space in

Columbus, Ohio, in October 2025 for use by its legal department, the Office of the

Principal Legal Advisor. (*Id.* ¶ 31 (citation omitted).)

Two months later, ICE escalated its Ohio operations when it launched

Operation Buckeye. (Compl. ¶ 32 (citation omitted).) Over the course of five days in

December 2025, ICE surged its resources and conducted a targeted enforcement

mission that resulted in the arrest and detention of more than 200 non-citizens. (*Id.*

(citations omitted).) Reports indicate that at least two U.S. citizens were also swept

up as part of Operation Buckeye. (*Id.* (citation omitted).) Although ICE touted

Operation Buckeye's purpose as "targeting the worst of the worst criminal illegal

aliens," data reveals that the majority of immigration detainees in Ohio (and over

70% of non-citizens detained nationwide) in 2025 had no criminal convictions. (*Id.*

(citation omitted).) After Operation Buckeye ended, Defendants continued to

conduct enforcement activities at a smaller scale in Ohio through March 2026, when

this lawsuit was filed. (*Id.* ¶¶ 39, 49.)

### C.    Experiences of Plaintiffs and Others

Moises Javier Aguilar Peralta, Jose Armando de Leon Zapata, F.M., and S.T.

are the four named Plaintiffs in this action.[4] (Compl. ¶¶ 11–14.) They each contend

---

[4] The Court allowed F.M. and S.T. to proceed in this action under pseudonyms. (ECF No. 6.)

that Defendants' agents arrested them without a warrant and without an individualized determination of probable cause as to their likelihood of escape, in violation of § 1357(a)(2). (*Id.* ¶¶ 11–14, 104.) They argue that this conduct amounts to a policy or practice that extends beyond their particular circumstances to other similarly situated non-citizens, whom they seek to represent. (*Id.* ¶¶ 70, 99–104.)

### 1.    Arrest of Mr. Aguilar Peralta

Mr. Aguilar Peralta is Honduran citizen who came to the United States in 2023. (Compl. ¶ 11.) Since arriving, he has lived in Ohio, and he applied for asylum based on his fear that he would be killed if he returned to his home country. (*Id.* ¶¶ 11, 60.) Mr. Aguilar Peralta has a U.S. work permit and social security number. (*Id.* ¶¶ 11, 58.) He lives with his sister and her two children, has a job, and helps financially support his partner and son back in Honduras. (*Id.* ¶ 58.)

On December 18, 2025, Mr. Aguilar Peralta went to a Home Depot store minutes away from his home to purchase materials for work. (Compl. ¶¶ 11, 57.) As he left the store, two ICE agents dressed in civilian clothing with face coverings exited an unmarked Ford Explorer and announced in Spanish, "Police! This is a routine check!" (*Id.* ¶ 57.) Meanwhile, another unmarked truck arrived, and two more similarly dressed agents got out. (*Id.*) The agents asked Mr. Aguilar Peralta where he was from and whether he had U.S. residency or citizenship. (*Id.*) He showed the agents his driver's license and explained that he had a pending asylum case, but the agents told him that it was "not valid." (*Id.* ¶¶ 57, 59.)

8

Mr. Aguilar Peralta says that the agents proceeded to arrest him without showing him a warrant, without asking him any questions about his family or his ties to the community, and without assessing whether he was likely to escape before they could obtain a warrant. (Compl. ¶¶ 58, 59.) Mr. Aguilar Peralta cooperated with the agents and did not run away, resist, or fight back. (*Id.* ¶ 59.) When the agents arrested him, he heard one of them shout something like, "I have one more! I have one more!" (*Id.*)

After "processing" Mr. Aguilar Peralta, the agents chained his arms and legs together, chained his handcuffs and leg chains to a chain around his waist, and drove him to Detroit, Michigan. (Compl. ¶ 59.) From there, agents transported him to the North Lake Correctional Facility in Baldwin, Michigan, where he was detained for 27 days before an immigration judge found that he posed no risk of flight and released him on bond. (*Id.*)

Since his release, Mr. Aguilar Peralta has been afraid to go about his daily life. (Compl. ¶ 11.) He feels panic, has trouble sleeping, and frequently checks his surroundings for ICE presence, worried that he will be sent back to Honduras and killed. (*Id.* ¶¶ 60, 89.) He lives in an area of Columbus that he claims is heavy with targeted immigration enforcement. (*Id.* ¶ 60) Although he has changed his routine in an effort to prevent re-arrest, including avoiding the Home Depot store near his home, he must still purchase materials for his job. (*Id.* ¶¶ 60, 89.)

### 2.    Arrest of Mr. De Leon Zapata

In May 2022, Mr. De Leon Zapata came to the United States on a visa, got a job, and started paying taxes. (Compl. ¶¶ 14, 54.) He has lived in Toledo, Ohio, since October of that year. (*Id.* ¶ 14.) He is now married, and his wife is a U.S. citizen. (*Id.*) His wife left an abusive family situation and depends on him for financial and emotional support. (*Id.* ¶ 54.) His criminal history reflects one misdemeanor conviction in March 2024 for driving without a license, as a result of which he does not drive or have a driver's license. (*Id.* ¶¶ 14, 54.)

Mr. De Leon Zapata took a Lyft to work on September 30, 2025. (Compl. ¶ 14.) Before he arrived, Toledo police officers pulled the Lyft car over. (*Id.* ¶¶ 14, 53.) When the officers asked for his identification, he did not have it. (*Id.* ¶ 53.) The officers then handcuffed and arrested him without asking his name, how long he had been in the United States, or whether he had been arrested before. (*Id.* ¶¶ 14, 53, 54.) Nor did they ask him about his family, his job, or his ties to the community. (*Id.* ¶ 53.) During this time, he cooperated and did not try to flee or resist. (*Id.*)

Shortly thereafter, CBP agents arrived at the scene, assured Mr. De Leon Zapata that everything would be alright, and told him that he was being arrested because he is an "illegal alien" and that they would deport him quickly. (Compl. ¶¶ 54, 55.) They replaced his handcuffs and put him in their vehicle. (*Id.* ¶ 55.) Like the police officers, the CBP agents never asked him his name or anything about his family, employment, or community ties. (*Id.* ¶ 54.) He alleges that the CBP agents did not have a warrant or make a pre-arrest escape determination. (*Id.* ¶¶ 14, 53.)

10

The CBP agents then took Mr. De Leon Zapata to a CBP station, where they asked his name and other questions. (Compl. ¶¶ 14, 55.) At the station, agents had him write down his phone passcode, which they used to look through his phone. (*Id.* ¶ 55.) He was detained for 21 days before being released on bond after an immigration judge found that he was not a flight risk. (*Id.*)

Because of his arrest and detention, Mr. De Leon Zapata and his wife were unable to move into their own apartment closer to his job, so he still must use rideshare services to get to work. (Compl. ¶¶ 56, 92.) Even though he has a pending petition for legal status, he fears re-arrest, particularly given rumors that ICE has been active in his neighborhood, which is home to many other non-citizens. (*Id.* ¶¶ 92, 93.) His life is composed of going to work and coming home because he is too scared to go out to eat. (*Id.*) He always looks around to ensure his safety, he has difficulty sleeping, and he worries about leaving his wife alone again. (*Id.*) He is anxious that he will not have enough money to pay another bond if he is re-detained. (*Id.* ¶ 93.)

### 3. Arrest of F.M.

F.M. fled Kenya in December 2023 after facing violence and persecution. (Compl. ¶ 12.) He obtained a J1 visa, entered the United States, and settled in Huron, Ohio, where he worked on a farm for a year and applied for asylum. (*Id.*) When he received an asylum-based work permit in October 2024, he moved to Sandusky, Ohio, where he currently resides. (*Id.* ¶¶ 12, 52.) He pays taxes and has obeyed all laws, though his J1 visa expired. (*Id.* ¶ 51.)

11

On April 22, 2025, F.M. was working as a delivery driver. (Compl. ¶ 12.) As he got out of his vehicle in a Walmart parking lot to pick up a delivery, four CBP agents in civilian clothing approached him. (*Id.* ¶¶ 12, 50.) The agents told him that he was under arrest without asking him anything about himself, his job, or where he lived. (*Id.* ¶ 50.) F.M. responded that he had an ongoing immigration case, a driver's license, and a work permit, but the agents said that they were "just doing their job." (*Id.*) Although he was in "complete shock and panic," he remained calm and did not fight or resist, leading the agents to comment about how "nice and easy" he was to handle. (*Id.*) The CBP agents never showed him a warrant for his arrest or indicated that they had one, and he claims that they never made any pre-arrest determination that he was likely to escape before a warrant could issue. (*Id.*)

When F.M. was processed at the jail, he was questioned about why he had been arrested, considering that "it seems like he did things right." (Compl. ¶ 51.) F.M. was detained for five weeks until an immigration judge found that he did not pose a flight risk and released him on bond. (*Id.* ¶¶ 12, 51.) While detained, he met many other non-citizens from Sandusky who had also been arrested. (*Id.* ¶ 91.)

F.M. fears that he will be arrested again and sent back to Kenya. (Compl. ¶ 12.) He must go to work, but he worries about the pervasive immigration enforcement in his community, which is home to many non-citizens who work in agriculture and at large water parks and amusement parks. (*Id.* ¶ 52.) When he is not at work, he is too scared to be in public or go to church, and he prefers to stay isolated. (*Id.* ¶ 91.) He knows that agents are still at large in his community. (*Id.*)

12

### 4. Arrest of S.T.

Born in Lima, Peru, S.T. has lived in the United States since 2014. (Compl. ¶ 13.) She currently lives with her partner and three children, one of whom is a U.S. citizen, in Columbus. (*Id.*) She worked at a restaurant in the Easton Mall, has paid taxes since arriving in this country, and regularly went to church. (*Id.* ¶¶ 13, 61, 62.) At the time of her arrest, she lacked legal status in the United States. (*Id.*)

S.T. was driving in the mall parking lot on December 18, 2025, when unmarked trucks cut her off. (Compl. ¶ 13.) Two men carrying guns and wearing vests that read "ICE" got out of the trucks and walked toward her vehicle. (*Id.* ¶¶ 13, 61.) Both agents started yelling at her, one in English and one in Spanish. (*Id.* ¶ 61.) One agent took out his phone and began recording her. (*Id.*) The agents banged hard on her car door, so she opened it. (*Id.* ¶¶ 13, 61.) She had her phone and bank cards in her hand to show to the agents. (*Id.* ¶ 61.) They grabbed her hands, took her phone, pulled her out of the car, and put her in handcuffs without asking her name or any other questions. (*Id.* ¶¶ 13, 61.) They found her name on her bank cards and accused her of "being illegal." (*Id.* ¶ 61.)

S.T. did not try to run away or resist. (Compl. ¶ 63.) The agents put her in a truck and drove her (and another young man, who was sitting in the backseat) behind a Target store, where they sat her and the man on wooden benches. (*Id.*) While S.T. was sitting on the bench, the agents started laughing and saying, "[W]e got two more!" (*Id.*) Trucks brought more people to this location behind Target, and every time an arrestee got out of one of the trucks, the agents laughed at them. (*Id.*)

13

The agents asked them questions like, "[A]re you illegal?" (*Id.*) S.T. was never shown a warrant and alleges that she was arrested without an individualized determination of her likelihood of escape. (*Id.* ¶ 13.)

Agents then took S.T. to an office building in Westerville, Ohio, where she was processed. (Compl. ¶ 64.) She was placed in a room with a camera, and she and other women remained there for several hours before they were told that they were being transferred to Michigan. (*Id.* ¶¶ 64, 65.) Thereafter, S.T. was loaded into a truck with two women from Honduras and around twenty Hispanic men. (*Id.*) They were all handcuffed, and their feet were chained. (*Id.*) The group arrived in Michigan late that night. (*Id.*)

The next day, S.T. was "called in" for more information, and agents asked her how long she had been in the United States and how many children she had. (Compl. ¶ 65.) She overheard agents being told to work hard because they would get bonuses and gift cards if they continued to detain more people. (*Id.* ¶ 66.) Later that night, S.T. was handcuffed, chained, and transferred to a detention facility in Detroit, which was a four-hour drive away. (*Id.* ¶¶ 65, 66.) She was released from custody one month after her initial detention when an immigration judge found that she was not a flight risk. (*Id.* ¶¶ 13, 67.)

S.T. lost her job while she was detained and now stays home as much as possible, though she still must take her daughter to the bus stop and get groceries for her family. (Compl. ¶¶ 68, 90.) She is fearful of being arrested again because ICE continues to be very active in her neighborhood. (*Id.* ¶¶ 13, 68.) She heard that

14

ICE has an office located ten minutes from her neighborhood, and she receives text messages from her friends and neighbors reporting ICE activities and arrests near her home. (*Id.* ¶ 69, 90.) She has also seen posts online and elsewhere that ICE agents are arresting people in her area. (*Id.*)

### 5. Similarly Situated Arrestees

Along with their personal experiences, Plaintiffs recount Defendants' encounters with and arrests of other non-citizens.

Jose Cesareo Valladares. For the past eighteen years, Mr. Cesareo Valladares has lived in Columbus and worked in restaurants as the primary breadwinner for his girlfriend and child, who are both U.S. citizens. (Compl. ¶ 72.) He has never been charged with or convicted of a crime. (*Id.*)

On December 17, 2025, men in plain clothing approached Mr. Cesareo Valladares as he was returning home from the grocery store. (Compl. ¶ 71.) The men did not identify themselves as law enforcement or immigration agents. (*Id.*) They asked for identification, and he provided his Mexican Consulate ID card. (*Id.*) The men then accused him of "being illegal" and asked if he had gone back to Mexico at any point. (*Id.*) He responded that he had not and told the men how long he had been living in the United States. (*Id.*) Plaintiffs allege that the men then arrested Mr. Cesareo Valladares without showing him a warrant or asking about his ties to the community, his family, his employment, or his criminal history. (*Id.*) He was taken to Butler County Jail in Ohio before being transferred to Baldwin, Michigan, where he remained detained as of the filing of the Complaint. (*Id.* ¶ 72.)

Leosdanis Mulet Zaldivar. A Cuban national with a pending green card application under the Cuban Adjustment Act, Mr. Mulet Zaldivar has lived and worked in Columbus for three years. (Compl. ¶¶ 73, 74.) He and his family attend church services every Sunday, and he has never been charged with or convicted of a crime. (*Id.* ¶ 74.)

Mr. Mulet Zaldivar's wife was driving home with him and their children on December 20, 2025, when ICE agents in unmarked vehicles cut their car off. (Compl. ¶ 73.) The agents ordered Mr. Mulet Zaldivar to put his hands up, which he did. (*Id.*) They opened his door, unbuckled his seatbelt, pulled him out of the car, and pinned him against the hood before placing him in handcuffs. (*Id.*) The agents took his phone, which contained his REAL ID,[5] from his pocket and asked, "[W]hat makes you legal in this country?" (*Id.*) Mr. Mulet Zaldivar responded that he entered on humanitarian parole and referenced his green card application, but the agents told him to "take it up with the judge." (*Id.*) At some point, the agents examined his REAL ID and accused him of "being illegal." (*Id.*) They then placed him in one of their vehicles and drove away. (*Id.*) The agents never showed him a warrant for his arrest and asked no further questions. (*Id.*)

Mr. Mulet Zaldivar was taken to a facility in Columbus where approximately thirty-five other people were being held. (Compl. ¶ 75.) Facility personnel asked him

---

[5] The REAL ID Act is a federal statute that sets minimum standards for state driver's licenses and identification cards to be accepted for official purposes. *See* Pub. L. No. 109-13 § 202(c)(2)(B); 6 C.F.R. § 37.11. As of 2019, Ohio and at least 24 other states have agreed to comply with the REAL ID Act. *See Cmty. Refugee & Immigr. Servs. v. Petit,* 393 F. Supp. 3d 728, 730 (S.D. Ohio 2019) (Sargus, J.).

16

how many children he had, if he wanted to leave the country, and whether he would be willing to sign papers to leave voluntarily. (*Id.*) Mr. Mulet refused and was transferred to Butler County Jail, where he remained detained as of the filing of the Complaint. (*Id.*)

Guadalupe Montoya Cedillo. Mr. Montoya Cedillo has lived in Columbus for 21 years. (Compl. ¶ 76.) He is the primary financial provider for his family, including his three children, two of whom are U.S. citizens. (*Id.*) He has never been arrested and pays his taxes. (*Id.*)

While working at a construction site on December 21, 2025, Mr. Montoya Cedillo was arrested by masked individuals driving unmarked black vehicles. (Compl. ¶ 76.) Upon reviewing his Mexican identification card, the individuals told him that he had "no papers" and would be deported. (*Id.*) Plaintiffs allege that the men did not show him a warrant, inquire about how long he had lived in the United States, or ask about his community ties, his family, his employment, or his criminal history. (*Id.*)

Julio Cesar Chavez Velasquez. In December 2025, Mr. Chavez Velasquez was shopping for groceries to celebrate his daughter's birthday. (Compl. ¶ 77.) He had recently obtained a work permit and was in the process of starting a roofing and siding business. (*Id.* ¶ 78.) He has never been charged with or convicted of a crime and files his taxes. (*Id.*)

As Mr. Chavez Velasquez was putting items in his car, two black vehicles appeared and boxed him in, with one vehicle parking directly in front of his car and

17

the other directly behind. (Compl. ¶ 77.) Three or four men wearing face coverings and vests approached his car, in which his pregnant wife and daughter were sitting, but these men did not identify themselves as law enforcement or immigration officers. (*Id.*) They asked Mr. Chavez Velasquez for identification, and he provided his driver's license. (*Id.*) After running his license, the men told him to come with them. (*Id.*)

Mr. Chavez Velasquez's wife asked if the men had any documents or a warrant to take her husband. (Compl. ¶ 78.) One of the men became upset at this question and threatened to break the window and pull Mr. Chavez Velasquez out of the car. (*Id.*) Mr. Chavez Velasquez did not resist or try to run away—instead, he got out and was handcuffed. (*Id.*) The men asked where he was born and if his daughter was born in the United States before placing him in a vehicle next to another arrestee. (*Id.* ¶¶ 78, 79.)

Mr. Chavez Velasquez was taken to a location in Columbus, then transported to Michigan, and finally moved to a third location four hours away, where he remained detained as of the filing of the Complaint. (Compl. ¶ 79.) Plaintiffs allege that he was never shown a warrant before his arrest and that the men never asked him about his ties to the community, his employment, or his residency in the United States. (*Id.*) He fears that he could be arrested again if he is released. (*Id.* ¶ 94.)

M.A.R. Originally from Honduras, M.A.R. has lived in the United States since 2006, and he has resided in Columbus for 12 years. (Compl. ¶ 82.) He was the

18

sole breadwinner for himself and his partner, and he also provided financial support to his mother in Honduras. (*Id.*)

On the morning of February 7, 2026, M.A.R. was driving on the highway with a coworker when an unmarked vehicle with flashing lights pulled him over. (Compl. ¶ 81.) ICE agents approached his car but did not explain why they stopped him. (*Id.*) They did not ask him any questions about his community ties or his family. (*Id.*) The agents arrested M.A.R. and his coworker but did not show him any arrest warrants. (*Id.*) M.A.R. remained detained at the Butler County Jail as of the filing of the Complaint, forcing his daughter to work to support his partner. (*Id.* ¶ 82.)

J.R. J.R. has been in the United States since August 2016 and has a pending asylum application. (Compl. ¶ 83.) He has two children, one of whom is a U.S. citizen, and he possesses a valid work permit and driver's license. (*Id.*) He has worked in construction for nearly ten years, has no criminal history, pays taxes, has owned a home since 2020, and pays his family's bills and mortgage. (*Id.*)

J.R. was leaving his daughter's apartment in Reynoldsburg, Ohio, on March 13, 2026, when ICE agents stopped and detained him. (Compl. ¶ 84.) The agents cut off his car, pulled him out of the driver's seat, and saw that he was wearing a bright yellow shirt indicative of a construction worker. (*Id.*) J.R. did not attempt to flee or resist as the agents arrested him. (*Id.*) Plaintiffs allege that the agents did not show him a warrant or ask questions about his community ties or the likelihood that he would escape. (*Id.*)

19

### 6.    Relevant Experiences of Others

Along with the non-citizens whom Defendants' agents have arrested and detained, Plaintiffs present statements from other people who interact with the immigrant population in Ohio.

Brad Bonacci, the manager of a Columbus hotel, witnessed an incident on December 17, 2025, during which masked federal agents entered the hotel lobby looking for an unknown individual. (Compl. ¶ 80.) At that same moment, three housekeepers on their lunch break were walking to the parking lot. (*Id.*) Additional agents jumped out of their vehicles, "snatch[ed]" the housekeepers (who appeared Hispanic or Latino), and sped off. (*Id.*) Two of the housekeepers were U.S. citizens born in Puerto Rico, and they were released after spending four days in jail. (*Id.*)

Emily Montgomery Brown, an Assistant Clinical Professor of Law and the Director of the Immigration Clinic at The Ohio State University Moritz College of Law, and Brian Hoffman, the Executive Director of the Ohio Center for Strategic Immigration Litigation and Outreach, work with non-citizen clients. (Compl. ¶¶ 85, 86.) Plaintiffs allege that most of Attorney Brown's clients over the past year "appear to have been picked up in collateral, non-targeted arrests" at gas stations, in parking lots next to construction equipment, or by their cars parked outside their work or shopping areas. (*Id.* ¶ 85.) None of Attorney Brown's clients appear to have been arrested pursuant to a warrant, and agents did not ask her clients any questions to assess their escape risk before arresting them. (*Id.*) The same is true for most of Attorney Hoffman's prospective clients who have been detained by ICE

20

or USBP. (*Id.* ¶ 86.) Attorney Hoffman recently met with non-citizen siblings who were arrested while on their way to work in February 2026. (*Id.*) Both siblings have children who are U.S. citizens, but they were nevertheless arrested without a warrant and without a likelihood of escape determination. (*Id.*)

Additionally, Attorneys Brown and Hoffman have heard that their clients fear federal arrest and detention. (Compl. ¶¶ 97, 98.) These non-citizens have difficulty sleeping and are worried about spending time in public; they have kept their children home from school, quit their jobs or otherwise limited or avoided their everyday activities, and stopped attending church or other community events. (*Id.*) Staff at the Central Ohio Worker Center, a non-profit employment organization in Columbus, has noted a measurable decline in community members' willingness to access services due to fear of immigration enforcement. (*Id.* ¶ 95.) Many of these individuals know someone who has been arrested by ICE and are concerned that they, too, will be arrested and detained without a warrant and without a determination of their likelihood of escape. (*Id.* ¶ 97.)

## II.  PROCEDURAL HISTORY

Plaintiffs filed this action in March 2026. (*See generally* Compl.) In their Complaint, Plaintiffs allege that "[p]lain clothed, masked, and armed federal agents," who are "insufficiently trained [and] unqualified" and whom Defendants "recruited and deployed under pressure," have been "patrolling the streets of Ohio, wantonly stopping and detaining individuals without warrants and without probable cause." (*Id.* ¶ 1.) Plaintiffs assert that this conduct violates § 1357(a)(2)

21

and its implementing regulation, as well as the Administrative Procedure Act ("APA") and the principle that agencies must follow their own regulations, as articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). (*Id.* ¶¶ 108–13.) Plaintiffs urge the Court to declare unlawful Defendants' policy or practice of making warrantless arrests without probable cause, and they seek, *inter alia*, injunctive relief vacating and prohibiting that conduct and requiring Defendants to "expunge all records collected and maintained about Plaintiffs and class members from their unlawful arrests." (*Id.*, Prayer for Relief.)

Plaintiffs seek a preliminary injunction requiring Defendants to suspend "their practice of making warrantless arrests in Ohio without an individualized, pre-arrest determination of probable cause that the person is likely to escape before a warrant can be obtained." (ECF No. 12.) In support, Plaintiffs offer their own declarations and declarations from nine other declarants. (ECF Nos. 12-1–12-13.) For purposes of a preliminary injunction, Plaintiffs ask the Court to provisionally certify a "Warrantless Arrests Class," defined as:

> All persons who, since April 22, 2025, have been, or will be, arrested in this State for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is likely to escape before a warrant can be obtained.

(ECF No. 14.)

The Court held an informal conference with the parties (*see* S.D. Ohio Civ. R. 65.1), during which the Court established briefing deadlines, scheduled an evidentiary hearing, and ordered the parties to engage in limited discovery. (ECF

22

Nos. 18, 19.) Shortly thereafter, Defendants moved to dismiss the case on several grounds. (ECF No. 30.)

The evidentiary hearing occurred over three days in June 2026. (ECF Nos. 60, 66, 67.) Plaintiffs presented testimony from nine witnesses—namely, Mr. Aguilar Peralta, Mr. De Leon Zapata, S.T., three declarants (Mr. Montoya Cedillo, Mr. Mulet Zaldivar, and Attorney Hoffman), USBP Acting Deputy Patrol Agent in Charge Steven Vorholt, ICE Acting Assistant Field Office Director ("AAFOD") Luke Affholter, and another non-citizen (Miguel Ajanel Pelico) who was arrested and detained by Defendants. The parties collectively admitted nearly fifty exhibits for the Court's review, including data on immigration arrests in Ohio,[6] and thereafter submitted proposed Findings of Fact and Conclusions of Law. (ECF Nos. 77, 78.)

## III. MOTION TO DISMISS

Because Defendants dispute the Court's subject-matter jurisdiction to decide Plaintiffs' claims, the Court will address the Motion to Dismiss before considering Plaintiffs' requests for a preliminary injunction and provisional class certification.

### A. Standard of Review

Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) provide for dismissal when a court lacks subject-matter jurisdiction. Without subject-matter jurisdiction,

---

[6] Plaintiffs obtained the data from the Deportation Data Project at the University of California, Berkeley and the University of California, Los Angeles. Plaintiffs intended to call Professor Graeme Blair, the Project's Co-Director, to authenticate and summarize the data, but the parties stipulated that Plaintiffs could submit the data for the Court's review without Professor Blair's testimony. (Hr'g Tr. Vol. III, 468:11–20, ECF No. 69-2.) Thus, Defendants' Motion *in Limine* to exclude Professor Blair's testimony (ECF No. 56) is **DENIED as moot**.

"a federal court lacks authority to hear a case." *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990). When subject-matter jurisdiction is challenged, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

"Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack "questions merely the sufficiency of the pleading," so the trial court takes the allegations in the complaint as true. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A factual attack challenges the factual existence of subject-matter jurisdiction, such that no presumption of truth applies to the alleged facts. *Ritchie*, 15 F.3d at 598. "[O]n a Rule 12(b)(1) challenge to subject matter jurisdiction, the court is empowered to resolve factual disputes." *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986).

Here, Defendants do not specify in their Motion to Dismiss whether they are making a facial or factual attack on the Court's subject matter jurisdiction. (*See generally* ECF No. 30.) But, in support of dismissal, they repeatedly point to the declarations that Plaintiffs attached to their Motion for Preliminary Injunction. (*See id.*, PAGEID ## 476–77, 480.) Courts construe a challenge to subject-matter jurisdiction as factual when the moving party relies on materials outside of the complaint. *See, e.g.*, *Meredith v. United Collection Bureau, Inc.*, No. 1:16 CV 1102, 2018 WL 1782854, at *2 (N.D. Ohio Apr. 13, 2018) ("Because [defendant] attached

and relied on [p]laintiff's deposition testimony to support its motion [to dismiss], the Court will construe it as a factual attack [on plaintiff's standing]."); *Campbell v. Miller*, 835 F. Supp. 2d 458, 464 (S.D. Ohio 2011) (Smith, J.) ("Defendant attached evidence in support of its motion to dismiss. Accordingly, Defendant's motion is construed as a factual attack." (citation omitted)); *cf. House-Forshee v. Benefits Comm. of W. & S. Fin. Grp. Co. Flexible Benefits Plan*, No. 1:24-CV-110, 2025 WL 1235076, at *3 (S.D. Ohio Apr. 29, 2025) (Bowman, M.J.) (observing in context of mootness challenge that "[t]he fact that both parties rely on evidence outside the complaint confirms that the pending motion constitutes a factual attack"), *R&R adopted*, 2025 WL 1456685 (S.D. Ohio May 21, 2025) (McFarland, J.).

In addition, Defendants do not merely question the sufficiency of the pleadings but challenge Plaintiffs' account of the underlying facts and assert that those facts do not give rise to federal jurisdiction. (*See, e.g.*, ECF No. 30, PAGEID ## 479–80.) "A factual challenge attacks the factual allegations underlying the assertion of jurisdiction, either through the filing of an answer or otherwise presenting competing facts." *Lindke v. Tomlinson*, 31 F.4th 487, 490 n.1 (6th Cir. 2022) (citation omitted); *see also Gentek Bldg. Prods., Inc.*, 491 F.3d at 330 ("[A] factual attack … raises a factual controversy[.]"). So, the Court views Defendants' Motion as contesting the factual existence of Plaintiffs' standing to sue.

Because no presumption of truthfulness applies to a complaint's factual allegations when a party raises a factual attack, courts must "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or

25

does not exist." *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (emphasis omitted). Courts have "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* (citations omitted); *see also, e.g.*, *Rogers*, 798 F.2d at 918 ("Should facts critical to jurisdiction be in dispute, as ofttimes they are, the court must make appropriate inquiry, and must satisfy itself on [its] authority to entertain the case. The court has considerable leeway in devising procedures in that direction[.]" (citation omitted)); *Morrison v. Cir. City Stores, Inc.*, 70 F. Supp. 2d 815, 819 (S.D. Ohio 1999) (Spiegel, J.) ("[A] court may consider any evidence properly before it when a defendant factually attacks subject matter jurisdiction under Rule 12(b)(1)."), *aff'd on other grounds,* 317 F.3d 646 (6th Cir. 2003). Courts must consider these extra-pleading materials, though, "in a manner that is fair to the non-moving party." *Rogers,* 798 F.2d at 918.

The parties presented voluminous evidence in their briefing and during the three-day preliminary injunction hearing. Counsel for both sides were aware throughout the hearing that Plaintiffs' standing is contested. (*See, e.g.*, Hr'g Tr. Vol. I, 110:22–111:11, ECF No. 69 (arguing that immigration data and anticipated testimony thereon "relate[ ] directly to standing"); *id.* at 128:3–12 (statement from Plaintiffs' counsel that "you heard from the last witness, I think, pretty clearly about that, most clearly about that, the significant changes in their lives based on that fear. And that's about standing, Your Honor"); *see also* Conf. Tr. 50:22–56:17, ECF No. 38 (discussing discovery sought to establish standing).) The parties also

26

addressed this jurisdictional issue at length in their respective Proposed Findings of Fact and Conclusions of Law. (*See* ECF Nos. 77, 78.) And Plaintiffs consolidated their response in opposition to Defendants' Motion with their reply in support of their preliminary injunction request. (ECF No. 46.) As a result, and to fully ensure itself of its subject-matter jurisdiction, the Court will consider all evidence properly in the record when determining Plaintiffs' standing to bring this case.

### B.     Analysis

Defendants move to dismiss Plaintiffs' Complaint on several grounds. (*See* ECF No. 30.) Upon review, the Court concludes that Plaintiffs' lack of standing prevents the Court from exercising subject-matter jurisdiction in this case. As a result, the Court does not reach Defendants' other arguments for dismissal.

#### 1.     Standing Principles

Article III of the United States Constitution limits federal courts' jurisdiction to certain cases and controversies. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Id.* (internal quotations and citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975) (observing that standing is "the threshold question in every federal case, determining the power of the court to entertain the suit"). "[S]tanding does not have to be maintained throughout all stages of litigation" but rather "is to be determined as of the time the complaint is filed." *Patton v. Fitzhugh*, 131 F.4th 383, 391 (6th Cir. 2025) (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 524 (6th Cir. 2001)).

To establish Article III standing, a plaintiff must demonstrate "(1) an injury in fact that is both (2) caused by the defendant's conduct and (3) redressable by a favorable court decision." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 842 (6th Cir. 2024) (citing *Susan B. Anthony List v. Driehaus*¸ 573 U.S. 149, 157–58 (2014)). As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing these elements "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted). Defendants do not address the traceability and redressability prongs of the analysis, so the Court focuses on injury-in-fact.

Injury is "the '[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). The injury requirement ensures that the plaintiff has a "personal stake in the outcome of the controversy." *Warth*, 422 U.S. at 498. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

"[A] plaintiff must demonstrate standing separately for each form of relief sought[.]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted). "[T]he type of harm alleged impacts the available relief." *Simpson-Vlach v.*

28

*Michigan Dep't of Educ.*, No. 22-1724, 2023 WL 3347497, at \*4 (6th Cir. May 10, 2023) (citations omitted). "While allegations of past injury permit a plaintiff to seek compensatory relief, allegations of ongoing or future harm permit a plaintiff to seek declaratory or injunctive relief." *Id.* (citations omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983) ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury[.]").

"When a plaintiff claims to have standing based on the threat of a future injury, it is not enough that the future injury is reasonably likely to occur[.]" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020) (citing *Clapper*, 568 U.S. at 410). Indeed, "[a]llegations of *possible* future injury" or "a highly attenuated chain of possibilities" do not suffice. *Clapper*, 568 U.S. at 409–10 (emphasis in original) (citation omitted). Instead, a plaintiff seeking declaratory or injunctive relief must establish a threatened future injury that is "*certainly* impending." *Id.* at 409 (emphasis in original) (quoting *Lujan*, 504 U.S. at 564 n.2). This does not require "literal[ ] certain[ty]," but there must be at least a "substantial risk" that the harm will occur. *Id.* at 414 n.5 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010)).[7]

If an individual is threatened with enforcement of a law, "an actual arrest, prosecution, or other enforcement action is not a prerequisite" for challenging the

---

[7] The distinction between the "substantial risk" standard and the "certainly impending" standard for future injury is unclear. Regardless, the "substantial risk" standard appears to be "something well in excess of 'likely' [to occur]." *Tate v. EyeMed Vision Care, LLC*, No. 1:21-CV-36, 2023 WL 6383467, at \*4 (S.D. Ohio Sept. 29, 2023) (Cole, J.).

law. *Susan B. Anthony List*, 573 U.S. at 158; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." (emphasis in original)). Courts will engage in pre-enforcement review when the threatened enforcement is "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159; *see, e.g., Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 832 (6th Cir. 2001) ("[W]hen seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." (citation omitted)). A plaintiff satisfies the injury-in-fact requirement, then, where he or she alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). "The mere *possibility* of prosecution, however—no matter how strong the plaintiff's intent to engage in forbidden conduct may be—does not amount to a 'credible threat' of prosecution." *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (emphasis in original).

Courts also find standing for injunctive relief when a plaintiff alleges a past injury that presents "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *see also Rizzo v. Goode*, 423 U.S. 362, 372 (1976) ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present

30

adverse effects." (citation omitted)). A defendant's ongoing unlawful treatment of the plaintiff is what matters to this inquiry, and the standard requires more than a completed past injury plus lingering fear, anxiety, or emotional distress. *See, e.g.,* *O'Shea*, 414 U.S. at 496; *Clark v. Stone*, 998 F.3d 287, 294, 296 (6th Cir. 2021).

"That a suit may be a class action ... adds nothing to the question of standing[.]" *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976). "[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc.*, 578 U.S. at 338 n.6 (internal quotations and citation omitted); *see also, e.g., Doe v. Mission Essential Grp., LLC*, No. 2:23-CV-3365, 2024 WL 3877530, at *4 (S.D. Ohio Aug. 20, 2024) (Morrison, J.) ("The named plaintiff purporting to represent a class must have standing himself to seek relief on behalf of putative class members.").

### 2. Plaintiffs' Standing to Obtain Relief

The Court now turns to whether Plaintiffs have carried their burden to show their standing to obtain declaratory and injunctive relief.

### a. Certainly Impending Threat of Future Injury

Although past wrongs are evidence bearing on "whether there is a real and immediate threat of repeated injury," such *past* wrongs do not, on their own, show a *present* case or controversy regarding equitable relief. *O'Shea,* 414 U.S. at 495–96. To establish standing, Plaintiffs must persuade that Defendants' agents will almost surely encounter and arrest them again without a warrant and without a probable

31

cause determination that they would be likely to escape before a warrant could be obtained. *See, e.g.*, *Tennessee Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 904 (6th Cir. 2024) ("To obtain [ ] forward-looking relief, the plaintiff must instead show that the same kind of injury is 'certainly impending' in the future." (citation omitted)); *cf. Lyons*, 461 U.S. at 105, 109 ("If Lyons has made no showing that he is realistically threatened by a repetition of his experience of October, 1976, then he has not met the requirements for seeking an injunction in a federal court.").

Plaintiffs contend that they have standing to pursue their claims because they expect that Defendants' agents will unlawfully stop, arrest, and detain them a second time. (*See* ECF No. 46, PAGEID ## 659–60.) They argue that it is more than likely that they will be improperly arrested again because Defendants are acting pursuant to an illegal policy or practice—specifically, conducting warrantless arrests without the requisite probable cause determination as to likelihood of escape. (*Id.*) Considering this policy or practice, Plaintiffs insist that they do not have mere subjective apprehensions of a future unlawful arrest but rather a realistic and reasonable threat of repeated injury. (*Id.*)

> **i.    Policy or Practice of Conducting Warrantless Arrests without Likelihood of Escape Determination**

Whether Defendants have a policy or practice requiring or authorizing unlawful conduct is relevant to the standing inquiry. *See Lyons*, 461 U.S. at 105–06; *see, e.g.*, *Hussen*, 822 F. Supp. 3d at 987. "Evidence of a relatively few instances of

32

violations by individual police officers, 'without any showing of a *deliberate policy* on behalf of the named defendants,' does not provide a basis for equitable relief." *Daubenmire v. City of Columbus*, No. 2:04-CV-01105, 2008 WL 4758677, at \*10 (S.D. Ohio Oct. 24, 2008) (Marbley, J.) (emphasis in original) (quoting *Lyons,* 461 U.S. at 104); *see, e.g., Escobar Molina,* 811 F.Supp.3d at 33. "Only when the threatened act that will cause injury is authorized or part of a policy, [is it] significantly more likely that the injury will occur again." *Daubenmire*, 2008 WL 4758677, at \*10 (internal quotations and citation omitted).

It may be that questioning the existence of an illegal policy or practice "puts the merits cart before the jurisdictional horse." *Hussen*, 822 F. Supp. 3d at 987. But the Court must inquire into Defendants' alleged policy or practice of conducting warrantless arrests without probable cause for jurisdictional purposes because the standing determination depends on the nature and extent of Defendants' conduct and whether such conduct continues to affect Plaintiffs or will imminently affect them in the future.[8] *See id.* at 999.

---

[8] When considering a factual attack on jurisdiction, a court "engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330. If, however, "an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim." *Id.* (citation modified); *see also Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 444 (6th Cir. 2006) ("When the basis of federal jurisdiction is intertwined with the plaintiff's federal cause of action, the court should assume jurisdiction over the case and decide the case on the merits." (citation omitted)). "The question of subject matter jurisdiction and the merits will normally be considered intertwined where the [same] statute provides both the basis of federal court subject matter jurisdiction and the cause of action." *Id.* (citation omitted).

Plaintiffs must show "more than a few instances" of alleged past unlawful arrests to establish a "deliberate" official agency policy or a pervasive unofficial practice or custom. *Daubenmire*, 2008 WL 4758677, at *10. One court in a similar case concerning Defendants' warrantless arrest authority assumed that a policy or practice potentially conferring standing for injunctive relief "could be established in similar ways that plaintiffs may show [42 U.S.C.] § 1983 municipal liability[.]" *See Hussen*, 822 F. Supp. 3d at 986. The Undersigned adopts that approach here.

In this case, Plaintiffs have not shown that *all* of Defendants' agents *always* make warrantless arrests without determining the non-citizen arrestee's likelihood of escape. (*See, e.g.*, Hr'g Ex. P75 (statistical sample of Form I-213s documenting ICE arrests, at least two of which explicitly reflect that agents conducted an escape assessment).) Nor have Plaintiffs shown that either ICE or CBP adopted a written policy of unlawful conduct. Although the Court finds that Plaintiffs have shown for jurisdictional purposes that Defendants authorized their agents, through an unofficial custom or practice, to make unlawful warrantless arrests in Ohio,

---

Defendants' factual attack on standing is not intertwined with the merits of Plaintiffs' claims. The jurisdictional question here does not require the Court to resolve Plaintiffs' substantive claims. None of Plaintiffs' claims under § 1357(a)(2)), its implementing regulation, the APA, or the *Accardi* doctrine require as an element the existence of an unlawful policy or practice. *See, e.g.*, *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 303 F. App'x 517, 519 (9th Cir. 2008) (observing that a "pattern, practice, or policy" that is contrary to law does "not itself [make] a final agency action within the meaning of the APA"). Nor is the Court, through this jurisdictional inquiry, finding as a matter of fact for merits purposes that a policy or practice existed—rather, the Court is determining whether Plaintiffs have shown that the existence of such a policy or practice would lead to certainly impending future harm. Consequently, the intertwinement rule does not prevent the Court from considering Defendants' factual attack.

Plaintiffs have not convinced the Court that Defendants are sufficiently likely to subject them to another arrest under that practice.

### aa. Formal Policies

A "policy" for § 1983 purposes includes "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the entity]." *Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1285 (6th Cir. 1990) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978)). The parties refer to two official, written policies addressing warrantless civil immigration arrests under which ICE operated during the relevant time.[9]

First, ICE's documented policy on warrantless arrests until mid-2025 was contained in the Broadcast Statement of Policy issued in conjunction with the *Castañon Nava* settlement. (*See* Section I.A. *supra*.) The Broadcast Statement quoted directly from § 1357(a)(2) in defining when and how agents may conduct warrantless arrests. (*Id.*) It instructed agents to consider, as part of determining probable cause for likelihood of escape, "the totality of circumstances known to the officer before making the arrest." (*Id.*) "While there is no exhaustive list of factors that should be considered," the Broadcast Statement listed various factors "relevant to the determination," which "may" include:

> [T]he ICE Officer's ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond.

---

[9] The parties did not provide or cite any official written policy on these issues promulgated by CBP or USBP.

(*Id.*) The Broadcast Statement made clear that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be *obtained*." (*Id.* (emphasis in original).)

The Broadcast Statement further directed agents to properly document warrantless arrests in the non-citizen's Form I-213 by including information on, *inter alia*, the non-citizen's "ties to the community, if known at the time of arrest, including family, home, or employment," and "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." (*Id.*) The Broadcast Statement explicitly noted that "[i]nformation learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest." (*Id.*)

The Broadcast Statement did not deviate from the statutory and regulatory requirements for warrantless arrests. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1063 (7th Cir. 2025) ("[T]he Consent Decree requires—rather than enjoins—Defendants' compliance with a federal statute, § 1357(a)(2).") Plaintiffs have not argued that the Broadcast Statement inaccurately conveyed the requirements that agents must follow.

Second, Plaintiffs chiefly rely on the Lyons Memo to support their claim that Defendants are acting unlawfully. (*See* ECF No. 12, PAGEID ## 139–40; *see, e.g.*, Hr'g Tr. Vol. II, 324:16–20.) As mentioned above, ICE considers the Lyons Memo to

36

be a "clarification" memorandum that "serves as a reminder" of the agency's authority to carry out warrantless arrests. (Lyons Memo, PAGEID # 496; *see also* Hr'g Tr. Vol. II, 288:6–289:23 (testimony by AAFOD Affholter that the Lyons Memo merely restates existing ICE policy).) Since its issuance in January 2026, there has been no superseding revocation, change, or amendment to the Lyons Memo. (*See* Hr'g Tr. Vol. II, 288:19–20.)

The Lyons Memo states that, to conduct a warrantless arrest, ICE agents must have probable cause to believe that both prongs of § 1357(a)(2) are met, and that the probable cause assessment "must be made before a warrantless arrest is effectuated." (Lyons Memo, PAGEID # 497.) The Lyons Memo explains that a non-citizen is "likely to escape" if "an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." (*Id.*) Whether a non-citizen is likely to remain at the scene of the encounter or another identifiable location "is based on the totality of the circumstances known to the immigration officer <u>at the time of the encounter and prior to the arrest</u>." (*Id.* (emphasis in original).) The Lyons Memo goes on to list seven "possible factors" for consideration, which "include, but are not limited to:"

1. The subject's behavior prior to and during the encounter (e.g., refusal to follow lawful commands, attempts to evade officers, or other suspicious behavior prior to the arrest);
2. The subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle);
3. The subject's age and health;

37

4. Possession of identity or work authorization documents that the immigration officer suspects are fraudulent;

5. Presentation of unverifiable or suspected false information to the immigration officer;

6. Whether the officer has probable cause to arrest the subject for improper entry by an alien, in violation of INA § 275, 8 U.S.C. § 1325, or reentry of a removed alien, in violation of INA § 276, 8 U.S.C. § 1326; and

7. Whether the alien has complied with the legal requirements for registration under INA § 262, 8 U.S.C. § 1302, and notification of the Secretary of his or her address under INA § 265, 8 U.S.C. § 1305, including whether he or she is carrying on his or her person evidence of registration as required by INA § 264(e), 8 U.S.C. § 1304(e).

(*Id.*, PAGEID ## 497–98 (citations omitted).) The Lyons Memo expressly states that "no single factor is determinative" and recognizes that "likelihood of escape" is an "on-the-spot determination ... often made with limited information about the subject's identity, background, or place of residence and no corroboration of any self-serving statements made by the subject." (*Id.*, PAGEID # 499.)

Finally, the Lyons Memo instructs agents conducting a warrantless arrest to "document in the [N]arrative section of the Form I-213 … all factors considered in determining that the alien was likely to escape before a warrant could be obtained." (Lyons Memo, PAGEID # 499.) Documentation of "both aggravating and mitigating factors," to be "completed during processing, as soon as practicable following the arrest," is required. (*Id.*)

Reviewing the Lyons Memo, it accurately describes those circumstances in which warrantless civil immigration arrests are lawful under § 1357(a)(2). It expressly prohibits the illegal conduct that Plaintiffs allege is occurring— warrantless arrests without probable cause of both an immigration violation and a

likelihood of escape. Thus, there is no evidence that Defendants had (or currently have) a written policy encouraging or allowing warrantless arrests without the requisite probable cause. (*See also, e.g.*, Hr'g Tr. Vol. III, 528:10–16 ("Q. One last question, Mr. Affholter. You've worked in I.C.E. for how many years? A. Twenty. Q. Have you ever been told or seen a policy that you should not conduct an escape risk assessment before making a warrantless arrest? A. I have not.").)

Nevertheless, Plaintiffs insist that the Lyons Memo merely "pays lip service to controlling law" and argue that it actually "collapse[s] the two-prong analysis of unlawful presence and escape risk using circular reasoning, such that one prong of the analysis—lack of legal immigration status—can always or nearly always satisfy the second prong." (ECF No. 77, ¶ 70); *see also Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. CV 25-3417 (BAH), 2026 WL 1256234, at *10 (D.D.C. May 7, 2026) (finding that the Lyons Memo "[p]rovides flawed guidance on escape risk"). But the Lyons Memo's plain language belies Plaintiffs' characterization. It does not (and cannot) specifically list every factor that an ICE agent should consider when making a probable cause determination of likelihood of escape for a warrantless arrest.[10] It states that the considerations are non-exhaustive, and, as at least one court has recognized, "the possible factors listed are suggestive rather than prescriptive." *Escobar Molina*, 2026 WL 1256234, at *16. Plaintiffs' argument that

---

[10] Indeed, the promulgation of regulations implementing § 1357(a)(2) rejected commentators' recommendation to list factors governing civil immigration arrests. *See* 59 Fed. Reg. 42406-01, 42411 (Aug. 17, 1994) ("The commenters also suggested that the rule should specify which factors Service officers should use to determine the likelihood of escape. This is the type of discretionary detail that is appropriate in a training course and manual, but not in a regulation.").

more detail should have been included does not make the Lyons Memo incorrect or misleading. That they (or the Court) would have chosen different verbiage does not mean that the Lyons Memo as drafted is unlawful.

AAFOD Affholter corroborated, moreover, that ICE agents are expected to understand and consider key concepts and standards not explicitly provided within the Lyons Memo. For example, he confirmed that agents should consider not only a non-citizen's likelihood of escape from the immediate scene of the encounter but also from another readily identifiable location, as the Lyons Memo states. (*See* Hr'g Tr. Vol. II, 331:14–18, 448:21–449:5; Hr'g Tr. Vol. III, 535:3–10, 548:11–24; Affholter Dep. 104:17–105:9, ECF No. 76 (sealed) / ECF No. 79 (redacted).) In addition, though one court found that ICE agents could read the Lyons Memo as impermissibly blessing an escape determination based only on probable cause of a non-citizen's lack of status, *see Escobar Molina*, 2026 WL 1256234, at *13, AAFOD Affholter testified that ICE agents in Ohio should know that the likelihood of escape analysis is based on the totality of the circumstances—in other words, no factor is more important than another, and the analysis should consider more than one factor alone. (Affholter Dep. 125:25–126:5, 135:1–25, 151:6–23; Hr'g Tr. Vol. II, 449:7–450:9; Hr'g Tr. Vol. III, 514:3–20.) Even though the Lyons Memo does not specifically mention a non-citizen's community ties, family history, and employment status as factors for consideration of probable cause, it is ICE's policy to consider these things. (Affholter Dep. 146:3–147:9; Hr'g Tr. Vol. II, 449:9–21 (listing as factors "the amount of time spent at addresses and employers and ties to the

40

community").) Again, that Plaintiffs (or the Court) would have chosen to explicitly include these historical and community factors in the Lyons Memo does not mean that the Lyons Memo as drafted is unlawful.

Plaintiffs have not shown that Defendants promulgated or enforced a formal, written policy that unlawfully authorized or mandated agents to ignore § 1357(a)(2)'s requirements.

### bb.     Unofficial Practices or Customs

Turning to Defendants' actual practices, however, Plaintiffs have shown that Defendants authorized a widespread and persistent pattern of illegal warrantless arrests in Ohio during the relevant time.

Considering the standard applied to government entities in § 1983 suits, a plaintiff need not demonstrate an official policy to prevail—rather, "the existence of a custom of tolerance or acquiescence of federal rights violations" is sufficient. *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020). A practice must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691 (citation omitted); *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (observing that "custom" refers to "a legal institution that is permanent and established, but is not authorized by written law" (citation omitted)).

The parties agree that Defendants' conduct when effectuating arrests implicates the Fourth Amendment,[11] which protects "[t]he right of the people to be

---

[11] Plaintiffs do not, however, bring a Fourth Amendment claim against Defendants in this case. (*See generally* Compl., ECF No. 1.)

41

secure ... against unreasonable searches and seizures." U.S. Const. amend. IV; *see Pacheco-Alvarez*, 227 F. Supp. 3d at 887 ("[T]he Fourth Amendment applies to arrests of citizens and illegal aliens alike."). A person is "seized" under the Fourth Amendment "when, by means of physical force or a show of authority, his freedom of movement is restrained" or if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980). An officer is permitted to conduct a brief, investigatory seizure of an individual when he or she "has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). In the immigration context, "officers may briefly detain an individual for questioning if they have 'a reasonable suspicion, based on specific articulable facts, that the person being questioned ... is an alien illegally in the United States.'" *Vasquez Perdomo*, 146 S. Ct. at 1 (Kavanaugh, J., concurring) (quoting 8 C.F.R. § 287.8(b)(2)); *see also Hussen*, 822 F. Supp. 3d at 987–89 (discussing applicability of Fourth Amendment to non-citizens).

An investigative seizure "becomes an arrest and must be supported by probable cause" if law enforcement "exceed[s] the bounds permitted by reasonable suspicion." *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) (citation omitted). In determining when an investigative seizure transforms into an arrest, courts should "decide the issue on a case-by-case basis" and consider "the scope and nature of the restraints placed on an individual's liberty." *Id.* (citations omitted).

42

Courts should look to factors such as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force." *Lawson v. Creely*, 137 F.4th 404, 418 (6th Cir. 2025) (quoting *Richardson*, 949 F.2d at 857); *see also Pacheco-Alvarez,* 227 F. Supp. 3d at 887 (noting that "[ ]though no one factor is dispositive, courts often focus on the 'investigative means' the officers employed" and whether officers transported detainee elsewhere or placed detainee in police vehicle for questioning (citations omitted)).

Plaintiffs have presented evidence showing that Defendants permitted their agents to conduct investigative seizures that morphed into warrantless civil immigration arrests without the requisite probable cause of a likelihood of escape. The existence of this practice is supported by, *inter alia*, Defendants' public and internal statements acknowledging the use of a standard lower than that required by § 1357(a)(2) when making warrantless arrests, Agent Vorholt and AAFOD Affholter's testimony in this case to that same effect, sworn statements from the four named Plaintiffs and six declarants testifying to Defendants' illegal conduct, and over a dozen Form I-213s from CBP and ICE that reflect warrantless arrests without any probable cause determination as to escape.

Initially, Defendants themselves repeatedly affirmed their abandonment of the probable cause requirement for warrantless arrests. In a May 2025 email to an interim ICE deputy assistant director and various ICE field office directors, Acting

43

Executive Associate Director Marcos Charles called on agents to "step up" because "anyone that is found to be amenable to removal needs to be arrested." (Hr'g Ex. P73.) A few months later, in September 2025, President Trump fired a U.S. Attorney in California less than six hours after she told USBP Chief Banks that he could not arrest non-citizens without probable cause. (*See* ECF No. 12, PAGEID ## 135–36 (citing Heather Knight and Hamed Aleaziz, <u>Trump Fired a U.S. Attorney Who Insisted on Following a Court Order</u>, NYTIMES (Sept. 26, 2025), *https://nytimes.com/2025/09/26/us/trump-fires-usattorney-california-immigration.html*).) The Court also takes judicial notice of Defendants' public statements as conveyed in other cases. Former Chief Border Patrol Agent Gregory Bovino, for instance, told the press at the end of 2025 that "[w]e need *reasonable suspicion* to make an immigration arrest. … You notice *I did not say probable cause*, nor did I say I need a warrant." *Escobar Molina*, 811 F. Supp. 3d at 45 (citation omitted) (emphasis added). These and similar assertions were made publicly to reach a broad audience, including supervisors and agents under Defendants' command and control.

Perhaps most significantly, AAFOD Affholter and Agent Vorholt conceded, either implicitly or explicitly, that Defendants were not consistently conducting probable cause determinations surrounding escape risk when they made warrantless arrests in Ohio during the relevant time. Agent Vorholt, a supervisor who oversees and evaluates the field operations of USBP agents and their supervisors, testified that almost all of his agency's arrests are warrantless.

(Vorholt Am. Decl. ¶ 3, ECF No. 61; Hr'g Tr. Vol. I, 136:13–137:5; Vorholt Dep., 115:2–17, ECF No. 75 (sealed) / ECF No. 80 (redacted).) He attested that an agent has probable cause to arrest a non-citizen without a warrant as long as the agent knows that the non-citizen lacks legal status in the United States:

> Q: So, purely the fact that they are here illegally meets the element that they are likely to escape?
> THE WITNESS: We have to make the arrest.
> THE COURT: And the basis for you making the arrest is you and your people are finding, because they are here illegally, they are likely to escape?
> THE WITNESS: More likely than not, yes.
> THE COURT: So they are more likely to escape than not to escape. Then that, in your training and experience, gives you probable cause to arrest them?
> THE WITNESS: Yes.
> THE COURT: Without asking any further questions, other than knowing that they are here illegally?
> THE WITNESS: Yes.

(Hr'g Tr. Vol. I, 157:25–158:15.) In other words, CBP and USBP seemingly expect their agents to assume that every non-citizen who lacks legal status automatically poses a sufficient likelihood of escape, meaning that these agents improperly consider the fact that a non-citizen is illegally present as satisfying both prongs of § 1357(a)(2) for a warrantless arrest. (Hr'g Tr. Vol. I, 156:16–157:5, 157:8–158:4, 159:1–10; Vorholt Dep. 39:20–40:1.)

AAFOD Affholter acknowledged that ICE agents must conduct an escape-risk assessment before effectuating a warrantless arrest. (*See, e.g.*, Affholter Dep. 44:21–45:22.) But he posits that many of the examples of warrantless arrests offered by Plaintiffs were not, in fact, warrantless because the ICE agent obtained a warrant in the field before making the arrest. (Hr'g Tr. Vol. II, 290:11–291:2, 305:9–17,

45

326:10–19, 455:2–9.) More specifically, a Form I-200, or a "Warrant for Arrest of Alien," is effective and allows an ICE agent to effectuate an arrest once it is signed by a supervisor. (Affholter Dep. 140:1–141:10; Hr'g Tr. Vol. II, 373:8–15, 377:1–22, 446:15–16.) A supervisor in the field (or reachable instantaneously by phone or email) can sign and issue Form I-200 warrants in a matter of five to ten minutes, if not less. (Hr'g Tr. Vol. II, 290:24–291:2; Affholter Dep. 103:7–21, 131:3–8, 138:3–5.) Such a field-issued warrant, according to AAFOD Affholter, obviates the need for the agent to conduct a probable cause inquiry into the likelihood of escape. (Affholter Dep. 105:10–109:9.)

There are several problems with AAFOD Affholter's testimony that many of the arrests were warranted. First, at least one court has found that Form I-200 warrants issued in the field concurrently with a non-citizen's arrest are invalid and should be treated as warrantless arrests. *See Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 853 (N.D. Ill. 2025), *aff'd in part sub nom.* 175 F.4th 828 (7th Cir. 2026); *cf. Ramirez Ovando*, 810 F. Supp. 3d at 1226 ("Defendants argue that plaintiffs have not alleged an injury that confers standing because, while the initial detention was accomplished without a warrant, their continued detention was later supported by I-200 warrants ICE issued for all the plaintiffs in the field office during processing. … But issuing *post hoc* warrants once plaintiffs had already been unlawfully arrested does nothing to cure the initial statutory violation."). Furthermore, the law prevents agents from prolonging an investigative stop to get a warrant, as AAFOD Affholter recognized. (*See* Hr'g Tr. Vol. III, 541:3–

46

10 ("It must be a reasonable amount of time. If it cannot be done in a reasonable amount of time, then a warrantless arrest would be considered.").) Obtaining a warrant is not an instantaneous process, and the process could be made longer if a stop involves multiple non-citizen arrestees. (*See* Hr'g Tr. Vol. II, 295:25–296:4.)

Even crediting AAFOD Affholter's interpretation that issuing a warrant in the field negates the statutory obligation to make a probable cause determination of a non-citizen's likelihood of escape, it is far from clear that ICE agents in fact obtained warrants *before* arresting non-citizens in this case, and many instances in the record lead the Court to the opposite conclusion.

A Form I-200 warrant is composed of a top portion and a bottom portion. (*See generally* Hr'g Exs. P60, P75.) The Form I-200 warrants used by ICE require the supervisor to sign the top portion after (1) affirming that he or she has probable cause to believe that a non-citizen is removable from the United States, and (2) checking some combination of boxes describing the basis for that belief. (*See* Hr'g Ex. P75.) The bottom portion of ICE's warrants consists of the certificate of service and requires the serving agent to sign and input information about where, when, and in what language the warrant was served. (*Id.*) Although an ICE warrant reflects (or should reflect) the date on which it was issued and the date on which it was served, nothing requires agents or supervisors to document the exact time of issuance or service, and most (if not all) of the Form I-200 warrants that Plaintiffs obtained from ICE in this case do not reflect the time of issuance. (*Id.*; Hr'g Tr. Vol. II, 291:14–18.) As for CBP, the top portion of its Form I-200 warrant requires a

47

supervisor to sign and affirm that there is evidence that a non-citizen lacks status. (*See* Hr'g Ex. P60.) The supervisor may date the top portion, but there is no requirement to include a time of issuance. (*Id.*) The bottom portion includes blanks for the location, date, and time of service. (*Id.*)

Because of these varying information requirements, it is not usually possible to determine, from a warrant's face, when that warrant was issued relative to when the arresting agent found probable cause of lack of status. That a supervisor issued a warrant for a non-citizen on the same day as that non-citizen was arrested, then, does not confirm that the warrant was issued prior to the arrest or that the non-citizen was arrested based on that warrant.

Plaintiffs' accounts and those of the declarants—which Defendants do not dispute—are evidence that Defendants uniformly and consistently utilized a practice in Ohio by which they, without a warrant, "arrest[ed] first and ask[ed] questions later." (ECF No. 77, ¶ 237.) Beginning with Mr. Aguilar Peralta, ICE agents approached him in December 2025 during Operation Buckeye and asked him where he was from and whether he had citizenship or residency. (Aguilar Peralta Decl. ¶¶ 32–33, ECF No. 12-3.) The agents did not ask him any other questions relevant to his likelihood of escape. (*Id.* ¶¶ 42, 50; Hr'g Ex. P10.) Instead, the agents handcuffed him, patted him down, and arrested him without showing him a warrant at any point. (Aguilar Peralta Decl. ¶¶ 41, 58, 61; Hr'g Tr. Vol. I, 17:22–23, 18:13–15, 19:11–22.) The only signed Form I-200 warrant produced for Mr. Aguilar Peralta states that it was issued on December 18, 2025 (the day of his arrest), but it

48

does not say the time of issuance. (*See* Hr'g Ex. P10.) Although the warrant was also served on December 18, 2025, it was served in Detroit, which was where Mr. Aguilar Peralta was processed several hours after his arrest. (*See id.*; Aguilar Peralta Decl. ¶¶ 91, 97–98.) There is no evidence, then, that ICE agents arrested him pursuant to a warrant issued before his arrest or a probable cause determination surrounding his escape.

Agents similarly failed to show S.T. a warrant or ask her any questions going to her escape risk prior to arresting her in December 2025 as part of Operation Buckeye. (S.T. Decl. ¶¶ 35–36, ECF No. 12-4; Hr'g Tr. Vol. I, 86:25–87:24.) Her Form I-213 states that the agents identified her through a "brief investigative consensual immigration interview," but Defendants do not dispute that the agents handcuffed her and searched her phone (conduct indicative of an arrest) before they asked about anything other than her legal status. (Hr'g Ex. P11.) The record includes two signed Form I-200 warrants, one of which is dated the day after S.T. was arrested; the other is handwritten and was signed and served in Columbus on the day of her arrest. (*Id.*) AAFOD Affholter testified that a handwritten warrant suggests that it was issued in the field, as was commonly done during Operation Buckeye. (Hr'g Tr. Vol. II, 442:8–13.) But a review of S.T.'s warrant does not resolve whether agents issued it before or after they arrested her.

The warrants for Mr. Montoya Sadillo, Mr. Cesareo Valladares, and Mr. Mulet Zaldivar are also handwritten and dated the same day as their arrests. (Hr'g Exs. P3, P6, P8.) ICE agents may have asked each man about his immigration

49

status, but the undisputed testimony reflects that the agents did not ask any other questions relevant to the likelihood of escape determination. (Hr'g Tr. Vol. III, 569:21–24; Montoya Cedillo Decl. ¶¶ 25–27, ECF No. 12-7; Cesareo Valladares Decl. ¶¶ 25–28, ECF No. 12-5; Hr'g Tr. Vol. II, 262:7–20, 263:4–9; Mulet Zaldivar Decl. ¶¶ 35–39, ECF No. 12-6.) The Form I-213s for M.A.R. and J.R. reflect the same lack of inquiry into escape risk. (*See* Hr'g Ex. P4 (providing that ICE agents asked only for J.R.'s driver's license before taking him into custody); Hr'g Ex. P9 ("The encounter revealed both the driver, [M.A.R.], citizen of Honduras, and passenger … were illegally present in the United States. Officers removed both subjects from the vehicle and were taken into custody [sic] without further incident.").) Defendants did not produce a signed warrant for J.R., and M.A.R.'s warrant is not time-stamped. (*Id.*)

One of the clearest examples of ICE's practice is the agency's arrest of Mr. Ajanel Pelico, a Guatemalan national. (*See* Hr'g Ex. P12.) ERO agents were surveilling his residence and car, but he was not the target of the agents' operation. (*Id.*) On February 25, 2026, agents stopped the car and identified Mr. Ajanel Pelico as one of three occupants. (*Id.*) Mr. Ajanel Pelico testified that an agent opened the car door, pulled him out, patted him down, handcuffed him, and put him in an ICE vehicle within five minutes of pulling the car over without so much as asking him his name. (Hr'g Tr. Vol. II, 348:1–350:24.) The only Form I-200 warrant produced for Mr. Ajanel Pelico is unsigned. (Hr'g Ex. D12.) And his Form I-213 seems to affirmatively confirm that no such assessment was done. (Hr'g Ex. P12 ("Once

50

officers determined that [Mr. Ajanel Pelico] was illegally present in the United States, Officers handcuffed and searched [him] and transported him to ERO Cleveland office processing area without incident.").)

CBP's arrests of F.M. and Mr. De Leon Zapata are just as problematic, if not more so. Agent Vorholt admitted that neither man was arrested pursuant to a warrant issued prior to the arrest—indeed, Defendants did not produce a signed warrant for Mr. De Leon Zapata, and Agent Vorholt issued F.M.'s warrant himself, but only after F.M. had been taken to the Sandusky Bay Station. (Vorholt Dep. 64:17–23; Hr'g Exs. P2, P5; Hr'g Tr. Vol. I, 138:4–139:6, 143:2–9.) Agent Vorholt did not dispute that the arresting agents failed to ask any questions to assess F.M. or Mr. De Leon Zapata's escape risk.[12] (Hr'g Tr. Vol. I, 189:23–190:7, 193:16–194:3.)

Nor does the statistical sample composed of dozens of Form I-213s give the Court any indication that Defendants' agents are regularly following the probable

---

[12] Agent Vorholt submitted a declaration in which he stated that the arresting agents believed that F.M. and Mr. De Leon Zapata would "likely flee the area" if left at the scene while a warrant was obtained. (Vorholt Decl. ¶ 6, ECF No. 29-2.) He further described the factors that informed those escape determinations, including intelligence that an associate of a known gang member had previously owned or driven F.M.'s vehicle. (*Id*.) Agent Vorholt later amended that declaration to, *inter alia*, remove the gang-related intelligence and add details about Mr. De Leon Zapata's manner of entry into the country. (ECF No. 61.)

The Court does not find Agent Vorholt's statements about the purported escape risk determination for F.M. and Mr. De Leon Zapata to be credible. Although Agent Vorholt spoke to the arresting agents to verify the information contained in his declarations, he did not draft them and did not seem to make meaningful inquiries into the truth or accuracy of their contents. (Hr'g Tr. Vol. I, 179:4–12.) There were also contradictions between Agent Vorholt's amended declaration and his testimony at the preliminary injunction hearing. Thus, the Court rejects the information in Agent Vorholt's amended declaration about F.M. and Mr. De Leon Zapata's escape risk determinations.

cause requirement in 8 U.S.C. § 1357(a)(2). (*See* Hr'g Exs. P60, P75.) A Form I-213 is primarily composed of the Narrative section, and an agent must document in that section the circumstances of his or her encounter with a non-citizen that led to the arrest and other case information. (Hr'g Tr. Vol. II, 278:25–283:4; *see also* Lyons Memo, PAGEID # 499.) For a warrantless arrest, an agent is required to include the facts that he or she knew at the time of the arrest that supported his or her probable cause finding that the non-citizen was likely to escape before a warrant could be obtained. (*See, e.g.*, Lyons Memo, PAGEID ## 497, 499.) In Ohio, agents are generally directed to provide the pre-arrest details supporting probable cause of escape in a portion of the Narrative section titled "Encounter." (*See* Hr'g Tr. Vol. II, 452:9–21 (testimony from AAFOD Affholter that "[t]he policy and all of the guidance on the matter [ ] state that [the facts] must be documented in the I-213 Narrative portion for Ohio. We generally include that in a portion that's titled as the 'Encounter'"); Hr'g Tr. Vol. I, 163:3–11 (exchange with Agent Vorholt providing, "Q. The information … based on what's been collected in the field, is in a field called 'Encounter,' right? A. For the field, yes").)

The Form I-213s offered in this case contain information in the Narrative section that could be pertinent to an escape assessment, like a non-citizen's criminal, family, and employment history. (*See* Hr'g Exs. P60, P75.) But unless this pertinent information appears in the Encounter portion of the Narrative section, there is no way to know definitively from the Form I-213s whether the arresting agent knew and considered these details prior to making a warrantless arrest.

Considering Ohio's direction to use the Encounter portion for such information, the reasonable assumption is that, if key information is not included there, the arresting agent did not learn that information until later. (*See* Hr'g Tr. Vol. II, 452:9–21; Hr'g Tr. Vol. I, 163:3–11 ("Q. And the rest of the information that follows the Encounter field in an I-213 is usually filled in based on information that's gathered after the arrest …? A. That's correct.").) Indeed, Form I-213s are typically completed after arrest or during processing and contain information gathered from several government resources at various times. (Hr'g Tr. Vol. II, 278:25–279:6.)

Mr. Aguilar Peralta's Form I-213 exemplifies this—though details about his employment, criminal charges, and other things appear in other portions of the Narrative section, his Encounter portion does not include such details. (*See* Hr'g Ex. P10 (providing that Mr. Aguilar Peralta "admitted to being a Honduran citizen illegally present in the United States and was subsequently arrested for his illegal presence").) His Form I-213 is like the majority of others produced here. For instance, CBP agents arrested a non-citizen in December 2025, and though the Form I-200 warrant purports to have been signed about ten minutes *after* it was served, the Form I-213's Encounter portion states only that the non-citizen "readily admitted" to being illegally present and that agents "then placed [the non-citizen] under arrest" without any further questions. (Hr'g Ex. P60.) Likewise, ICE arrested a non-citizen on February 17, 2026, but the Form I-200 warrant is dated February 18, 2026, and the corresponding Form I-213 states in the Encounter portion that ICE transported the non-citizen to the Butler County Jail after he "freely admitted"

53

to illegal presence. (Hr'g Ex. P75.) In comparison, two of the Form I-213s were completed correctly—they explicitly state in the Encounter portion that Defendants "conducted individualized assessments of each [non-citizen] through interviews and immigration database checks" and "assessed the likelihood of escape before a warrant could be obtained." (*Id.* (determining that the "mobile nature of the vehicle, the circumstances of the stop, and the inability to verify a legitimate address for any of the occupants" led agents to find a high likelihood of escape).) Thus, that the majority of the Encounter portions in the sample Form I-213s are silent is some evidence that the determinations did not occur.

In the face of this evidence, Defendants claim that their agents are expected to operate within the Fourth Amendment's bounds and receive ongoing training in the law of arrests and the rights of non-citizen arrestees. (Affholter Decl. ¶¶ 11, 13–15, ECF No. 33; Hr'g Tr. Vol. I, 134:12–136:8; Hr'g Tr. Vol. II, 302:12–16 ("All law enforcement officers must undergo the biannual, or every—every six months, we take OPLA training on the Fourth Amendment."); Hr'g Tr. Vol. III, 556:6–558:20 (discussing training on an investigative stop versus an arrest); *see also* Affholter Dep. 83:14–16 ("The officers are trained in Fourth Amendment search and seizures and ICE arrest authority.").) But "[o]n this record, Defendants' evidence of officer training and policy carries little weight" because "that's not what happened here." *Hussen,* 822 F. Supp 3d at 994. And Defendants admit that there is no training on how to specifically evaluate a non-citizen's likelihood of escape, though agents are

54

trained on how to properly and comprehensively gather articulable facts generally. (Hr'g Tr. Vol. II, 308:2–12, 313:7–314:15, 422:24–423:13.)

The Court also recognizes that numerous other courts to consider this issue have likewise found the existence of such an illegal practice. *See Escobar Molina*, 811 F. Supp. 3d at 33; *Ramirez Ovando*, 810 F. Supp. 3d at 1237; *United Farm Workers*, 785 F. Supp. 3d at 735; *M-J-M-A-*, 822 F. Supp. 3d at 1147, 1175; *Hussen*, 822 F. Supp. 3d at 994. Those courts were faced with similar evidence of improper warrantless arrests as that offered by Plaintiffs here. That Defendants are engaging in this conduct in at least five other states is relevant to the Court's analysis of how Defendants are operating in Ohio. Tellingly, Defendants have made no effort to distinguish their conduct in Ohio from their practices in other states.

Thus, Plaintiffs have sufficiently shown, for purposes of the Court's jurisdictional inquiry, that Defendants authorized federal immigration agents to conduct warrantless arrests in Ohio without probable cause that the arrestees were likely to escape before a warrant for their arrest could be obtained from mid-April 2025 to the present. However, this does not end the inquiry.

> **ii. Threat of Defendants' Future Application of Unlawful Practice to Plaintiffs**

Even when the government has an illegal policy or practice, a plaintiff lacks standing to seek an injunction against its enforcement if he cannot credibly show that there is an imminent and certainly impending threat of future harm from that policy or practice. *See Lyons*, 461 U.S. at 106 n.7 ("[T]o have a case or controversy with the City that could sustain Count V, Lyons would have to credibly allege that

he faced a realistic threat from the future application of the City's policy."). To make such a showing in this case, Plaintiffs must show a substantial likelihood that Defendants will imminently encounter them again and that any such confrontation will almost certainly result in their unlawful arrest (i.e., not only an arrest but a warrantless arrest without a probable cause determination of likelihood of escape). *See, e.g.*, *id.* at 105–06 ("In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police, but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner." (emphasis in original)); *Hussen*, 822 F. Supp. 3d at 999 (observing that plaintiffs seeking injunctive relief must show that defendants are sufficiently likely to subject them to a stop or arrest under a policy or practice authorizing unlawful stops and arrests); *cf. Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J, concurring) (discussing veracity of plaintiffs' basis to believe that law enforcement will imminently stop *them* again). They have not met their burden.

### aa. Likelihood that Plaintiffs will Re-Encounter Defendants

It is undisputed that none of the four named Plaintiffs had lawful immigration status in the United States at the time of their arrests. Although some of them had (and may still have) work permits, driver's licenses, social security numbers, and/or pending asylum or other status-based applications or petitions,

these items and proceedings do not, themselves, confer lawful status. (*See* Hr'g Tr. Vol. I, 181:8–16; Hr'g Tr. Vol. II, 381:17–25, 451:1–8); *see, e.g.*, USCIS Policy Manual, Vol. 7, Ch. 3 (June 26, 2026) ("An alien is in unlawful immigration status if he or she is in the United States without lawful immigration status either because the alien never had lawful status or because the alien's lawful status has ended. … A pending application to extend or change status …, a pending adjustment application, or a pending petition does not confer lawful immigration status on an applicant.").[13] After their arrests, Plaintiffs were placed in removal proceedings and released on bond. (*See* Aguilar Peralta Decl. ¶ 109; De Leon Zapata Decl. ¶¶ 32, 39, ECF No. 12-2; F.M. Decl. ¶¶ 35, 42, ECF No. 12-1; S.T. Decl. ¶ 94; *see also* Affholter Decl. ¶¶ 20, 25.) Consequently, they are now in their communities but lack legal status and are amenable to removal, so they could be exposed to a second encounter by Defendants.

That Plaintiffs *could* encounter Defendants again, though, does not support the necessary conclusion that Defendants almost certainly *will* encounter them again. Perhaps most supportive of this point, there is no evidence that Defendants have stopped or encountered any of the four named Plaintiffs since their release, even though, for instance, Mr. De Leon Zapata has taken the same route to work

---

[13] Available at *https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-3* (last visited July 17, 2026). Courts may take judicial notice of matters of public record, including policies and information reflected on government websites. *See* Fed. R. Evid. 201(b)–(c); *Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009); *see, e.g.*, *Epps v. United States*, No. 1:23-CV-510, 2024 WL 2176877, at \*5 n.1 (S.D. Ohio May 15, 2024) (Cole, J.) ("[B]ecause the proposed party here is a governmental entity, the Court concludes it can take judicial notice of information posted on an official government website regarding that entity.").

nearly every day since he was released from detention in October 2025. (De Leon Zapata Decl. ¶¶ 36; Hr'g Tr. Vol. I, 45:20–46:2, 72:11–13, 74:10–18, 75:4–10.) "[T]he lack of a subsequent encounter makes it less likely that future violations are certainly impending." *Hussen*, 855 F. Supp. 3d at 999.

The probability of an encounter is further diminished when the Court considers Defendants' staffing in Ohio during the relevant time. By way of context, both CBP and ICE operate under DHS's umbrella and occasionally work together on enforcement priorities, but their jurisdictions and activities differ. (Vorholt Dep. 21:23–22:1; *see, e.g.*, Hr'g Tr. Vol. II, 420:6–16.) CBP has multiple divisions (including USBP) and focuses its Ohio operations near the port of entry and border with Canada on Lake Erie, though it is authorized to function throughout the state. (Vorholt Dep. 20:2–21:18.) ICE, which is responsible for enforcement within the nation's interior boundaries, consists of (1) the agency's legal office; (2) Enforcement and Removal Operations ("ERO"), which acts through 25 national field offices; and (3) Homeland Security Investigations ("HSI"), which acts through 30 national field offices. (Affholter Decl. ¶ 5.) Both ERO and HSI employ agents that work in the field to conduct stops and civil immigration arrests. (Affholter Dep. 18:10–22; Vorholt Dep. 22:9–15; Hr'g Tr. Vol. II, 420:6–24.)

In April 2025, approximately 50 to 60 ERO agents operated throughout Ohio. (Affholter Dep. 22:12–25:24; Hr'g Tr. Vol. II, 271:16–23.) About half of those agents were dedicated to field enforcement at any given time. (*Id.*) The total number of ERO agents working in Ohio grew slowly over the course of the year and peaked in

58

December 2025, when over 120 out-of-state agents who conducted Operation Buckeye were added to the Ohio agents handling typical enforcement efforts. (Affholter Dep. 25:1–13, 67:15–20; Hr'g Tr. Vol. II, 306:3–6, 362:4–10; *see also* Affholter Decl. ¶ 8 ("No State, County, or Municipal officials from Ohio participated in Operation Buckeye.").) As of early June 2026, however, the numbers had dropped to roughly 90 to 100 total ERO agents in Ohio, only between 20 and 40 of whom were actually involved in field enforcement—by way of example, the ERO office in Columbus had five agents that regularly conducted encounters in the field. (Affholter Dep. 25:14–26:2; Hr'g Tr. Vol. II, 418:12–419:1.)

As for HSI, the number of agents who provided field support in Ohio oscillated in 2025 between 20 and 40. (Affholter Dep. 23:5–22.) In Columbus, around four or five HSI agents contributed to field enforcement each day. (Hr'g Tr. Vol. II, 419:2–420:5.) But by early June 2026, less than 10 HSI agents worked in the field across the entire state because HSI implemented a force drawdown in the first few months of 2026, aiming to withdraw and reallocate resources. (Affholter Dep. 22:12–17; Hr'g Tr. Vol. II, 419:2–20; Hr'g Tr. Vol. III, 552:14–21.)

The record does not reflect total CBP or USBP staffing numbers. The Court takes notice of CBP's recent report that it has over 21,000 border patrol agents, but the report does not indicate how many of those agents operate in Ohio. *See* U.S. Customs and Border Protection, *Border Patrol sets record with 21,471 agents on board* (June 24, 2026), available at *https://www.cbp.gov/newsroom/national-*

59

*media-release/border-patrol-sets-record-21471-agents-board*. CBP withdrew its two agents from Columbus in April 2026. (Hr'g Tr. Vol. II, 420:8–421:5.)

ICE also enforces federal immigration law by partnering with state and local law enforcement offices. (Affholter Dep. 33:2–36:14); *see* 8 U.S.C. § 1357(g). Through its "287(g) Program," ICE delegates its authority to perform specified immigration functions (including effectuating arrests through a task force model) to participating law enforcement offices that act under ICE's direction and oversight. (*Id.*; Hr'g Tr. Vol. II, 271:24–273:18.) Around 21 law enforcement offices in Ohio have expressed interest or signed a memoranda of agreement to join the 287(g) Program, but only nine are currently operational, and there is no evidence as to when or if the other offices will come online. (Hr'g Tr. Vol. II, 272:5–19); *see also* Participating Agencies, ICE's 287(g) Program (spreadsheet showing 17 law enforcement offices with executed memoranda of agreement).[14] Of those nine operating programs, none act in the jurisdictions encompassing Ohio's largest metropolitan areas or any of Plaintiffs' hometowns. (Affholter Dep. 35:1–36:20 (testifying that there are no operational jurisdictions in the Columbus region)); *see* Participating Agencies, ICE's 287(g) Program (reflecting that none of the nine offices are located in Cuyahoga (Cleveland), Hamilton (Cincinnati), Franklin (Columbus), Lucas (Toledo), Montgomery (Dayton), or Erie (Sandusky) counties). In any event, Plaintiffs have not challenged the 287(g) Program or the conduct of the Ohio law enforcement offices participating therein.

---

[14] Available at *https://www.ice.gov/identify-and-arrest/287g* (last visited July 17, 2026).

These metrics emphasize the relatively small ratio of ICE and CBP agents (or other officers acting with similar authority) to Ohio's non-citizen population.[15] And Plaintiffs have not pointed to any sources positively affirming that staffing at these agencies will meaningfully increase in Ohio in the near term.[16] To the contrary, AAFOD Affholter testified that he did not know of any plans to hire additional ICE agents for Ohio and that there are no ICE employees slated to start working in Columbus in the near term. (Affholter Dep. 77:11–24; Hr'g Tr. Vol. II, 421:13–16.) Consequently, the chances that Plaintiffs will re-encounter Defendants' agents are reasonably low. *Cf. Mattox v. City of Jefferson*, No. 1:04 CV 2257, 2007 WL 120651, at *3 (N.D. Ohio Jan. 10, 2007) ("Plaintiff is unable to establish that he will have any future contact with the Ohio State Highway Patrol, and thus, he is unable to establish a real and immediate threat that the Ohio State Highway Patrol will … interfere with his rights.").

---

[15] In 2020, this Court considered data from Earlham College reflecting that "[i]n Ohio, there are approximately 90,000 unauthorized immigrants who reside in the state." *Intercommunity Just. & Peace Ctr. v. Registrar, Ohio Bureau of Motor Vehicles*, 440 F. Supp. 3d 877, 887 (S.D. Ohio 2020) (Sargus, J.).

[16] Although Plaintiffs offer news articles suggesting that Defendants are continuing to increase the number of arresting agents, the statements in those articles are speculative or omit key details. (*See, e.g.*, ECF No. 12, PAGEID # 154 n.38 (citing January 2026 news article reporting on "possible ICE surge" in Springfield, Ohio, and stating that Governor Mike DeWine "doesn't know for sure" whether ICE would send officers to the city).) Plaintiffs also point to the recent opening of an ICE legal office in Westerville, Ohio, but that entity does not effectuate arrests or conduct enforcement operations. (*See* Affholter Dep. 112:9–20.)

> **bb.** **Plaintiffs' Likelihood of Unlawful Re-Arrest**

Even assuming Plaintiffs are stopped again, it is far from certain that Defendants will illegally re-arrest them during such a repeated encounter. *See, e.g.*, *Hussen*, 822 F. Supp. 3d at 999 ("[E]vidence that witnesses regularly observe immigration agents does not show a substantial risk of a future stop or arrest."). Instead, the status of Defendants' enforcement efforts in Ohio (including the stabilizing and falling arrest figures) and the potential for prosecutorial discretion signal that Plaintiffs are not significantly likely, for purposes of their request for equitable relief, to be arrested by Defendants a second time.

Plaintiffs urge the Court to find that Defendants' enforcement efforts in Ohio are proceeding apace or are imminently increasing. They urge the Court to consider the Trump administration's national quota of 3,000 daily arrests, and they point to several news articles and media sources reporting that Defendants continue to escalate their nationwide immigration enforcement activities. (*See* Compl. ¶¶ 26–32 (citations omitted); ECF No. 12, PAGEID ## 120–22 (citations omitted).) For example, according to a March 2026 article, data from "an internal ICE document" and "detailed records of ICE immigration arrests" shows that the pace of ICE arrests nationwide "has topped 1,100 per day on average in 2026, far higher than the rate last spring of roughly 600 arrests per day[.]" (*See* ECF No. 12, PAGEID ## 121 n.5 (citing Albert Sun, Allison McCann & Hamed Aleaziz, <u>New Data Shows Where ICE Has Been Most Active This Year</u>, NYTIMES (Mar. 20, 2026), *https://www.nytimes.com/2026/03/20/us/ice-arrests-immigration-*

62

*enforcement.html*).) That same article, however, concedes that "the pace of these arrests has varied across the country in sometimes surprising ways." (*Id.*) Although national figures are interesting, more central to the Court's inquiry here are *Ohio's* arrest metrics.

Plaintiffs provided data on the number of civil immigration arrests recorded by ICE in Ohio from October 2022 through March 10, 2026. (*See* Hr'g Exs. P77, P80.) The native data, when filtered to include ERO administrative arrests of all types by all programs in Ohio only, reflects a steady increase over the course of 2025, beginning with a little over 100 arrests in the month of January 2025 and ending with around 580 arrests in the month of December 2025. (Hr'g Ex. P77.) December was the peak, though, as the number of arrests in January and February 2026 fell to around 475 each month. (*Id.*) Plaintiffs submitted a chart tailored to the relevant time:



(Hr'g Ex. 80; *see* Hr'g Tr. Vol. III, 596:1–17.) The chart, though scaled differently,[17] illustrates the same pattern—a fluctuating but upward trend in arrests from April to December 2025, with a surge in mid-December during Operation Buckeye followed by a leveling out and a downward trend. (Hr'g Ex. P80.)

The native data further identifies the arrests by local law enforcement offices as part of ICE's 287(g) Program beginning in July 2025. (Hr'g Ex. P77.) That month, only four arrests were made pursuant to that program, and the number reached more than 30 in both September and October 2025 before falling to around 15 in February 2026. (*Id.*) From this, the Court observes that local law enforcement offices, like ICE itself, conducted fewer civil immigration arrests in Ohio in early 2026 than they did in 2025.

CBP (through USBP), which operates the Sandusky Bay Station and generally limits its enforcement efforts in Ohio to seven northern counties near Lake Erie, makes a fraction of these arrest figures. (Vorholt Am. Decl ¶ 2; Hr'g Tr. Vol. I, 133:14–134:5; *cf.* F.M. Decl. ¶¶ 7, 12, 23 (stating that F.M. encountered CBP agents in Norwalk, Ohio); De Leon Zapata Decl. ¶¶ 3, 20 (stating that Mr. De Leon Zapata encountered CBP agents in Toledo, Ohio); Hr'g Ex. P60 (statistical sample of Form I-213s by CBP reflecting arrests of non-citizens in northern Ohio counties,

---

[17] Plaintiffs did not explain how they used the native data in Exhibit P77 to create the chart in Exhibit P80, nor did they indicate whether they chose to omit certain categories of arrests in the native data from the chart. The Court believes that the chart principally contains arrests conducted as part of ICE's Field Operations Team (formerly known as the "Fugitive Operations Team"), which works to identify non-citizens subject to arrest who are at-large in the community. (*See generally* Hr'g Ex. P77; *see* Hr'g Tr. Vol. III, 523:24–524:20.)

including Allen, Ottawa, Huron, and Lorain counties).) Agent Vorholt estimated that USBP agents from the Sandusky Bay Station conducted around 249 arrests this fiscal year (which started in October 2025). (Hr'g Tr. Vol. I, 133:14–134:5, 136:9–22.) He said that if USBP agents are working with ICE agents on an enforcement task, the expectation is that ICE will make the arrest, even when USBP is involved. (*See* Vorholt Dep. 22:19–24.)

Additionally, Operation Buckeye is over, and both Agent Vorholt and AAFOD Affholter testified that they are not aware of any future enforcement ramp-ups in Ohio. (Hr'g Tr. Vol. II, 369:9–14 ("We do not have any knowledge or information that there are any surges planned."); Vorholt Dep. 113:21–114:2 ("Q. And, in fact, hasn't the instruction that's been coming from above to accelerate the rate of finding and arresting people in your—. A. I have never had that, never been told that. … Not to my knowledge."); H'rg Tr. Vol. III, 559:13–15.) The Supreme Court has made clear that "mere[ ] speculat[ion] and ... assumptions about" how the government will act is not a sufficiently particularized harm to meet the injury-in-fact requirement. *Clapper*, 568 U.S. at 411. "This is true even where the government has the power to do what a plaintiff fears it might." *See Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 410 (6th Cir. 2019). Even though Defendants have the power to amplify their civil immigration enforcement activities and boost their arrest figures, the evidence does not show that they were doing so at the time Plaintiffs filed their Complaint, and Plaintiffs' supposition that they will do so does

65

not show a substantial probability of future harm.[18]

The likelihood of future re-arrest is further diminished by ICE's ability to exercise prosecutorial discretion.[19] Simply because a non-citizen may be subject to arrest does not mean that ICE must effectuate the arrest. (Hr'g Tr. Vol. II, 295:9–10; *see, e.g.*, Ex. P75 (noting that "CLM ICE is exercising PD" in M.A.R.'s case in 2015)); *cf. Arizona v. Biden*, 40 F.4th 375, 391 (6th Cir. 2022) ("Immigration authorities, as the Supreme Court has made clear, have considerable discretion over whom to arrest and remove.") (citing *Arizona v. United States*, 567 U.S. 387, 396 (2012)). Pertinent here, ICE officers in Ohio do not make a warrantless arrest each time they encounter an alien who they have reason to believe is in the United States unlawfully. (*See, e.g.*, Hr'g Tr. Vol II, 295:14–16 ("I can think of many, many, examples where we do not arrest everyone that we encounter in the field, and we

---

[18] Even if Ohio was increasing its enforcement levels around the time Plaintiffs filed this case, Plaintiffs have not demonstrated that all of Defendants' agents always make warrantless arrests, let alone that all agents do so without the requisite probable cause. (*See, e.g.*, Hr'g Ex. P75 (reflecting escape determination for warrantless arrest).) ERO agents in Columbus, for example, typically conduct targeted enforcement; they target specific non-citizens whom the agency has been investigating and about whom they have information before making any arrests. (Hr'g Tr. Vol. II, 363:6–15, 421:17–422:7.) For such targeted operations, Ohio ICE agents obtain a Form I-200 warrant that corresponds to the targeted non-citizen. (*See, e.g.*, *id.* at 459:23–460:1 ("Q. And you mentioned that an I-200 can be filled out before a targeted operation? A. They should always be filled out before a targeted operation, correct.").) Although these agents may encounter "collateral" non-citizens who are not the focus of the operation, their primary objective is to take a particular target into custody, rather than "roving or just doing circles" in Ohio communities looking for non-citizens to arrest. (*Id.* at 421:17–422:7.)

[19] There is no evidence that CBP exercises prosecutorial discretion. (*See, e.g.*, Vorholt Dep. 40:2–21; Hr'g Tr. Vol. I, 148:10–24 ("Q. And your agents do not have the discretion to not arrest anyone they find that is here unlawfully, correct? A. We do not.").)

exercise prosecutorial discretion."), 328:16–17 ("The I.C.E. policy is 'may be arrested.' There's no policy that says they 'need to be arrested.'"), 332:10–11 ("Officers always have prosecutorial discretion whether they make an arrest or not"), 437:13–15 ("There have been many instances where we know that the individual is subject to arrest, but we use discretion and choose not to arrest."); Hr'g Tr. Vol. III, 532:3–533:22 (testifying that prosecutorial discretion is still in effect, though potentially "less than it happened before").) Moreover, a supervisor may decline an agent's request to issue an arrest warrant, or an agent may issue a non-citizen a Notice to Appear and send them on their way. (Hr'g Tr. Vol. II, 445:22–25; Hr'g Tr. Vol. III, 533:23–534:18.) These points highlight the intricacies of the speculative chain of events that would have to occur for Plaintiffs to show standing.

*     *     *

Plaintiffs have not demonstrated a sufficient likelihood that they will encounter Defendants again or that such an encounter would imminently and almost certainly result in their illegal re-arrest. Consequently, they have failed to establish that a future injury from Defendants' use of their unlawful practice is certainly impending or that there is a substantial risk of the same. *See also Hussen*, 822 F. Supp. 3d at 1000–01 (finding no standing to seek injunctive or declaratory relief despite having found the existence of a practice of unlawful warrantless arrests). That Defendants' practice authorizes unlawful arrests, as opposed to requiring or mandating them, supports this conclusion. *See Clapper*, 568 U.S. at 412 ("Moreover, because [the statute] at most *authorizes*—but does not *mandate* or

67

*direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural." (emphasis in original)). Therefore, Plaintiffs lack Article III standing to obtain the forward-looking relief they seek.

###### b.      Past Injury with Continuing, Present Adverse Effects

Plaintiffs also argue that they have standing because they have "drastically changed their daily life as much as they can to avoid rearrest by federal immigration officers." (ECF No. 46, PAGEID # 661.) They explain that, after their release, they have been afraid to go about their daily lives, frequently monitor their surroundings for immigration agents, stay home or avoid going in public, and experience psychological effects like anxiety and trouble sleeping. (*See* Aguilar Peralta Decl. ¶ 131; S.T. Decl. ¶¶ 98, 105; De Leon Zapata Decl. ¶¶ 35–38; F.M. Decl. ¶¶ 36–40; *see generally* Hr'g Tr. Vol. I.) S.T. lost her job after being detained, and Mr. De Leon Zapata could not move into an apartment as planned. (S.T. Decl. ¶ 100; De Leon Zapata Decl. ¶ 31.) Plaintiffs also reference physical injuries (such as those from handcuffs or chains) and monetary losses from paying bond or losing security deposits. (*See, e.g.*, De Leon Zapata Decl. ¶ 35; S.T. Decl. ¶ 78.) These injuries, Plaintiffs allege, are ongoing or have "continuing, present adverse effects."

Some of Plaintiffs' arguments sound in the chilling effect doctrine applicable to First Amendment claims. *See, e.g.*, *Hussen*, 822 F. Supp. 3d at 986 ("The second theory is akin to the First Amendment's 'chilling effect' doctrine: Plaintiffs claim they are injured going forward because 'DHS's illegal policies are forcing them ... to alter their lives in new and painful ways.'"); *see Monsanto Co.*, 561 U.S. at 154–55

(finding that having to take measures to test for and minimize the likelihood of contamination amount to injuries-in-fact to confer standing for injunctive relief). "[A] litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent." *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 610 (6th Cir. 2008). Although there are instances in which "chill" is sufficient to establish an injury in fact, the analysis "depends on how likely it is that the government will attempt to use [ ] provisions against them—that is, on the threat of enforcement—and not on how much the prospect of enforcement worries them." *Am. Libr. Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992); *see also, e.g.*, *Clark*, 998 F.3d at 295 ("The Clarks' argument that their parental rights have been chilled due to fear of false prosecution for child abuse is also unavailing because they have failed to demonstrate false prosecution with any level of certainty.").

As discussed above, it is far from assured that Defendants will encounter Plaintiffs again, let alone act consistently with their practice and re-arrest Plaintiffs without a warrant or a probable cause determination of likelihood of escape. That Plaintiffs *subjectively* fear this outcome does not *objectively* establish a certainly impending threat of enforcement. *See, e.g.*, *Hange v. City of Mansfield*, 257 F. App'x 887, 891 (6th Cir. 2007) ("[T]he mere subjective fear that a plaintiff will be subjected again to an allegedly illegal action is not sufficient to confer standing."); *Hussen*, 822 F. Supp. 3d at 1000 ("The *Monsanto* theory requires a *justified* fear of future injury." (emphasis added) (citation omitted)); *cf. Lyons*, 461 U.S. at 107 n.8

69

("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." (emphasis in original)). Instead, Plaintiffs' chill "aris[es] merely from [their] knowledge that a governmental agency was engaged in certain activities or from [their] concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to [them]," which is not sufficient for standing. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Allegations of such a subjective "chill" are "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Id.* at 13–14.

Plaintiffs' continuing fear, anxiety, and physical and psychological hardships certainly amount to lingering effects, and the Court does not intend to minimize them. But Plaintiffs have not explained how these effects stem from the *unlawful, warrantless nature* of their past arrests, rather than from the fact that they were arrested at all and subsequently detained in conditions that were, to put it lightly, less than ideal. *See Lyons*, 461 U.S. at 101–02 (holding that a plaintiff must show that he or she "has sustained or is immediately in danger of sustaining some direct injury *as the result of* the challenged official conduct" (emphasis added)). There is no dispute that all four Plaintiffs lacked lawful status in the United States when they encountered Defendants' agents. This means that Defendants could have gotten a warrant and lawfully arrested them at a later time pursuant to that warrant, after which they would likely have experienced similar effects of having to pay bond, fearing re-arrest, injuries from handcuffs, and other things. (*Cf., e.g.*, Hr'g Tr. Vol. I,

70

75:21–76:11 (exchange with Mr. De Leon Zapata providing, "Q. Okay. Did your arrest in 2025 affect you differently than the arrest in 2023? A. (Through Interpreter) Yes. … THE COURT: How was it different in 2025? THE WITNESS: (Through Interpreter) In 2023, they let me call my friends to let them know that I was being arrested. THE COURT: Is that the only difference? THE WITNESS: (Through Interpreter) Yes").)

Finally, though Plaintiffs are suffering from the lingering effects of their arrests, they were not subject to ongoing unlawful treatment by Defendants when they filed their Complaint. *See, e.g.*, *Hussen*, 822 F. Supp. 3d at 1000–01. All four named Plaintiffs were released on bond, and there is no evidence that any were required to, for instance, wear ankle monitors or adhere to reporting requirements. *Cf. Ramirez Ovando*, 810 F. Supp. 3d at 1227 (finding plaintiffs' ankle monitors and reporting requirements to be continuing injuries sufficient to confer standing). This case is distinguishable from cases in which plaintiffs are found to have standing under this theory because they are still detained when they file their complaint or are continually denied some benefit, use, or license. *See, e.g.*, *O'Shea*, 414 U.S. at 496 ("Neither the complaint nor respondents' counsel suggested that any of the named plaintiffs at the time the complaint was filed were themselves serving an allegedly illegal sentence or were on trial or awaiting trial before petitioners."); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184–85 (2000) (finding standing where company was continuing to discharge pollutants into river near plaintiffs' homes); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51

71

(1991) ("[A]t the time the second amended complaint was filed, plaintiffs … had been arrested without warrants and were being held in custody without having received a probable cause determination, prompt or otherwise."); *Grendell*, 252 F.3d at 835 (finding that plaintiff's withdrawal from cases, as evidence of a chilling effect caused by fear of unconstitutionally imposed attorney sanctions, was an insufficient injury to support standing because plaintiff did not "present evidence that the Ohio Supreme Court currently threatens him with sanctions in any other case"). Plaintiffs' injuries are backward-looking, which is not sufficient to confer standing for equitable relief.

*  *  *

Ultimately, Plaintiffs have not shown an injury-in-fact, either through a certainly impending threat of future injury or a past injury with continuing adverse effects, that satisfies Article III's requirements for forward-looking relief. The Court thus lacks subject matter jurisdiction over their claims. As such, Defendants' Motion to Dismiss is **GRANTED**.

## IV. MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Because Plaintiffs lack standing to bring this case, the Court may not exercise subject matter jurisdiction over the action. Consequently, Plaintiffs' motions for a preliminary injunction and for provisional class certification in connection therewith are **DENIED as moot**.

72

## V.     CONCLUSION

Plaintiffs have not sufficiently shown a likelihood that a future injury is certainly impending, that there is a substantial risk of future injury, or that they experienced past unlawful conduct with continuing, present adverse effects. Therefore, they do not possess standing to seek injunctive or declaratory relief. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

Accordingly, Defendants' Motion to Dismiss (ECF No. 30) is **GRANTED**. Plaintiffs' Motion for Preliminary Injunction (ECF No. 12) and Motion for Provisional Class Certification (ECF No. 14) are **DENIED as moot**. Defendants' Motion *in Limine* to exclude Professor Blair's testimony (ECF No. 56) is **DENIED as moot**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

73